## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY,<br>   378 N. Main Ave.<br>   Tucson, AZ 85702<br><br>HEALTHY GULF,<br>   935 Gravier Street, Ste 700<br>   New Orleans, LA 70176<br><br>LOUISIANA BUCKET BRIGADE,<br>   2803 Saint Phillip Street<br>   New Orleans, LA 70119<br><br>RISE ST. JAMES,<br>   8581 Highway 18,<br>   St. James, LA 70086<br><br>     *Plaintiffs*,<br><br>     *v.*<br><br>U.S. ARMY CORPS OF ENGINEERS<br>   441 G St. NW<br>   Washington, DC 20314<br><br>LIEUTENANT GENERAL TODD T.<br>SEMONITE, in his official capacity as<br>Commanding General, U.S. Army Corps<br>of Engineers,<br>   441 G St. NW<br>   Washington, DC 20314<br><br>     *Defendants*. | Case No. _____<br><br>COMPLAINT FOR DECLARATORY<br>AND INJUNCTIVE RELIEF |

## INTRODUCTION

1.       Plaintiffs Center for Biological Diversity, Healthy Gulf, Louisiana Bucket

Brigade, and RISE St. James (collectively "Plaintiffs") challenge the actions and omissions of

the U.S. Army Corps of Engineers ("the Corps") in issuing federal permits and authorizations relating to the proposed FG LA LLC Plastics facility ("Plastics Facility") in St. James Parish, Louisiana.

2.      FG LA LLC ("Formosa") is a member of the Taiwanese conglomerate Formosa Plastics Group. Formosa seeks to build the Plastics Facility in a part of Louisiana known as "Cancer Alley." As reported by Bloomberg Businessweek on December 19, 2019, in an article titled *A Plastics Giant That Pollutes Too Much for Taiwan Is Turning to America*, Formosa Plastics Group faced a "crackdown" in Taiwan and is now trying to increase its operations in the U.S. Gulf Coast region. Formosa Plastics Group has already been found in violation of federal laws in the United States, with one district court judge concluding that a Formosa Plastics Group affiliate was a "serial offender" for discharging plastic pellets into Texas waterways. Federal documents show that another Formosa Plastics Group facility in Baton Rouge, Louisiana, has been in violation of the Clean Air Act every quarter since 2009.

3.      With this track record, Formosa now seeks to build a massive new petrochemical complex on the banks of the Mississippi River, on the site of former 19th century sugar plantations and in the heart of Cancer Alley. Cancer Alley stretches for 85 miles along the Mississippi River from New Orleans to Baton Rouge. The area is comprised of primarily low-income and African American communities, and contains a disproportionate concentration of refineries, chemical plants, and petrochemical plants compared to the rest of the nation. People living in this area suffer from an alarming rate of cancer and other health problems.

4.      The Plastics Facility would turn fracked gas into plastic chemicals and resins that are the building blocks for a wide range of plastic products, over 40 percent of which are used for packaging and other single uses. The Plastics Facility will have severe adverse consequences.

5.     Construction of the Plastics Facility would degrade and destroy wetlands that provide habitat for rare wildlife species, protect water quality, provide erosion protection, and act as a buffer to local communities from the worst effects of flooding. Construction would also impact important cultural and historic resources, including slave burial grounds.

6.     Each year, the Plastics Facility would emit thousands of tons of soot, smog, and other toxic chemicals, which would further sicken communities and degrade the environment. Along with other air pollutants, the Plastics Facility would emit harmful greenhouse gas pollution. Greenhouse gas emissions from the Plastics Facility are estimated to exceed 13.6 million tons per year, the equivalent annual emissions of three coal-fired power plants. These emissions would contribute to the climate crisis and exacerbate Louisiana's susceptibility to flooding, land loss, and storm surges. Wetlands destroyed during construction of the Plastics Facility would remove some of the natural buffers against these impacts.

7.     The Plastics Facility is expected to discharge pollutants that are carcinogens and endocrine disruptors, as well as plastic pellets and other materials, into the Mississippi River. This pollution would harm wetlands, wildlife, and public health. Nearly one million people downstream from the proposed site rely on the Mississippi River for drinking water. In addition, the Plastics Facility will create the building blocks for single-use plastic products that already litter our oceans and choke marine life.

8.     The harms from the Plastics Facility are likely to be much higher than disclosed, as Formosa Plastics Group and its affiliates have a long track record of violating environmental, health, and safety regulations. These violations have resulted in chemical explosions and illegal emissions and discharges.

9.      Furthermore, the Plastics Facility is sited on two 19th century sugarcane plantations, which include two cemeteries that contain the remains of enslaved people. The Corps determined that the Plastics Facility would not impact the boundaries of the Buena Vista Cemetery and that a previous landowner excavated and may have destroyed the Acadia Cemetery, but information the State of Louisiana recently released to Plaintiffs indicates that none of the assessments conducted for the Acadia Cemetery and relied upon by the Corps for its historic resources analysis and determination were conducted in the correct location.

10.      On September 5, 2019, the Corps issued a permit, pursuant to Section 404 of the Clean Water Act, authorizing the dredge and fill activities needed to construct the Plastics Facility. These activities will result in the destruction of wetlands and the discharge of pollutants that pose a threat to public health and the environment. Also on September 5, 2019, the Corps issued the required authorizations under Section 10 of the Rivers and Harbors Act.

11.      With this action, Plaintiffs seek full disclosure of the impacts on the human environment of permitting this massive petrochemical complex. The Corps failed to prepare an Environmental Impact Statement ("EIS"), in violation of the National Environmental Policy Act, ("NEPA"), 42 U.S.C. §§ 4321, *et seq.*, and its finding that the project would have no significant environmental effect was based on a deeply flawed and inadequate Environmental Assessment. The Environmental Assessment failed to take the legally required "hard look" at the direct, indirect, and cumulative impacts of the Corps' decision to authorize the construction of the Plastics Facility and failed to analyze a reasonable range of alternatives to that decision.

12.      In addition, the Corps violated the Clean Water Act and the Rivers and Harbors Act when it overlooked major consequences of the Plastics Facility in finding the project to be in the public interest and when it failed to adopt the least environmentally damaging alternative.

13.     Finally, the Corps violated the National Historic Preservation Act when it failed to conduct an adequate historic properties consultation and determination. It prepared its "no effect" determination before an additional site survey was prompted by more detailed information provided by an independent researcher unaffiliated with Formosa or the State of Louisiana. This new information indicates that none of the site surveys undertaken to date for the cemeteries where enslaved people were buried, one of which is located on wetlands that will be permanently impacted by the Plastics Facility, have been adequate.

14.     Plaintiffs seek a declaration that the Corps violated NEPA, the Clean Water Act, the Rivers and Harbors Act, and the National Historic Preservation Act when it issued the permits and authorizations for the Plastics Facility and an order vacating those decisions.

## JURISDICTION AND VENUE

15.     Plaintiffs state a claim under the Administrative Procedure Act, 5 U.S.C. §§ 701-706 ("APA"), which authorizes a federal court to find unlawful and set aside any final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A). Jurisdiction arises under 28 U.S.C. § 1331 (federal question jurisdiction), 28 U.S.C. § 2201 (declaratory relief), and 28 U.S.C. § 2202 (injunctive relief).

16.     Venue in this district is appropriate under 28 U.S.C. § 1391(e) because it is the district in which the Defendants reside.

## PARTIES

17.     Plaintiff Center for Biological Diversity ("the Center") is a non-profit organization with approximately 67,000 active members nationwide. The Center is headquartered in Arizona and maintains offices across the country, including in Washington, D.C. The Center works through science, law, and policy to secure a future for all species, great

or small, hovering on the brink of extinction. The Center's mission also includes protecting air quality, water quality, and public health. In pursuit of this mission, the Center has been working to stem the environmental and public health harms from plastics production in the Gulf region and nationwide.

18.     Plaintiff Healthy Gulf is a nonprofit organization headquartered in New Orleans. Healthy Gulf is committed to restoring the Gulf of Mexico to an ecologically and biologically sustainable condition. Healthy Gulf members and supporters live, work, and recreate in the five Gulf states of Louisiana, Texas, Mississippi, Alabama, Florida, and nationwide. Healthy Gulf's members and supporters include fishers, kayakers, canoers, and others who value the Mississippi River as part of their cultural heritage, as a natural resource, and, often, as essential for their livelihoods. Healthy Gulf has long been concerned by what it perceives as the Corps' mismanagement of the Mississippi River, as well as other riverine and coastal wetlands. As a result, Healthy Gulf has monitored wetlands that are the subject of Section 404 dredge and fill permits and other Corps' permitting in the Gulf of Mexico, and filed comments and legally challenged the Corps' permitting of wetlands destruction.

19.     Plaintiff Louisiana Bucket Brigade is an environmental health and justice organization with members who live in the shadow of Louisiana's oil refineries and chemical plants, including in St. James. Louisiana Bucket Brigade's mission is to bring about a Louisiana that is healthy, prosperous, and pollution-free. Louisiana Bucket Brigade uses grassroots organizing and action to hold the petrochemical industry and government accountable for the true costs of pollution from petrochemical operations and hasten the transition from fossil fuels to cleaner forms of energy.

20.     Plaintiff RISE St. James is a faith-based environmental and social justice organization based in St. James, Louisiana, fighting for the removal of harmful petrochemical pollution from the air, land, water, and bodies of the people in St. James Parish. RISE St. James' membership consists entirely of St. James residents advocating for racial, social, and environmental justice. These members are extremely concerned about the impacts of toxic pollution in their communities, and as a result, have been very active in opposing Formosa's Plastics Facility and other proposed petrochemical facilities in St. James.  Also by virtue of their multi-generational ties to the land of St. James Parish that reaches back to the days of slavery, RISE St. James is deeply concerned about the protection of the local sites where their community's enslaved ancestors are buried. RISE St. James opposes the disturbance or removal of local cemeteries of enslaved people; reverence for the lives led by historically enslaved people should be paramount.

21.     Plaintiffs have individual members who live in or near St. James Parish; regularly visit this area, including wetlands and riverine areas near and downstream of the project site; and intend to use and enjoy these areas in the near future and beyond. They use and enjoy these areas for a variety of purposes, including wildlife and nature observation and fishing, and intend to continue to use and enjoy these areas in the near future and beyond. Many members' families have lived in this region for generations and feel spiritually connected to the Mississippi River and the cultural and natural landscape surrounding it.

22.     Plaintiffs' members are concerned that wetlands destruction will harm wildlife and leave their community more vulnerable to flooding. They are concerned that toxic air and water emissions from the Plastics Facility will harm their health and the environment, including by causing cancer, respiratory, and skin issues and by potentially contaminating their drinking

water. They are concerned that construction and operation of the Plastics Facility will lead to increased truck and barge traffic and increased noise levels that will further pollute their environment and also jeopardize their safety. They are also concerned that the addition of the Plastics Facility to the area will further decrease their already diminished property values.

23.     For example, one of Plaintiffs' members lives three miles from the proposed Plastics Facility, and her grandparents, whom she visits on a regular basis, live two miles away from the proposed Plastics Facility. She enjoys observing wildlife but has noticed that increased flooding has disrupted wildlife patterns by driving animals such as wild boars, coyotes, and foxes from their normal habitat in forested wetlands. She is concerned that the proposed Plastics Facility and its impacts to wetlands will further impact wildlife and decrease her ability to observe animals in the wild, including migratory birds. She is also concerned about toxic air and water emissions. She has sensitive skin and allergies and has noticed that her allergies and skin issues have increased along with the increase in petrochemical industrial facilities locating in the region. She is concerned that the Plastics Facility would exacerbate these conditions and also expose young children in her community to respiratory, skin, and other ailments. She obtains her drinking water from the Mississippi River and is concerned that her drinking water will be contaminated by discharges of chemicals and plastic into the Mississippi River near where she lives.

24.     Another member who has lived in St. James Parish for 68 years lives two-and-a-half miles away from the proposed Plastics Facility and can smell the petrochemical pollution from existing plants inside of his house for several hours every night. He is concerned that the proposed Plastics Facility would exacerbate these noxious odors. He is concerned for his health and for the health of his community. For example, he is concerned that his neighbor, who has

colon cancer, was made ill due to proximity to the chemical industry. He is concerned that the Plastics Facility would further degrade nearby wildlife. He has fished in the Mississippi River for many years but has noticed that the consistency of the fish meat has changed over the past few decades and believes this is due to the increase in industrial activities nearby. If the proposed Plastics Facility was built, he would be wary of eating the fish he catches because of concerns that they may have ingested plastic.

25.     Plaintiffs and their members have an interest in ensuring industrial activities in St. James Parish do not further harm the environment through the Clean Water Act and Rivers and Harbors Act permitting processes. Plaintiffs and their members also have interests in the preparation of comprehensive environmental analyses required under NEPA and historic property consultations and determinations under the National Historic Preservation Act. Plaintiffs submitted comments on the draft Clean Water Act and Rivers and Harbors Act permits and Formosa's Environmental Assessment Statement (the draft Environmental Assessment submitted by Formosa), as well as the proposed air and land use approvals for the Plastics Facility.

26.     Plaintiffs and their members have been and are suffering, and will continue to suffer irreparable injury as a result of the Corps' approval of the Plastics Facility and its failure to comply with NEPA, the Clean Water Act, the Rivers and Harbors Act, and the National Historic Preservation Act. The Corps' approval specifically allows Formosa to discharge fill into forested wetlands, permanently harming those wetlands, to construct the Plastics Facility. The approval also allows the construction of the Plastics Facility, which is expected to emit and discharge a variety of pollutants, including carcinogens and endocrine disrupters, into the air and water; discharge plastic into the Mississippi River and other waterbodies; and impact cultural

and historic resources. The Corps' approval of the Plastics Facility, based on an inadequate environmental review and failure to consider mandatory factors under the law, injures the health, recreational, economic, professional, scientific, cultural, historic, and aesthetic interests of Plaintiffs and their members.

27.     The Corps' failure to follow the requisite procedures when approving the Plastics Facility deprives Plaintiffs and their members of information to which they are entitled under NEPA and the National Historic Preservation Act, including information pertaining to the full effects of this behemoth petrochemical facility located in Cancer Alley and along the Mississippi River; reasonable alternatives to the proposed action; and available measures to mitigate adverse environmental impacts, including to cultural and historic resources. This lack of required public information has injured Plaintiffs and their members by depriving them of a meaningful opportunity to comment on the missing information and denying them the procedural safeguards required by NEPA and the National Historic Preservation Act to ensure that the Corps carefully considers the direct, indirect, and cumulative effects of its proposed actions; environmentally superior alternatives to that action; and appropriate mitigation measures prior to allowing construction of a new petrochemical facility.

28.     Defendant U.S. Army Corps of Engineers is a federal regulatory agency that is organized under the U.S. Department of Defense. The Corps is headquartered in Washington, D.C. It is authorized by federal law to issue permits and authorizations for activities involving the discharge of dredged or fill materials into waters of the United States, including wetlands, upon satisfaction of certain conditions.

29.     Defendant Lieutenant General Todd T. Semonite is sued in his official capacity as the Chief of Engineers and Commanding General of the U.S. Army Corps of Engineers. As

Commanding General, he is ultimately responsible for the issuance of all Army Corps permits. He issued the Clean Water Act Section 404 Permit and authorization under Section 10 of the Rivers and Harbors Act. These decisions are the final agency actions challenged in this case.

30.     Plaintiffs have suffered and will suffer actual, concrete injuries that are traceable to the Corps' conduct and would be redressed by the requested relief. Plaintiffs have no adequate remedy at law.

## STATUTORY BACKGROUND

### A.     <u>Clean Water Act</u>

31.     Congress enacted the Clean Water Act to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To accomplish this goal, the Clean Water Act prohibits the discharge of any pollutant, including fill material, into waters of the United States unless authorized by a permit. *Id*. §§ 1311(a); 1344(a)–(e).

32.     The Corps is authorized to permit site-specific discharge permits under Section 404 on a case-by-case basis if certain environmentally-protective criteria have been met. *Id.* § 1344(a). The Corps cannot issue a permit for discharge of fill material "which will cause or contribute to significant degradation of the waters of the United States." 40 C.F.R. § 230.10(c). The Corps may not issue a permit under Section 404 unless and until the applicant has demonstrated that there is no practicable alternative to the proposed discharge "which would have less adverse impact." *Id.* § 230.10(a). Where the discharge is proposed for a special aquatic site, such as a wetland, and the project is not water dependent, "practicable alternatives that do not involve special aquatic sites are presumed to be available, unless clearly demonstrated otherwise." *Id.* § 230.10(a)(3). The applicant must also demonstrate that steps have been taken to "minimize potential adverse impacts of the discharge." *Id.* § 230.10(d).

33.     Before issuing a permit under Section 404, the Corps must undertake a review that involves, among other things, site-specific documentation and analysis; public notice and opportunity for public hearings; a public-interest review; an economic analysis; and consultation with other federal agencies. 33 U.S.C. § 1344; 33 C.F.R. § 320.4.

**B.     Rivers and Harbors Act**

34.     The Rivers and Harbors Act of 1899 is the nation's oldest environmental law. The statute prohibits a number of activities that impair ports, channels, and other navigable waters. Section 10, 33 U.S.C. § 403, among other things, makes it unlawful "to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of" any navigable water without a permit from the Corps.

35.     Before issuing a permit under Section 10 of the Rivers and Harbors Act, the Corps must undertake an "evaluation of the probable impacts, including cumulative impacts, of the proposed activity and its intended use on the public interest. . . . The benefits which reasonably may be expected to accrue from the proposal must be balanced against its reasonably foreseeable detriments." 33 C.F.R. § 320.4(a)(1).  The Corps may not grant a Section 10 permit unless it finds the permit is in the public interest. *Id.*

**C.     National Environmental Policy Act**

36.     The National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4347, "is our basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a).

37.     A primary objective of NEPA is to ensure that agencies like the Corps "make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment." 40 C.F.R. § 1500.1(c).  NEPA also seeks to facilitate informed decision-making and public participation by requiring "that environmental

information is available to public officials and citizens before decisions are made and before actions are taken." *Id.* § 1500.1(b). Furthermore, Congress specified that to carry out NEPA's policy, federal agencies have continuing responsibility to "preserve important historic, cultural, and natural aspects of our national heritage." 42 U.S.C. § 4331(b)(4).

38.     To accomplish these objectives, NEPA requires agencies to fully disclose all the potential environmental impacts of a proposed action. 42 U.S.C. § 4332(2)(C). Agencies must use accurate information and ensure the scientific integrity of this analysis. 40 C.F.R. § 1502.24. The agency must disclose if information is incomplete or unavailable and explain "the relevance of the incomplete or unavailable information to evaluating reasonably foreseeable significant adverse impacts." *Id.* § 1502.22(b)(1)-(2).

39.     If an agency action has effects that may be "significant," an agency must prepare an Environmental Impact Statement ("EIS"). 42 U.S.C. § 4332(2)(C). To determine whether an impact is "significant," an agency must analyze the "context" within which the action would occur, including the societal, regional, and local contexts, as well as the "intensity" of the proposed action. 40 C.F.R. § 1508.27. The "intensity" of the action derives from the degree to which the proposed action affects public health and safety, unique characteristics of the geographic area "such as proximity to historic or cultural resources," the degree to which possible effects are "highly uncertain" or involve "unique or unknown risks," the degree to which the action and the degree to which effects are likely to be "highly controversial," among other factors. *Id*. § 1508.27(b).

40.     If it is unclear whether impacts are significant enough to warrant an EIS, the agency may prepare an Environmental Assessment to assist in making that determination. *Id*. § 1501.4.

41.    An agency's Environmental Assessment must discuss the need for the proposal, alternatives, and the environmental impacts of the proposed action and its alternatives. *Id.* § 1508.9. The Environmental Assessment must analyze not only the direct impacts of a proposed action, but also the indirect and cumulative impacts. *Id.* §§ 1508.7, 1508.8, 1508.25. The direct effects of an action are those effects "which are caused by the action and occur at the same time and place." *Id.* § 1508.8(a). The indirect effects of an action are those effects "which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." *Id.* § 1508.8(b). Cumulative impacts are the result of any past, present, or future actions that are reasonably certain to occur. *Id.* § 1508.7. Such effects "can result from individually minor but collectively significant actions taking place over a period of time." *Id.*

42.    The effects of an action include "ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative." *Id.* § 1508.8.

43.    Agencies must also consider the environmental justice implications of a proposed project. During the NEPA process, "each Federal agency shall make achieving environmental justice part of its mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations in the United States . . . ." Exec. Order 12,898, 59 Fed. Reg. 7629 (Feb. 16, 1994).

44.    If, after taking a "hard look" at the impacts, the agency determines an EIS is not required, the agency must provide a convincing statement of reasons why the project's impacts

are insignificant and issue a Finding of No Significant Impact, or "FONSI." 40 C.F.R. §§ 1501.4, 1508.9, 1508.13.

45.     Conversely, if an action may have a significant effect on the environment, or even if there are substantial questions as to whether it may, the agency must prepare an EIS. *See* 42 U.S.C. § 4332(2)(C).

### D.    National Historic Preservation Act

46.     Congress enacted the National Historic Preservation Act of 1966 with the express intent that "the historical and cultural foundations of the Nation should be preserved as a living part of our community life and development in order to give a sense of orientation to the American people." Pub. L. 89-665, 80 Stat. 915 (1966).

47.     Section 106 of the National Historic Preservation Act requires federal agencies involved in an "undertaking," which includes projects requiring a federal permit, to "take into account the effect of the undertaking on any historic property." 54 U.S.C. § 306108. An "historic property" is "any prehistoric or historic district, site, building, structure, or object that is included on, *or eligible for* inclusion on, the National Register [of Historic Places], including artifacts, records, and material remains relating to the district, site, building, structure, or object." *Id*. § 300308 (emphasis added). Criteria for evaluation include "districts, sites, buildings, structures, and objects . . . that are associated with events that have made a significant contribution to the broad patterns of history" or "that have yielded, or may be likely to yield, information important in prehistory or history." 36 C.F.R.§ 60.4.

48.     The regulations implementing the National Historic Preservation Act provide for the protection of any cemetery that "derives its primary significance from graves of persons of

transcendent importance, from age, from distinctive design features, or from association with historic events." 36 C.F.R. § 60.4(d).

49.     The National Park Service's National Register Bulletin 41, *Guidelines for Evaluating and Registering Cemeteries and Burial Places,* recognizes that the public "can gain information significant in American culture from burial places" that may be eligible for inclusion on the National Register. The Bulletin provides the example of "West Africans carried in the slave trade to the east coast of America, and their descendants, who "adapted traditional burial rites to plantation and community life."

50.     The National Historic Preservation Act is designed to ensure that federal decision-makers thoroughly evaluate and address the impacts of their proposed actions on historic properties prior to taking final action. The Act's "take into account" or "Section 106" process requires federal agencies to identify and disclose historic properties within affected areas; evaluate the potential adverse effects of the federal undertaking to the historic properties; and seek ways to avoid, minimize, or mitigate any adverse effects to the historic properties before granting permits or approvals for a project. 36 C.F.R. §§ 800.4-800.6. The Section 106 process also requires the action agency to seek and consider the views of the State Historic Preservation Officer and the public regarding the undertaking and its effects on historic properties. *Id.* § 800.2(c), (d).

### E.     Administrative Procedure Act

51.     Judicial review of federal agency action is governed by the Administrative Procedure Act ("APA"), 5 U.S.C. § 551-706.

52.     Under the APA, courts "shall hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with the law" or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D). Courts shall also set aside agency action "unlawfully withheld or unreasonably delayed." *Id.* § 706(1).

## FACTS AND PROCEDURAL BACKGROUND

### A.    <u>The Plastics Facility Is Part of a Massive Plastics Production Boom</u>

53.     Formosa turns fossil fuels—including fracked gas—into base chemicals and resins that will eventually be molded into consumer plastics products such as plastic bottles, single-use packaging, plastic grocery bags, and artificial turf, as well as commercial and industrial products.

54.     Formosa's proposed Plastics Facility is part of a larger trend. An oversupply of cheap fracked gas in the United States is driving a boom in domestic plastics production, with $204 billion of new investments announced for hundreds of new and expanded projects by 2025, with more investment on the horizon. By 2025, domestic production capacity of the chemical components needed to manufacture plastic is expected to increase by more than a third. As a result, it is estimated that by 2050, plastics could outweigh fish in the oceans. This new infrastructure would lock in generations of plastics production, undermining public efforts to reduce plastics consumption to reverse the plastic pollution crisis.

55.     The plastics infrastructure expansion is planned primarily on the Gulf Coast because of its proximity to fracked gas from the Bakkan Shale and Permian Basin. The low-income communities and communities of color who live and work there are already overburdened with pollution from refineries, petrochemical factories, and other industrial activities. These communities are also already experiencing the impacts of the climate crisis, including increased flooding, storm surges, and severe weather.

**B.      The Plastics Facility Would Harm Public Health, the Environment, and Cultural and Historic Resources**

56.      The project site for the Plastics Facility is 2,400 acres of undeveloped fields and wetlands along the Mississippi River that were the site of two 19th century sugar plantations. The site includes 909 acres of mostly forested wetlands that serve as feeding and nesting habitat for bald eagles and as many as 25 other species of protected migratory birds. Three federally endangered species have the potential to occur in the vicinity of the site: the Pallid sturgeon, the Atlantic sturgeon, and the West Indian manatee.

57.      The Plastics Facility would include the construction of a $9.4 billion petrochemical complex, including 10 chemical plants as well as support facilities. The complex would include two ethylene production units, two ethylene glycol production units, two high-density polyethylene production units, one limited low-density polyethylene production unit, one propylene plant, one polypropylene production unit, one low-density polyethylene production unit, two utility plants, a central wastewater treatment plant, haul roads, and logistics, storage, and loading facilities.

58.      Construction of the Plastics Facility would permanently impact 61.7 acres of wetlands and 49.7 acres of other waters of the United States. This includes filling wetlands on the bank of the Mississippi River as well as constructing multiple detention ponds in the wetlands. The impacted wetlands serve important ecological functions—such as wildlife habitat and a buffer against flooding, land loss, and storm surges. Once lost, the wetlands cannot be easily replaced, if at all.



The site of the proposed Plastics Facility. *Photo*: Center for Biological Diversity, 2019

59.     The Plastics Facility would emit massive amounts of toxic air pollutants. It would emit almost 3,000 tons per year of carbon monoxide, soot, and smog-forming pollutants. These pollutants can cause or worsen respiratory ailments, including emphysema, bronchitis, and asthma, and can cause or aggravate existing heart disease—leading to increased hospital admissions and premature death. In addition, the Plastics Facility would emit more than 800 tons per year of hazardous air pollutants, including benzene, ethylene oxide, butadiene, formaldehyde, and acetaldehyde. These pollutants have adverse impacts on the reproductive, developmental, renal, neurological, and respiratory systems, and many are known or probable carcinogens.

60.     The Plastics Facility would discharge massive amounts of toxic chemicals into waters of the United States, including but not limited to polycyclic aromatic hydrocarbons, benzene, butadiene, and phthalates. These toxic chemicals have been linked to cancer, immune system suppression, organ damage, and endocrine disruption. In addition, the Plastics Facility would discharge plastic pellets, flakes, granules, and/or powders into wetlands and the

Mississippi River. The chemical and plastic pollution would be eaten by wildlife, collect in sediments, and contaminate drinking water resources.

61.     The Plastics Facility would both exacerbate the climate crisis and leave Louisiana residents less able to withstand its impacts. The Plastics Facility would emit more than 13.6 *million* tons per year of greenhouse gases—the equivalent annual emissions of three coal-fired power plants. This figure underestimates the climate impacts of the Plastics Facility because it only counts emissions from operating the facility itself and does not account for emissions from the power transmitted to the facility or for emissions from the entire lifecycle of plastics production—from fracking for feedstock, to transporting fracked gas, to eventual disposal in incinerators, landfills, or oceans. The Plastics Facility would be in a low-lying area and susceptible to flooding and storm surges, and the loss of wetlands would remove buffers against these impacts.

62.     The aforementioned impacts address only permitted discharges and emissions from the Plastics Facility. Because Formosa Plastics Group and its affiliates have a long, documented history of violations of environmental and health and safety regulations, adverse impacts may be much more severe. Emissions and discharges may be greater than allowable limits, and explosions and malfunctions may further endanger workers and communities nearby.

63.     Federal documents demonstrate that a Formosa Plastics Group facility in Baton Rouge has been in violation of the Clean Air Act every quarter since 2009. As noted above, residents of Texas sued a Formosa Plastics Group affiliate over its illegal discharge of billions of plastic pellets into Cox Creek and Lavaca Bay from its Point Comfort facility. In June 2019, a federal district judge held Formosa liable for "enormous" violations and concluded that "Formosa is a serial offender, violating its Permit concerning discharge of floating solids." *San*

*Antonio Bay Estuarine Waterkeeper v. Formosa Plastics Corp.*, No. 6:17-cv-0047, 2019 U.S. Dist. LEXIS 108082, at *26 (June 27, 2019). On December 3, 2019, the court approved a $50 million settlement agreement between the parties to pay for environmental cleanup and education projects in the region. Between 2000 and 2019 alone, federal documents show that Formosa Plastics Group and its affiliates violated federal environmental, workplace health and safety, and railroad safety regulations 69 times and incurred $20.8 million in government penalties (which do not include clean-up costs).

64.     The Plastics Facility will also impact cultural and historic resources. The Corps identified four archeological sites on the Formosa property: the Winchester Plantation, the Acadia Plantation, and two unnamed sites that contain historic brick and mortar fragments and artifact surface scatter.

65.     The Corps also acknowledged two cemeteries within the permit area that are illustrated on an 1877 map: the Acadia Cemetery and the Buena Vista Cemetery. The Corps stated that the Buena Vista Cemetery contains the remains of the plantation owner's family and that the Acadia site contains the remains of formerly enslaved people that worked on the plantation. Documents from the State of Louisiana indicate both cemeteries contain the remains of enslaved peoples.

66.     The Acadia Cemetery is located within the 61.7 acres of wetlands that the Plastics Facility will permanently impact.

67.     The Corps concluded that further action was unnecessary because the Buena Vista Cemetery is outside of the project's area of potential effects, and the Acadia Cemetery historically existed within what is now a modern borrow pit excavated by the previous landowners in 2013. The Corps noted that it is suspected that these pits "may have destroyed and

relocated" the remains of the Acadia Cemetery, which had not been found in the cultural resources surveys conducted for the property.

68.     The Corps added that the project will be subject to the standard change of scope of work, unexpected discovery, and Louisiana Unmarked Burial Sites Act provisions.

69.     On January 29, 2019, the Corps submitted its determination that no historic properties would be affected to the State Historic Preservation Office ("SHPO") and the tribal liaison. The Corps noted that the SHPO concurred with its determination in letters dated November 3, 2018, and December 20, 2018, indicating that the SHPO had no objection to future development of this area and also concurred with the proposed plan to fence the location of the Buena Vista Cemetery.

70.     The EA acknowledges that "after this issue was settled," an anonymous source provided information to the SHPO indicating that Formosa's archeologist had surveyed the wrong areas and that the cemeteries were likely located in different locations than searched. Formosa's archeologist went back onsite to look for the Acadia Cemetery and found nothing but did determine that the Buena Vista Cemetery had different boundaries. According to the Corps, on June 27, 2019, the SHPO provided its concurrence. Based on this information, the Corps determined that it had fulfilled its responsibilities under Section 106 of the National Historic Preservation Act.

71.     Public records released by the State Division of Archeology reveal that there were extensive communications between the anonymous source and the head of the Louisiana Division of Archeology about the potential existence and correct location of the Acadia Cemetery. The records also reveal extensive communications about the cemeteries between Formosa's representatives and the Division of Archeology as well as the Louisiana Attorney

General's office. The confirmation of the Acadia Cemetery could, for example, require the relocation of the planned utility plant and possibly other facilities at the Plastics Facility. The anonymous source, an independent researcher with a more detailed historic map of the area, told the Division of Archeology that the researcher was greatly concerned that Formosa's archeologist had not examined the correct area and that this could result in destruction of the Acadia Cemetery. There is no indication that the results of the final June 2019 survey were provided to the anonymous source for review or that the Army Corps verified that the location, methodology, or results of this survey were thorough, accurate, and complied with applicable standards and guidelines.

72.     On November 14, 2019, Plaintiffs submitted a Freedom of Information Act request to the Corps for more information about its National Historic Preservation Act determination and the recent developments. On December 18, 2019, Plaintiffs submitted a letter to the Corps urging it to investigate this issue in more depth and consider additional measures to ensure the accuracy of its conclusions and protection of the Acadia Cemetery and other historic properties on the Formosa site before it is converted to a petrochemical complex. Plaintiffs have received no response to either request as of the date of this filing.

### C.     The Plastics Facility Would Be an Environmental Justice Disaster

73.     Along with affecting wetlands and cultural and historic resources, the Plastics Facility would disproportionately impact today's residents of St. James Parish, who are predominantly low-income and African American communities that are already overburdened by petrochemical pollution. The Plastics Facility would be situated in the 5th District of St. James, which is 87 percent African American, near communities such as Freetown, a town founded by former slaves.  It is less than a mile from a primary school and a church. Local residents have

complained to state and federal officials that too many people in their community are sick or have died from toxic exposures from area industry.

74.     According to U.S. Environmental Protection Agency data, residents within two miles of the Plastics Facility are more likely than over 90 percent of residents statewide to be exposed to air toxics and cancer risks, soot, and wastewater discharge. In fact, the area around the Plastics Facility has been dubbed Cancer Alley because of the devastating health impacts caused by a confluence of chemical plants and refineries located there.  Many residents of St. James are opposed to the project because they do not want more pollution in their communities and feel like they are targets of environmental racism.

75.     Contrary to the purported economic benefits touted by Formosa, the Plastics Facility could further economically devastate surrounding communities. The Plastics Facility would receive $1.4 billion in local property tax exemptions—money that is sorely needed for schools, hospitals, and other public services and infrastructure. Residents are concerned the chemical industry has already changed their community and made it a less desirable place to be, with several schools, businesses, and the post office in District 5 closed in recent years as the chemical industry continued to expand. Home values, which in many cases represent the primary or sole assets for their owners, will likely continue to plummet near these industrial facilities, further compounding these deleterious effects.

### D.      **The Challenged Action**

76.     On August 27, 2018, the Corps issued a joint notice with the Louisiana Department of Environment Quality informing the public that Formosa had applied for Clean Water Act Section 404 and Rivers and Harbors Act Section 10 permits to discharge fill into the Mississippi River during construction of the Plastics Facility.

77.     Formosa requested authorization from the Corps to construct and maintain a "Petrochemical Complex and Marine Facility," which would include the construction of a dock, water intake structure, water discharge structure, heavy haul Mississippi River levee crossing/road, barge dock, and ship dock. In addition, the Plastics Facility would include a rail complex, power generation facilities, pipelines for importing and exporting materials, waste water treatment plant, and several storm water detention ponds.

78.     The Joint Notice stated that the Corps was unaware of properties listed on the National Register of Historic Places near the Plastics Facility and that the possibility exists that the proposed work may damage or destroy presently unknown archeological, scientific, pre-historical, historical sites, or data.  The Corps stated that it sent copies of the notice to the State Archeologist and the SHPO.

79.     On September 25, 2018, the Center, the Louisiana Bucket Brigade, and the Gulf Restoration Network (now Healthy Gulf) submitted comments on the permit applications to the Corps. These comments stated, *inter alia,* that approving the applications without performing an EIS would violate NEPA, and that the applicant's Environmental Assessment Statement was deficient because it improperly ignored indirect and cumulative impacts. The comments further stated that Formosa's proposal failed to satisfy the standards of the Clean Water Act, the Rivers and Harbors Act, and implementing guidelines because the proposed discharge was not in the public interest, was not the least environmentally damaging practicable alternative, would not minimize potential harm to the aquatic ecosystem, and was likely to cause or contribute to the degradation of the waters of the United States.

80.     On September 5, 2019, the Corps issued a Clean Water Act Section 404 permit and Rivers and Harbors Act Section 10 permit to Formosa.

81.     The Corps did not prepare an EIS for their decision. Instead, the Corps issued an Environmental Assessment and FONSI.

82.     The Corps authorized "unavoidable direct, permanent impacts" to 53.2 acres of herbaceous wetlands, 8.5 acres of forested wetlands, and 49.7 acres of other waters of the United States.

83.     The Corps adopted Formosa's declaration that the overall project purpose is the construction of a "plastics manufacturing facility to meet the public's demand for plastic around the world." The Corps concluded the Plastics Facility was not water dependent and therefore did not need to be sited within or adjacent to a special aquatic site to fulfill its basic purpose. However, the Corps determined that access to the Mississippi River for transportation of materials, supplies, and equipment was "essential."

84.     Despite acknowledging that the "entire project lies within Corps jurisdiction," the Corps declined to consider the impacts of air or water pollution resulting from the Plastic Facility's construction and operation. Accordingly, the permits and their accompanying NEPA and public-interest evaluations are silent on air and water pollution, human health risks, and a variety of other impacts.

85.     However, while defining the scope of the project narrowly to exclude the risks and impacts of operating the project, the Corps' decision touted the putative economic benefits of operating the Facility. The Corps did not disclose that such benefits are contingent on exposing the residents, wetlands, and waters of Louisiana to serious environmental impacts and risks.

86.     In its alternatives analysis pursuant to NEPA and the Clean Water Act, the Corps limited its evaluation of alternative sites to those which met Formosa's criteria; namely, the site

must be 800 acres or more in size; have a rail line running through it; have Mississippi Rover dock access; have high voltage energy transmission lines; and have access to ethylene, ethane, and natural gas pipelines on the property, among other features. Due to the exacting criteria Formosa provided and the Corps accepted, the Corps did not seriously evaluate any sites other than the preferred alternative.

87.     The Corps also concluded that no historic properties as defined by the National Historic Preservation Act and its implementing regulations, 36 C.F.R. § 800.16(l), are present on the Formosa project site, and that the project would be subject to the standard change of scope of work, unexpected discovery, and provisions of Louisiana's Unmarked Human Burial Sites Preservation Act.

## FIRST CAUSE OF ACTION: VIOLATION OF THE APA AND NEPA
### Failure to Prepare an Environmental Impact Statement

88.     Plaintiffs re-allege and incorporate, as if fully set forth herein, each and every allegation in the preceding paragraphs of this Complaint.

89.     NEPA requires a federal agency to prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

90.      The Corps' issuance of a Section 404 permit under the Clean Water Act is a major federal action within the meaning of NEPA. The Corps' issuance of a Section 10 permit under the Rivers and Harbors Act is a major federal action within the meaning of NEPA.

91.     NEPA's implementing regulations specify factors that the Corps must consider in determining whether an action may significantly affect the environment warranting an EIS. 40 C.F.R. § 1508.27(b).

92.     The Corps' authorizations to construct and maintain the Plastics Facility implicate nearly every NEPA significance factor for when an EIS is required: it may have adverse impacts; it may affect public health or safety; it may affect geographically unique areas, including historic or cultural resources; it is highly controversial; it is related to other actions with individually insignificant but cumulatively significant impacts; and it may cause a violation of federal or state law imposed for the protection of the environment. 40 C.F.R. § 1508.27.

93.     Yet the Corps determined that its issuance of permits for the Plastics Facility would not have significant environmental impacts and did not require the preparation of an EIS.

94.     The Corps' decision that the Plastics Facility would have no significant environmental impacts and its permitting of the facility without first preparing an EIS was arbitrary, capricious, an abuse of discretion, not in accordance with NEPA or its implementing regulations, and in violation of the APA, 5 U.S.C. § 706(2). Alternatively, the Corps' failure to prepare an EIS before permitting and authorizing the Plastics Facility constitutes an agency action unlawfully withheld or unreasonably delayed, in violation of the APA. *Id.* § 706(1).

**SECOND CAUSE OF ACTION: VIOLATION OF THE APA AND NEPA**
**Issuance of Inadequate Environmental Assessment and Finding of No Significant Impact**

95.     Plaintiffs re-allege and incorporate, as if fully set forth herein, each and every allegation in the preceding paragraphs of this Complaint.

96.     An Environmental Assessment must take a "hard look" at the environmental impacts of an agency's decision before an agency acts, *see* 40 C.F.R. § 1500.1, and include a discussion of the need for the proposal, alternatives to the proposal, and the environmental impacts of the proposal and the alternatives. *Id.* §§ 1502.13-16, 1508.9(b). An Environmental

Assessment must "provide sufficient evidence and analysis for determining whether . .  a finding of no significant impact" is sufficient. *Id.* § 1508.9(a)(1).

97.     The Corps' Environmental Assessment and FONSI fail to comply with NEPA and its implementing regulations in multiple respects, including but not limited to:

### A.     <u>Indirect and Cumulative Impacts Analysis</u>

98.     An Environmental Assessment must discuss a proposed action's direct, indirect, and cumulative effects. Indirect effects "are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." 40 C.F.R. § 1508.8(b). These "may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effect on air and water and other natural systems." *Id.* . Cumulative effects are "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions . . . . Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time" *Id.* § 1508.7.

99.     Here, the Corps failed to adequately consider the indirect and cumulative impacts of its decision to authorize the construction and operation of the Plastics Facility.  These indirect and cumulative impacts relate to a number of factors, including but not limited to, air quality; water quality; wetlands damage; public health and welfare; cultural and historic resources; environmental justice; increased risk of flooding; and climate change.

100.     For example, indirect effects from the Project will include the emissions of tons of hazardous air pollutants that are known to cause cancer and a host of other respiratory, neurological, reproductive, and developmental illnesses, which would significantly impact the residents of St. James Parish. These and other indirect impacts are reasonably foreseeable, and

the Corps' failure to consider these indirect effects is arbitrary and capricious and in violation of NEPA and the APA.

101.    The Corps also failed to consider the cumulative impact of permitting another petrochemical facility in a community already overburdened with air pollution, exposure to hazardous materials, wetlands degradation, and destruction of cultural and historic resources, including the burial grounds of enslaved people. It further failed to consider the cumulative impact of additional waste in the form of plastic pellets discharged directly from the facility and plastic consumer goods made from the facility's products. In addition, meaningful consideration of greenhouse gas emissions is within the scope of required NEPA review, and the Corps utterly failed to evaluate the impacts of the Plastic Facility's greenhouse gas emissions from the construction and operation of the Plastics Facility as well as the plastics production lifecycle. Such failures are arbitrary, capricious, and not in accordance with NEPA or the APA. 5 U.S.C. § 706(2).

### B.    Purpose and Need Determination and Alternatives Analysis

102.    At the heart of NEPA is the duty to consider all reasonable alternatives to the proposed action. 40 C.F.R. §§ 1508.9(b), 1502.14. The range of alternatives is governed by the description of the project purpose and need. *Id.* § 1508.9(b). It is a violation of NEPA to define the project's purpose in a way that limits consideration of reasonable alternatives.

103.    In issuing the permits, the Corps did not consider all reasonable alternatives to the proposed action. Moreover, it accepted the applicant's narrow definition of the project purpose and need. Such a narrow definition precluded meaningful consideration of reasonable and viable alternatives. To the extent that it did consider any such alternative, such consideration was unlawfully truncated and arbitrary.

104.    For example, the Environmental Assessment did not consider an alternative of requiring the project to be located outside of wetland areas. The Environmental Assessment also did not consider construction of a smaller facility. It did not give meaningful consideration to a no action alternative. Nor did it consider an alternative site for the Plastics Facility outside of St. James or St. John Parish, both minority communities already overburdened by industrial facilities.

105.    The Corps' failure to properly define the purpose and need of the action and failure to adequately consider reasonable alternatives is arbitrary, capricious, and not in accordance with NEPA, in violation of the APA. 5 U.S.C. § 706(2).

### C.    Economic Data Analysis

106.    NEPA and its implementing regulations require the Corps to produce environmental review documents that are factually accurate, well-supported, and fully disclose the impacts of an action to the public. 40 C.F.R. § 1500.1. These standards apply to the Corps' treatment of economic data. *Id.* § 1502.23 (cost benefit analysis).

107.    The Corps' permitting decision failed to accurately assess the economics of the Plastics Facility. For example, the Corps refused to disclose or consider the impacts and risks of air and water pollution resulting from the project, yet expressly weighted and considered the economic benefits of operating the Plastics Facility, even though those benefits cannot arise without exposing the surrounding area to significant environmental and health risks. Further, the Corps did not evaluate potential economic harms from the Plastics Facility, such as depressed home values. The Corps' failure to include and analyze information that is important, significant, and essential renders the Environmental Assessment and FONSI inadequate. 40 C.F.R. § 1500.1.

108.    The Corps' Environmental Assessment and FONSI are therefore arbitrary, capricious, an abuse of discretion, and not in accordance with NEPA or its implementing regulations, and in violation of the APA. 5 U.S.C. § 706(2).

## THIRD CAUSE OF ACTION: VIOLATION OF THE
## RIVERS AND HARBORS ACT, CLEAN WATER ACT, AND APA
### Arbitrary and Inadequate Public Interest Review

109.    Plaintiffs re-allege and incorporate, as if fully set forth herein, each and every allegation in the preceding paragraphs of this Complaint.

110.    Prior to the issuance of any Rivers and Harbor Act or Clean Water Act permit, the Corps is required to conduct a "public interest" review consistent with its governing regulations. 33 C.F.R. § 320.4(a). In conducting a public interest review, the Corps must consider the probable impacts of the proposed action, its putative benefits, and weigh "all those factors which become relevant." *Id.* The Corps must balance the benefits "which reasonably may be expected to accrue" from the action against the "reasonably foreseeable detriments." *Id.* The Corps must consider as part of its public interest review the "relative extent of the public and private need for the proposed structure or work." 33 C.F.R. § 320.4(a)(2)(i). The Corps' public interest review for the Plastics Facility is inconsistent with the regulations for several reasons.

111.    The Corps failed to consider all reasonably foreseeable impacts from the Facility, including but not limited to harmful air and water pollution, health impacts to nearby residents, impacts to cultural and historic resources, disproportionate impacts on low income and minority communities, adverse economic impacts for nearby communities, Formosa Plastics Group's history of violations, adverse impacts to the bald eagle, Pallid sturgeon, and other protected species, contributions to the climate crisis, and contribution to already vast plastic pollution. The

Corps also failed to provide an adequate assessment of costs to the public from reduction in flood protection that will result from permanent wetland destruction.

112.    While the Corps excluded the risks and impacts of operating the Plastics Facility in its public interest review, the Corps simultaneously included the putative economic benefits of the Facility's operation. Failing to take into account the true costs of operation while considering its benefits is arbitrary and capricious.

113.    In addition, the Corps failed to adequately consider the "relative extent of the public and private need" for the Plastics Facility. 33 C.F.R. § 320.4(a)(2)(i). The Corps failed to consider evidence that the project is not needed at all, or that alternative project configurations would avoid the need for significant impacts to waters of the United States.

114.    By failing to undertake a lawful and adequate public interest review, the Corps has acted in a manner that is arbitrary, capricious, and not in accordance with law, in violation of the Rivers and Harbors Act, Clean Water Act, and the APA, 5 U.S.C. § 706(2).

## FOURTH CAUSE OF ACTION: VIOLATION OF THE CLEAN WATER ACT AND APA
### Arbitrary Assessment of Project Alternatives

115.    Plaintiffs re-allege and incorporate, as if fully set forth herein, each and every allegation in the preceding paragraphs of this Complaint.

116.    Under the Corps' regulations, it may not issue a permit if a practicable alternative exists that would have less adverse impact on the aquatic ecosystem. 40 C.F.R. § 230.10(a).

117.    The Corps' regulations place a high bar on permit issuance for special aquatic sites and projects that are not water dependent. Under these standards, the Corps must presume that practicable alternatives exist that do not involve significant impacts to federal protected waters, "unless clearly demonstrated otherwise." 40 C.F.R. §230.10(a)(3).

118.    Here, the Corps properly concluded that the project was not water dependent. It further properly concluded that the project impacted a special aquatic site—a wetland—and that it did not need to be in such a site to fulfill its basic project purpose. Under the circumstances, the law created a strong presumption that practicable alternatives were available. *Id.*

119.    Both Formosa and the Corps failed to present sufficient evidence to rebut the presumption enshrined in the Corps' regulations.

120.    Furthermore, the Corps avoided meaningful consideration of alternatives by narrowly defining the purpose and need of the project.

121.    The Corps' regulations state that "the Corps, will in all cases, exercise independent judgment in defining the purpose and need for the project from both the applicant's and the public's perspective." 33 C.F.R. pt. 325, App. B § 9(b)(4). It is a violation of the law to define the project purpose in a way that renders practicable alternatives impracticable.

122.    By failing to take a lawful and adequate analysis of practicable alternatives, the Corps acted in a manner that is arbitrary, capricious, and not in accordance with law, in violation of the Clean Water Act and APA. 5 U.S.C. § 706(2).

### FIFTH CAUSE OF ACTION: VIOLATION OF THE
### NATIONAL HISTORIC PRESERVATION ACT AND APA
#### Arbitrary and Inadequate Consultation and Determination

123.    Plaintiffs re-allege and incorporate, as if fully set forth herein, each and every allegation in the preceding paragraphs of this Complaint.

124.    Prior to the issuance of a Rivers and Harbor Act or Clean Water Act permit for the Plastics Facility, the Corps was required to take into account the effect of the undertaking on any historic property eligible for inclusion on the National Register of Historic Places. 54 U.S.C. §§ 306108, 300308; 36 C.F.R. § 60.4.

125.     The Corps did not adequately identify, disclose, evaluate, avoid, mitigate, document, or otherwise take into account the impacts of its proposed action on historic properties on the Formosa site, including at least two cemeteries containing the remains of enslaved people, in violation of the National Historic Preservation Act. 36 C.F.R. pt. 800.

126.     By failing to undertake and conclude a lawful and adequate National Historic Preservation Act consultation, the Corps has acted in a manner that is arbitrary, capricious, and not in accordance with law, in violation of the National Historic Preservation Act and the APA, 5 U.S.C. § 706(2).

## PRAYER FOR RELIEF

For the reasons stated above, Plaintiffs respectfully request that this Court:

1. Declare that the permits and authorizations issued by the Corps for the Plastics Facility violate NEPA, the Clean Water Act, the Rivers and Harbors Act, the National Historic Preservation Act, their implementing regulations, and the APA.

2. Vacate such permits and authorizations, and the underlying NEPA and National Historic Preservation Act reviews;

3. Retain jurisdiction over this matter to ensure that the Corps complies with the law;

4. Award Plaintiffs their costs of litigation, including reasonable attorneys' fees; and

5. Grant such other relief as the Court deems just and proper.

Respectfully submitted this 15th day of January, 2020.

*/s/ Catherine Kilduff*
Catherine Kilduff, DC Bar # 1026160
CENTER FOR BIOLOGICAL DIVERSITY
801 Boush St., Ste. 200
Norfolk, VA 23510
Ph: (202) 780-8862

ckilduff@biologicaldiversity.org

Emily Jeffers, CA Bar No. 274222*
Lauren Packard, CA Bar No. 317774*
Julie Teel Simmonds, CA Bar No. 208282*
CENTER FOR BIOLOGICAL DIVERSITY
1212 Broadway, Suite 800
Oakland, CA 94612
Ph: (510) 844-7100
ejeffers@biologicaldiversity.org
lpackard@biologicaldiversity.org
jteelsimmonds@biologicaldiversity.org

* *Pro Hac Vice Applications Forthcoming*

*Attorneys for Plaintiffs*