**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

CENTER FOR BIOLOGICAL DIVERSITY,
    *et al.*,

        *Plaintiffs*,                                    Case No.: 1:20-cv-00103-RDM

    v.

U.S. ARMY CORPS OF ENGINEERS,
    *et al.*,

        *Defendants*,

    and

FG LA LLC,

        *Defendant-Intervenor*.

**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
ORAL ARGUMENT REQUESTED**

Pursuant to Federal Rule of Civil Procedure 65(a) and Local Civil Rule 65.1, Plaintiffs

Center for Biological Diversity, RISE St. James, Healthy Gulf, and Louisiana Bucket Brigade,

respectfully move this Court to preliminarily enjoin the permit issued by the U.S. Army Corps of

Engineers ("Corps") on September 5, 2019, to FG LA LLC ("Formosa Plastics") for the filling

of wetlands and waters of the U.S. Plaintiffs also move this Court to enjoin construction

activities for the proposed petrochemical complex ("Plastics Facility"). This motion is supported

by the attached memorandum of points and authorities; declarations in support of standing and

harm by Sharon Lavigne, Milton Cayette, Anne Rolfes, Andrea Alexander, Stephanie Cooper,

Scott Eustis, Travis London, Cynthia Sarthou, and Miyoko Sakashita; declarations in support of

harm of Dr. Gary P. Shaffer and Dr. Ivor van Heerden; declaration and exhibits of Julie Teel

Simmonds to authenticate documents the Corps has agreed to add to the administrative record

and to demonstrate harm; and a declaration of Kieran Suckling on the issue of a bond. A proposed order is also attached.

If deemed necessary by the Court to resolve this motion, Plaintiffs request a hearing on this motion be held within the 21-day period provided by Local Civil Rule 65.1(d). Defendant-Intervenor Formosa Plastics has commenced site preparation and construction activities at the Plastics Facility. As explained in the accompanying memorandum, there is a high likelihood that historically significant burial sites will be damaged or destroyed in the absence of an injunction, and there are also threats of imminent, irreparable harm to wetlands, wildlife, aesthetics, levee stability, and air quality.

Plaintiffs sought to avoid the necessity of this motion on several occasions seeking a commitment from Formosa Plastics that it would extend its suspension of site preparation and construction activities until a decision on the merits from this Court. *See, e.g.* Teel Decl. Ex. D (March 30, 2020 request for a "stipulation for production of the administrative record and briefing schedule that includes an extension of the temporary suspension of work"); ECF No. 23 at 2 (noting Plaintiffs and Formosa Plastics were engaged in "discussions to determine whether they can reach an agreement on site preparation and construction activity at the site through the resolution of this case or some other agreed upon plan."). However, Formosa has lifted its suspension of activity at the site and is moving ahead with significant activity that threatens imminent and irreparable harm to Plaintiffs' interests. Teel Decl. Ex. E. (Formosa Plastics' June 18, 2020 advertisement in the St. James News Examiner-Enterprise).

Undersigned counsel conferred with counsel for the Corps and Formosa Plastics pursuant to Local Rule of Civil Procedure 7(m), and both parties oppose this motion.

//
//
//

Dated: July 14, 2020

Respectfully submitted,

s/ *Julie Teel Simmonds*
Julie Teel Simmonds, CA Bar No. 208282*
Emily Jeffers, CA Bar No. 274222*
Lauren Packard, CA Bar No. 317774*
CENTER FOR BIOLOGICAL DIVERSITY
1212 Broadway, Suite 800
Oakland, CA 94612
Ph: (510) 844-7100
jteelsimmonds@biologicaldiversity.org
ejeffers@biologicaldiversity.org
lpackard@biologicaldiversity.org

Catherine Kilduff, DC Bar # 1026160
CENTER FOR BIOLOGICAL DIVERSITY
801 Boush St., Ste. 200
Norfolk, VA 23510
Ph: (202) 780-8862
ckilduff@biologicaldiversity.org

*Admitted *Pro Hac Vice*

*Attorneys for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

CENTER FOR BIOLOGICAL DIVERSITY,
   *et al.*,

     *Plaintiffs*,                      Case No.: 1:20-cv-00103-RDM

  v.

U.S. ARMY CORPS OF ENGINEERS,
   *et al*.,

     *Defendants*,

  and

FG LA LLC,

     *Defendant-Intervenor*.

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION AND REQUEST FOR ORAL ARGUMENT**

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

STATUTORY BACKGROUND........................................................................................... 2

I.      The National Environmental Policy Act.............................................................. 2

II.     The National Historic Preservation Act............................................................... 3

III.    The Clean Water Act and Rivers and Harbors Act.............................................. 4

FACTUAL BACKGROUND ............................................................................................... 5

I.      The Formosa Plastics Petrochemical Complex.................................................... 5

II.     The Plastics Facility's Impacts on the Human Environment and
        Historic Resources ............................................................................................... 6

III.    The Corps' Approval ......................................................................................... 11

IV.     Formosa Plastics Begins Construction............................................................... 11

STANDARD FOR ISSUANCE OF A PRELIMINARY INJUNCTION .................................. 12

ARGUMENT ..................................................................................................................... 13

I.      Plaintiffs Are Likely to Succeed on the Merits................................................. 13

        A.      Plaintiffs Are Likely to Succeed on Their Claim That the Corps' EA
                Violated NEPA ...................................................................................... 13

                1.      The Corps' cursory analysis of impacts to wetlands and flooding
                        falls far short of the "hard look" NEPA requires...................................... 13

                2.      The EA never gave a hard look at impacts to air or water quality............ 17

                3.      The EA failed to take a hard look at environmental justice..................... 20

                4.      The EA failed to take a hard look at historic resources ............................ 21

                5.      The Corps unlawfully failed to consider several connected actions......... 21

                6.      The Corps omitted the required cumulative impacts analysis ................. 23

        B.      Plaintiffs Are Likely to Prevail on Their Claims That the Corps
                Inadequately Evaluated the Project's Impacts Under the NHPA ......................... 24

                1.      The Corps did not properly define the area of potential effects .............. 25

                2.      The Corps' lack of "identification efforts" violates the NHPA
                        and puts historic cemeteries at risk ......................................................... 26

i

C.   Plaintiffs Are Likely to Prevail on Their Clean Water Act and Rivers and Harbors Act Claims. ........................................................................ 30

1.   The Corps failed to demonstrate that the proposed project will have the least damaging environmental impact ................................. 30

2.   The Corps' finding that the proposed project is in the public interest is arbitrary and capricious ............................................................. 33

II.   Plaintiffs Will Suffer Irreparable Harm Absent Injunctive Relief. .................................... 38

III.   The Balance of Equities and the Public Interest Favor an Injunction .............................. 43

IV.   The Court Should Issue No Bond or Only a Minimal One ................................................. 45

CONCLUSION ................................................................................................................... 45

# TABLE OF AUTHORITIES

**Cases**

*All. to Save the Mattaponi v. U.S. Army Corps of Eng'rs,*
    606 F. Supp. 2d 121 (D.D.C. 2009) ............................................................................ 30, 33, 36

*Alliance for the Wild Rockies v. Cottrell,*
    632 F.3d 1127 (9th Cir. 2011) ................................................................................................. 40

*Am. Rivers v. Fed. Energy Reg. Comm'n,*
    895 F.3d 32 (D.C. Cir. 2018) .................................................................................. 14, 15, 18

*Animal Legal Def. Fund v. Purdue,*
    872 F.3d 602 (D.C. Cir. 2017) ................................................................................................. 34

*Brady Campaign to Prevent Gun Violence v. Salazar,*
    612 F. Supp. 2d 1 (D.D.C. 2009) ...................................................................................... 39, 43

*California v. U.S. Bureau of Land Mgmt.,*
    286 F. Supp. 3d 1054 (N.D. Cal. 2018) ................................................................................. 41

*Calvert Cliffs' Coordinating Comm. v. Atomic Energy Comm'n,*
    449 F.2d 1109 (D.C. Cir. 1971) ............................................................................................... 19

*City Club of N.Y. v. U.S. Army Corps of Eng'rs,*
    246 F. Supp. 3d 860 (S.D.N.Y. 2017) .................................................................................... 32

*Comanche Nation v. United States,* No. CIV-08-849-D,
    2008 WL 4426621 (W.D. Okla. Sept. 23, 2008) .................................................................. 27

*Del. Riverkeeper Network v. Fed. Energy Reg. Comm'n,*
    753 F.3d 1304 (D.C. Cir. 2014) ............................................................................................... 22

*Hammond v. Norton,*
    370 F. Supp. 2d 226 (D.D.C. 2005) ........................................................................................ 22

*Found. for N. Am. Wild Sheep v. U.S. Dep't of Agric.,*
    681 F.2d 1172 (9th Cir. 1982) ................................................................................................. 17

*Founds. on Econ. Trends v. Heckler,*
    756 F.2d 143 (D.C. Cir. 1985) ................................................................................................... 3

*Friends of Buckingham v. State Air Pollution Control Bd.,*
    947 F.3d 68 (4th Cir. 2020) ..................................................................................................... 20

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.,*
    528 U.S. 167 (2000) .................................................................................................................. 12

*Friends of the Earth, Inc. v. U.S. Army Corps of Eng'rs,*
    109 F. Supp. 2d 30 (D.D.C. 2000) .......................................................................................... 24

*Friends of the Earth, Inc. v. U.S. Army Corps of Eng'rs,*
  109 F. Supp. 2d 30 (D.D.C. 2000) ................................................................... 14

*Friends of the Wild Swan, Inc. v. U.S. EPA,*
  130 F. Supp. 2d 1207 (D. Mont. 2000) ........................................................... 44

*Gerber v. Norton,*
  294 F.3d 173 (D.C. Cir. 2002) ......................................................................... 15

*Gov't of the Province of Manitoba v. Norton,*
  398 F. Supp. 2d 41 (D.D.C. 2005) ............................................................... 2, 16

*Grand Canyon Trust v. Fed. Aviation Admin.,*
  290 F.3d 339 (D.C. Cir. 2002) .................................................................... 23, 24

*Great Old Broads for Wilderness v. Kempthorne,*
  452 F. Supp. 2d 71 (D.D.C. 2006) .............................................................. 23, 24

*Hough v. Marsh,*
  557 F. Supp. 74 (D. Mass. 1982) ..................................................................... 35

*Humane Soc'y of the United States v. Kempthorne,*
  481 F. Supp. 2d 53 (D.D.C. 2006) ................................................................... 39

*Idaho Conserv. League v. Atlanta Gold Corp.,*
  879 F. Supp. 2d 1148 (D. Idaho 2012) ........................................................... 44

*Idaho Rivers United v. Probert,* No. 3:16-cv-00102-CWD,
  2016 WL 2757690 (D. Idaho May 12, 2016) ................................................. 39

*\*Idaho v. Interstate Commerce Comm'n.,*
  35 F.3d 585 (D.C. Cir. 1994) ..................................................................... 15, 19

*Landwatch v. Connaughton,*
  905 F. Supp. 2d 1192 (D. Ore. 2012) .............................................................. 45

*League of Wilderness Defs. v. Connaughton,*
  752 F.3d 755 (9th Cir. 2014) ........................................................................... 45

*League of Wilderness Defs./Blue Mts. Biodiversity Project v. Connaughton,*
  752 F.3d 755 (9th Cir. 2014) ........................................................................... 40

*League of Women Voters of the United States v. Newby,*
  838 F.3d 1 (D.C. Cir. 2016) ............................................................................. 43

*League of Women Voters v. Newby,*
  838 F.3d 1 (D.C. Cir. 2016) ............................................................................. 12

*Maher v. New Orleans,*
  516 F.2d 1051 (5th Cir. 1975) ........................................................................... 4

*Nat'l Parks Conserv'n Ass'n v. Semonite,*
  916 F.3d 1075 (D.C. Cir. 2019) .......................................................................... 13

*Nat'l Wildlife Fed'n v. Marsh,*
  721 F.2d 767 (11th Cir. 1983) ............................................................................. 39

*Nken v. Holder,*
  556 U.S. 418 (2009) ........................................................................................... 43

*Ocean Advocates v. U.S. Army Corps of Eng'rs,*
  402 F.3d 846 (9th Cir. 2004) .............................................................................. 19

*Pueblo of Sandia v. United States,*
  50 F.3d 856 (10th Cir. 1995) .............................................................................. 29

*Pye v. United States,*
  269 F.3d 459 (4th Cir. 2001) .............................................................................. 26

*Quechan Tribe of the Fort Yuma Indian Rsrv. v. U.S. Dep't of Interior,*
  755 F. Supp. 2d 1104 (S.D. Cal. 2010) .......................................................... 43, 44

*Red Wolf Coal. v. U.S. Fish & Wildlife Serv.,*
  210 F. Supp. 3d 796 (E.D.N.C. 2016) .................................................................. 45

*Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs,*
  826 F.3d 1030 (8th Cir. 2016) ............................................................................ 41

*S. Fork Band of W. Shoshone v. U.S. Dep't of Interior,*
  588 F.3d 718 (9th Cir. 2009) .............................................................................. 19

*S. Utah Wilderness Alliance v. Norton,*
  237 F. Supp.2d 48 (D.D.C. 2002) ....................................................................... 16

*San Antonio Bay Estuarine Waterkeeper v. Formosa Plastics Corp.,*
  No. 17-0047, 2019 WL 2716544 (S.D. Tex. June 27, 2019) ......................... 2, 10, 34

*San Luis & Delta-Mendota Water Auth. v. Jewell,*
  969 F. Supp. 2d 1211 (E.D. Cal. 2013) ................................................................ 38

*Se. Alaska Conserv. Council v. U.S. Forest Serv.,*
  413 F. Supp. 3d 973 (D. Alaska 2019) ................................................................ 39

*Sherley v. Sebelius,*
  644 F. 3d 388 (D.C. Cir. 2011) ........................................................................... 12

*Shoreline Assocs. v. Marsh,* 555 F. Supp. 169 (D. Md. 1983),
  *aff'd,* 725 F.2d 677 (4th Cir. 1984) .................................................................... 32

*Sierra Club v. Fed. Energy Reg. Comm'n,*
  867 F.3d 1357 (D.C. Cir. 2017) .......................................................................... 18

*Sierra Club v. Marsh*,
   714 F. Supp. 539 (D. Me. 1989) ............................................................... 44

*Sierra Club v. Norton*,
   207 F. Supp. 2d 1310 (S.D. Ala. 2002)..................................................... 44

*Sierra Club v. Peterson*,
   717 F.2d 1409 (D.C. Cir. 1983) .................................................................. 3

*Sierra Club v. U.S. Army Corps of Eng'rs*,
   645 F.3d 978 (8th Cir. 2011) .............................................................. 39, 44

*Sierra Club v. U.S. Dep't of Agric.*, 841 F. Supp. 2d 349 (D.C. Cir. 2012) ................................. 41

*Sierra Club v. Van Antwerp*, 709 F. Supp. 2d 1254 (S.D. Fla. 2009),
   *aff'd*, 362 Fed. Appx. 100 (11th Cir. 2010) ............................................ 31

*Slockish v. U.S. Fed. Highway Admin.*,
   664 F. Supp. 2d 1192 (D. Or. 2009) ......................................................... 24

*So. Utah Wilderness All. v. Burke*,
   981 F. Supp. 2d 1099 (D. Utah 2013)........................................................ 28

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
   255 F. Supp. 3d 101 (D.D.C. 2017)..................................................... 20, 21

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
   No. 16-1534-JEB, 2020 WL 1441923 (D.D.C. Mar. 25, 2020) .................. 3

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
   No. 16-1534-JEB, 2020 WL 3634426 (D.D.C. July 6, 2020) ................... 45

*Utahns v. Dep't of Transp.*,
   305 F.3d 1152 (10th Cir. 2002) ......................................................... 30, 32

*W. Watersheds Proj. v. Schneider*,
   417 F. Supp. 3d 1319 (D. Idaho 2019) ..................................................... 45

*White Tanks Concerned Citizens, Inc. v. Strock*,
   563 F .3d 1033 (9th Cir. 2009) ................................................................. 19

*Winter v. Nat. Res. Def. Council*,
   555 U.S. 7 (2008)...................................................................................... 12

*Wyo. Outdoor Council v. U.S. Army Corps of Eng'rs*,
   351 F. Supp. 2d 1232 (D. Wyo. 2005)...................................................... 36

## Statutes

33 U.S.C. § 403......................................................................................................... 5

33 U.S.C. § 1251(a) ........................................................................................................ 4

33 U.S.C. § 1311(a) ........................................................................................................ 4

33 U.S.C. 1330 ............................................................................................................... 5

33 U.S.C. § 1344(a)–(e) ................................................................................................. 4

33 U.S.C. § 1344(e) ........................................................................................................ 4

42 U.S.C. §§ 4321-4370m-12 ........................................................................................ 2

42 U.S.C. § 4332(2)(C) .................................................................................................. 2

42 U.S.C. § 7412(b) ........................................................................................................ 7

54 U.S.C. § 300320(3) .................................................................................................... 4

54 U.S.C. § 306108 ........................................................................................................ 4

## Other Authorities

Exec. Order No. 12,898, 59 Fed. Reg. 7629 (Feb 16, 1994) ..................................... 3, 20

55 Fed. Reg. 36,641 (Sept. 6, 1990) ............................................................................ 17

82 Fed. Reg. 16,668 (Apr. 5, 2017) ........................................................................ 17, 37

83 Fed Reg. 25,776 (June 4, 2018) .............................................................................. 33

## Regulations

33 C.F.R. § 320.4 .......................................................................................................... 33

33 C.F.R. § 320.4(a)(1) ............................................................................................. 5, 33

36 C.F.R. § 60.4 ............................................................................................................. 4

36 C.F.R. § 800.16(d) .................................................................................................... 25

36 C.F.R. § 800.4 ........................................................................................................... 25

36 C.F.R. §§ 800.4-800.6 ................................................................................................ 4

36 C.F.R. § 800.4(a)(2) .................................................................................................. 27

36 C.F.R. § 800.4(a)(3) ............................................................................................. 27, 28

36 C.F.R. § 800.4(b)(1) .................................................................................................. 27

36 C.F.R. § 800.5(a)(2) .................................................................................................. 25

40 C.F.R. § 230.10(a)................................................................................................. 4, 30

40 C.F.R. § 230.10(a)(3)............................................................................................ 4, 30

40 C.F.R. § 230.41...................................................................................................... 8

40 C.F.R. § 230.53...................................................................................................... 35

40 C.F.R. § 1500.1(a)................................................................................................. 2

40 C.F.R. § 1500.1(b)................................................................................................. 2

40 C.F.R. § 1501.4...................................................................................................... 2, 14

40 C.F.R. § 1501.4(e)................................................................................................. 3

40 C.F.R. § 1508.7...................................................................................................... 3, 22

40 C.F.R. § 1508.8...................................................................................................... 2

40 C.F.R. § 1508.8(b)................................................................................................. 3

40 C.F.R. § 1508.9(a)................................................................................................. 14

40 C.F.R. § 1508.13.................................................................................................... 3

40 C.F.R. § 1508.25(a)(1).......................................................................................... 22

40 C.F.R. § 1508.25(a)(1)–(2).................................................................................... 22

40 C.F.R. § 1508.27(b)(7).......................................................................................... 3

40 C.F.R. § 1508.27(b)(8).......................................................................................... 21

## INTRODUCTION

Plaintiffs seek a preliminary injunction because the Army Corps of Engineers ("Corps") unlawfully approved a permit under which FG LA LLC ("Formosa Plastics"), a subsidiary of Taiwan-based Formosa Petrochemical Company, has started to construct one of the world's largest plastics facilities.[1] The facility will include 10 chemical plants; a heavy haul road and bridge; vessel and rail docks; power generation facilities; pipelines; a wastewater treatment plant; detention ponds; and other support facilities. Formosa Plastics is poised to transform sugarcane fields and wetlands along a stretch of the Mississippi River into a 1,500-acre plastics complex— 10 times the size of D.C.'s National Mall—threatening imminent and permanent harm to wetlands, wildlife, historic grave sites, levee stability, air quality, and environmental justice absent an injunction.

Only immediate intervention can save these wetlands and grave sites and prevent other irreparable harm to Plaintiffs, who are likely to prevail on their legal claims. The record filed on May 29 (ECF No. 25)[2] demonstrates that the Corps failed to comply with the National Environmental Policy Act, National Historic Preservation Act, Clean Water Act, and Rivers and Harbors Act. Indeed, the Corps flouted its legal obligations under these bedrock environmental laws at every step of the way, including failing to take a hard look at the wetland destruction, air pollution, water pollution, and numerous other impacts from the facility; failing to properly identify the burial sites of enslaved people that experts believe are on site; and failing to properly

---

[1] Plaintiffs filed their Complaint on January 15, 2020. ECF No. 1. In March, Plaintiffs noticed activities commencing at the site and contacted counsel for Formosa Plastics with concerns. Teel Dec. Ex. D. On March 26, 2020, Formosa Plastics announced it was temporarily suspending activities. *Id.* Yet on June 28, it announced in the local newspaper that it was restarting construction at the site including wetlands clearing, dock and road building, a pile driving program and utility work. Teel Dec. Ex. E.

[2] Plaintiffs moved to admit extra-record evidence on July 13 (ECF No. 27) and have reached agreement with the Corps on documents to complete the record. ECF No. 27-1, Ex. A.

consider whether this massive plastics facility on one of the few undeveloped sites in the heart of an area known as Cancer Alley is in the public interest. Rather than conducting the careful analyses required by law, the Corps simply adopted the self-serving statements of Formosa Plastics—an entity a federal court found to be a "serial offender" with "enormous" violations of environmental laws, including spilling billions of plastic pellets into Texas creeks and bays and failing to report its violations. *San Antonio Bay Estuarine Waterkeeper v. Formosa Plastics Corp.*, No. 17-0047, 2019 WL 2716544, at *8-9 (S.D. Tex. June 27, 2019).

Such reckless decisionmaking cannot stand. *Gov't of the Province of Manitoba v. Norton ("Manitoba")*, 398 F. Supp. 2d 41, 53 (D.D.C. 2005) ("courts are responsible for ensuring that agencies comply with the statutory duty imposed on them by Congress" (citation omitted)). Given the stakes in this case, which include the very life, health, history, and future of this African American community, a preliminary injunction to preserve the status quo is necessary and in the public interest. The Court should grant Plaintiffs' Motion for a Preliminary Injunction and maintain the status quo until the Court can resolve the case on the merits.

## STATUTORY BACKGROUND

### I.    The National Environmental Policy Act

The National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370m-12, "is our basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). NEPA mandates that agencies take a "hard look" at the environmental impacts of their actions to ensure informed decision-making and public participation. *See Id.* § 1500.1(b). To accomplish these objectives, NEPA requires agencies to fully disclose all the potential environmental impacts of an action, 42 U.S.C. § 4332(2)(C), including "ecological . . . aesthetic, historic, cultural, economic, social, or health" effects. 40 C.F.R. § 1508.8.

The agency may prepare an Environmental Assessment ("EA") to determine whether an Environmental Impact Statement ("EIS") is warranted. *Id.* § 1501.4. Under the NEPA

regulations in effect when the decision was made, the EA must analyze the direct, indirect, and cumulative impacts of a proposed action. *Id.* §§ 1508.7, 1508.8. Direct effects "are caused by the action and occur at the same time and place." *Id.* § 1508.8(a). Indirect effects are reasonably foreseeable effects "caused by the action and are later in time or farther removed in distance." *Id.* § 1508.8(b). Cumulative effects are those resulting from the "incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency . . . or person undertakes" them. *Id.* § 1508.7; *see id.* § 1508.27(b)(7). Agencies must consider environmental justice during the NEPA process "by identifying and addressing . . . disproportionately high and adverse human health or environmental effects of [their] activities on minority populations and low-income populations." Exec. Order No. 12,898, 59 Fed. Reg. 7629 (Feb 16, 1994); *see also Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, No. 16-1534-JEB, 2020 WL 1441923, at *2 (D.D.C. Mar. 25, 2020).

If an agency action has effects that *may* be significant, an agency must prepare an EIS *before* the action is taken. 42 U.S.C. § 4332(2)(C); *see Sierra Club v. Peterson*, 717 F.2d 1409, 1415 (D.C. Cir. 1983). If the agency determines an EIS is not required after taking a "hard look" at the impacts, the agency must provide a convincing statement of reasons why the project's impacts are insignificant and issue a Finding of No Significant Impact ("FONSI)." 40 C.F.R. §§ 1501.4(e), 1508.13. "Simple, conclusory statements of 'no impact' are not enough to fulfill an agency's duty under NEPA." *Founds. on Econ. Trends v. Heckler*, 756 F.2d 143, 154 (D.C. Cir. 1985).

## II.    The National Historic Preservation Act

In enacting the National Historic Preservation Act of 1966 ("NHPA"), Congress "acknowledged our debt to the past" with the express intent that "the historical and cultural foundations of the Nation should be preserved as a living part of our community life and development in order to give a sense of orientation to the American people." *Maher v. New*

*Orleans*, 516 F.2d 1051 (5th Cir. 1975). Section 106 requires federal agencies to "take into account the effect" of projects requiring a federal permit on "any historic property." 54 U.S.C. §§ 306108, 300320(3). Cemeteries and burial places associated with historic events are protected under the NHPA. 36 C.F.R. § 60.4. NHPA guidance recognizes the public can gain information "significant in American culture from burial places" and provides an example of West Africans "carried in the slave trade to the east coast of America, and their descendants" who "adapted traditional burial rites to plantation and community life." Teel Decl. Ex. C, Attachment 1, at 14.

The NHPA is designed to ensure that federal decision-makers thoroughly investigate the potential impacts of their proposed actions on historic properties prior to taking final action. The NHPA "take into account" or "Section 106" process requires federal agencies to define an area of potential effects, carry out appropriate identification efforts, disclose historic properties within the area, evaluate the potential adverse effects of the federal undertaking to the historic properties, and seek ways to avoid, minimize, or mitigate any adverse effects before granting permits for a project. 36 C.F.R. §§ 800.4-800.6.

## III.     The Clean Water Act and Rivers and Harbors Act

Congress enacted the Clean Water Act to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To accomplish this goal, the Act prohibits the discharge of any pollutant—including fill material—into waters of the United States unless authorized by a permit. *Id*. §§ 1311(a); 1344(a)–(e). The Corps may permit the discharge of fill under Section 404 if certain environmentally protective criteria have been met. *Id*. § 1344(e). The Corps must demonstrate there is no practicable alternative to the proposed discharge that would have "less adverse impact." 40 C.F.R. § 230.10(a). If the discharge is proposed in a special aquatic site, such as a wetland, and is not water dependent, "practicable alternatives . . . are presumed to be available, unless clearly demonstrated otherwise." *Id*. § 230.10(a)(3). The Corps may only issue the permit if it determines it is in the

public interest, taking into account aesthetic, historic, public welfare, and conservation impacts. 33 C.F.R. § 320.4(a)(1).

Section 10 of the Rivers and Harbors Act makes it unlawful "to excavate or fill" any navigable water without a Corps' permit. 33 U.S.C. § 403. Before issuing a permit, the Corps must undertake an "evaluation of the probable impacts, including cumulative impacts, of the proposed activity and its intended use on the public interest." 33 C.F.R. § 320.4(a)(1).

## FACTUAL BACKGROUND

### I.     The Formosa Plastics Petrochemical Complex

Taiwan-based Formosa Plastics seeks to build one of the world's largest plastic complexes, where it will turn fracked gas into the basic building blocks for plastic products (e.g. ethylene, propylene, polymer, and ethylene glycol). AR005391; Teel Decl. Ex. A, at 73. If built as planned, the complex will include 10 plastic petrochemical factories and  numerous support facilities, including, a heavy haul road across a major levee for the Mississippi River; three barge and ship docks); a rail complex; power generation facilities; pipelines to and on the site; a wastewater treatment plant; and stormwater detention ponds among other infrastructure. AR000104; Teel Decl. Ex. A, at 74.

Formosa Plastics is building the petrochemical complex in St. James Parish, Louisiana, along the west bank of the Mississippi River. The property is currently an agricultural field, and the surrounding neighborhood consists of open farmland and homes alongside forested wetlands. *See* AR000151, AR004162. The site is the former location of two sugar cane plantations. AR000998. Almost half of the 2,319-acre property (965.4acres) consists of wetlands and waters that are part of the Barataria-Terrebonne National Estuary Program, which was designed to protect and restore estuaries of "national significance." *See* 33 U.S.C. § 1330; AR000105; AR000148; AR000151 ("[h]igh quality forested wetland areas border two sides of the project site."). About 850 acres of these forested wetlands are part of the Lac des Allemands swamp—a

large, shallow area that drains into the Gulf of Mexico, where bald-cypress and tupelo trees surround wetlands and other low-lying places, creating rich fishing grounds in and around the floodplains of the Mississippi River. Shaffer Decl. ¶ 4.



Source: AR006336

Formosa Plastics requires a permit from the Corps to carry out this project because it will destroy wetlands. It will dump 554,671cubic yards of landfill into wetlands and low-lying areas, enough to fill more than 45,000 dump trucks. AR000535. Its stated project purpose is "to grade, place fill, aggregate material, and pilings to construct a plastics manufacturing facility to meet the public's demand for plastic around the world." AR000111.

## II.     The Plastics Facility's Impacts on the Human Environment and Historic Resources

In August 2018, the Corps issued a public notice on Formosa Plastics' request to fill and pave over wetlands and agricultural land for its petrochemical complex, AR004679, prompting hundreds of people to voice their opposition, AR001319–320, AR001987–2126, AR002227–

233, AR002313–345, AR003015–052. Plaintiffs submitted extensive comments describing the environmental impacts of the project and concerns about Formosa Plastics' history of environmental violations. AR002313–345, AR003015–052, AR000952–996. The project will have numerous harmful environmental impacts, including air and water pollution, the destruction of wetlands, and harm to historic grave sites.

*Air and water pollution:* The Plastics Facility will emit more than 13.6 million tons of carbon pollution—equivalent to pollution from three coal-fired power plants—and over 800 tons per year of toxic air pollutants. AR003026; Teel Decl. Ex. A, at 81. The Plastics Facility will pollute the air with soot, smog, and other pollutants, including carbon monoxide, particulate matter, volatile organic compounds, and carcinogens such as benzene, 1,3-butadiene, and ethylene oxide. AR003024–026, AR003037, AR005392. EPA regulates 19 of these as hazardous air pollutants that may cause serious adverse health impacts such as neurological harm or birth defects. *See* 42 U.S.C. § 7412(b). These various air pollutants cause premature death, heart attacks, asthma, cancer, respiratory, neurological and reproductive damage. AR003024–025; Teel Decl. Ex. A, at 24–159.

The Plastics Facility will also discharge water pollution into the St. James Canal and Mississippi River, "the main source for municipal water down river for highly populated areas." AR000148. The Corps did not disclose or analyze any wastewater or stormwater pollutants or impacts, and instead asserted that Formosa "is properly permitted with the LADEQ air and water permits." AR000154.

*Wetlands and floodplain impacts:* Site-preparation, fill, and construction activities—some of which are now underway—will directly, permanently damage 61.7 acres of wetlands and up to 54.5 acres of other waters of the United States. AR000104. There are three types of direct wetlands impacts: (1) borrow pits containing herbaceous and forested wetlands will be permanently filled and covered with a utility plant and other infrastructure, AR000105;

AR000572; (2) 6.7 acres of batture wetlands will be damaged or destroyed to construct a water intake facility, three vessel docks, pipe rack, heavy haul road, and bridge, AR000105, AR005150–152, AR000590; and (3) detention ponds will be built in forested wetlands at the south end of the property, AR000104, AR000581. The batture wetlands—unique wetlands between the levee and river—on the west bank of the Mississippi River are classified as rare, imperiled, or difficult to replace ("RID"). *See* AR002254. Formosa Plastics only purchased compensatory mitigation credits for direct wetlands impacts. AR000106–107.

Wetlands provide wildlife and fish habitat; protect water quality; store floodwater; shield against erosion; and guard communities like St. James from flooding. 40 C.F.R. § 230.41; AR003031–32, AR004151; Teel Decl. Ex. B, at 1–174. The affected wetlands and waters also serve as important wildlife habitat. Dozens of migratory bird species use the wetlands in this area, including bald eagles. AR006423, AR006428. Additionally, imperiled species including manatees and endangered pallid sturgeons—a giant, ancient-looking fish—inhabit affected areas. AR006446. The project will expose these and other species to habitat destruction, vessel traffic, and noise, light, and water pollution.

*Environmental justice:* The petrochemical complex will be built in a low-income neighborhood that is 95 percent African American. AR000179. The corridor along the Mississippi River between New Orleans and Baton Rouge is known as "Cancer Alley" due to the many polluting petrochemical plants and refineries already located there. AR002047. The Formosa Plastics facility will further pollute the water this community drinks and the air it breathes.

*Cultural and historic resources:* Construction of the Formosa Plastics complex will occur on and adjacent to historic cemeteries that experts believe contain the remains of enslaved people who worked on the plantations. AR000107 (the Acadia Cemetery "contained the slaves who were associated with this plantation . . . ."); AR000386 ("The absence of verifiable

8

indications (headstones or through archival research) of who was buried in the cemetery leads us to believe it could have been a slave cemetery associated with the Buena Vista Plantation."); Pls.' Mot. to Admit, Spees Decl. Ex. E, at 10, ECF No. 27-2.

Formosa Plastics twice overlooked these historic resources in two 2018 reports (AR006120–329, AR005915–6010) that led to its conclusion that "there will be no impact on cultural resources." AR005412. On August 10, 2018, the Louisiana State Historic Preservation Office ("SHPO") notified the Corps it learned from a local archeologist with Coastal Environments, Inc. ("CEI") that the reports overlooked one cemetery on an edge of the property (Buena Vista) and a second one (Acadia) where Formosa Plastics intends to build a utility plant. AR005353. The SHPO stated, "[a]s you can imagine, this prompted some consternation on the part of [Formosa Plastics]" and "would cause significant issues for the facility plan." *Id.*; *see also* Spees Decl. Ex. D, ECF No. 27-2 (email from Formosa's representative stating that protecting the Acadia Cemetery "would mean that portions of the planned Utilities Plant may have to be relocated, which makes this a very difficult option for [Formosa Plastics]."). The Corps' August 27, 2018 notice for the project did not mention the cemeteries' discovery. AR004679–680.

The Corps issued a finding of "No Historic Properties Affected for this undertaking" on January 28, 2019. AR000165. After that determination, the SHPO learned Formosa Plastics' consultants were still looking in the wrong places for the cemeteries. AR000165 (the Corps' Memorandum of Record notes only that a source contacted the State to communicate "that the cemeteries may be located in slightly different locations."); Spees Decl. Ex. B, ECF 27-2 (email from CEI archeologist to State Division of Archaeology stating he is "greatly concerned that the contracting firm conducting this research did not examine the correct area" and explaining in detail why) & Ex. C (email from Louisiana Attorney General's office to State Division of Archaeology, stating, "interments may still be intact," there could be a "dedication problem for the whole Acadia area," and "we may have to revisit whether to require them to examine the

borrowed area that was not yet examined."). In June 2019, Formosa Plastics' final archeological report redrew the boundaries for the Buena Vista Cemetery, which was not where fencing had originally been erected, and declared that there was no evidence of the Acadia Cemetery. AR000328.

In February 2020, CEI produced a report that concluded (1) Formosa Plastics' consultants searched in the wrong location each time they looked for cemeteries on the former Acadia Plantation; (2) four additional cemeteries may exist on the project site in addition to the two previously identified (Acadia and Buena Vista); and (3) further investigation is needed to avoid construction impacts to graveyards, including the Acadia Cemetery and four additional potential burial sites not mentioned in any of Formosa's reports. Spees Decl. Ex. E, ECF No. 27-2. The Corps has not re-opened the NHPA consultation process or suspended Formosa Plastics' permit pursuant to 33 C.F.R. § 325.7 (allowing the Corps to reevaluate and "modify, suspend, or revoke a permit"); AR000109.

*Formosa Plastics' history of non-compliance:* In June 2019, a federal court held Formosa Plastics liable for polluting Texas waterways with billions of plastic pellets from its plant in Point Comfort, Texas. *See, e.g.*, *San Antonio Bay Estuarine Waterkeeper*, 2019 WL 2716544, at *8-9. The court found the company had "enormous" permit violations and failed to report its non-compliance, further concluding Formosa is a "serial offender." *Id.* According to the Environmental Protection Agency, six of seven Formosa Plastics' facilities were in violation of federal environmental laws in 2018. AR003021; Teel AR Decl. Ex. A, at 1–7. Formosa Plastics' other plant in Louisiana, a PVC plastic facility in Baton Rouge, also has a long history of federal violations, including "significant" violations of the Clean Air Act every quarter since 2009. AR003021, Teel Decl. Ex. A, at 8-23.

### III.    The Corps' Approval

Despite the numerous harms to the environment, public health, and important cultural resources from this massive plastics complex, the Corps issued a permit to Formosa Plastics on September 5, 2019. The permit authorizes permanent damage to 116.2 acres of wetlands and waters, AR000104, and is necessary for Formosa Plastics to proceed, AR000139. A Memorandum of Record accompanied the permit and includes the Corps' entire analysis and conclusions under NEPA, the NHPA, and the Clean Water Act. *See* AR000104–185.

The Corps declined to prepare an EIS and instead issued an EA with a one-paragraph FONSI concluding that the Plastics Facility will have no significant environmental impacts. AR000184. With respect to the NHPA, the Corps concluded there will be no impact to the Buena Vista Cemetery because it is "excluded from the project site" and "will be fenced outside of the facility because it is near the project boundary line and the public will have access to it." AR000110, AR000129. As for the Acadia Cemetery, the Corps concluded that there will be no historic properties affected. AR000165. The Corps does not mention four other burial sites that may exist on the property. Under the Clean Water Act, the Corps deemed the project "the Least Environmentally Damaging Alternative [sic] Practicable Alternative," AR000144; and it concluded that issuing the permit was not contrary to the public interest, AR000185.

### IV.    Formosa Plastics Begins Construction

On March 23, 2020, the same day Louisiana's COVID-19 stay-at-home order went into effect, several large trucks and a crew of workers broke ground on Formosa Plastics' site. Members of Plaintiff RISE St. James recorded a video of the activity as they passed by and alerted their members and the media. On March 27, Formosa ordered the utility work to stop, citing caution due to coronavirus and high-water levels of the Mississippi River. Teel Decl. Ex. D. On June 18, 2020, Formosa published an advertisement in the local paper about its plans to restart work, including soil testing, utility relocation, highway widening, a "test pile program,"

pipeline projects, and a contractor dock. Teel Decl. Ex. E. During the week of July 6 and on July

13, 2020, members of Plaintiffs RISE St. James and Healthy Gulf reported seeing construction

trucks, crews, and materials stationed on the property along both highway 18 and 3127,

including what appears to be a new parking lot, a large crane, two excavators, a horizontal drill,

several bulldozers, and crews preparing to dig culverts and chipping trees from wetlands adjacent

to highway 3127. Teel Decl. ¶ 8.

Formosa Plastics' construction activities will quickly transform the rural landscape

around the site into a construction zone. Right now, the area consists of bucolic farms, homes, an

elementary school, churches, swamps, and forested wetlands along a bend in the Mississippi

River. It will soon be unrecognizable.

## STANDARD FOR ISSUANCE OF A PRELIMINARY INJUNCTION

To obtain a preliminary injunction, Plaintiffs must show (1) a likelihood of success on the

merits; (2) a likelihood of irreparable harm in the absence of preliminary relief; (3) the balance of

equities tips in their favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def.*

*Council*, 555 U.S. 7, 19–20 (2008). The D.C. Circuit has historically used a "sliding scale"

approach—allowing a "strong showing" on one factor to make up for a weaker showing on

another. *Sherley v. Sebelius,* 644 F. 3d 388, 392 (D.C. Cir. 2011) (citations omitted). The D.C.

Circuit has not yet decided whether *Winter* explicitly precludes the continued use of a "sliding

scale" approach. *League of Women Voters v. Newby,* 838 F.3d 1, 7 (D.C. Cir. 2016). In any

event, Plaintiffs satisfy all four factors here.[3]

---

[3] Plaintiffs have standing to bring this case. As described in the attached declarations, their
members have concrete and particularized injuries that are fairly traceable to Defendants'
actions, and those injuries will likely be redressed by a favorable decision. *See Friends of the
Earth, Inc. v. Laidlaw Envtl. Servs*., 528 U.S. 167, 180-81 (2000). *See* declarations of Alexander,
Cayette, Cooper, Eustis, Lavigne, London, Rolfes, Sakashita, and Sarthou.

## ARGUMENT

### I.     Plaintiffs Are Likely to Succeed on the Merits[4]

#### A.     Plaintiffs Are Likely to Succeed on Their Claim That the Corps' EA Violated NEPA

Plaintiffs are likely to succeed on their claim that the Corps failed to take a "hard look" at the environmental impacts of its action as NEPA requires. The Corps deficient EA fails to meaningfully evaluate the Plastics Facility's controversial environmental impacts, ranging from wetlands destruction that intensifies flooding to air pollution that unfairly burdens an African American community. The EA largely echoes Formosa Plastics' self-serving statements about the environmental effects, and without any independent analysis or verification the Corps decided that the project will have no significant impacts. Its one-paragraph FONSI (AR000184) fails to meet NEPA's requirement that the Corps "make a convincing case for its finding." *Nat'l Parks Conserv'n Ass'n v. Semonite*, 916 F.3d 1075, 1082 (D.C. Cir. 2019). Because this massive petrochemical complex will indeed have significant environmental impacts, the Corps' failure to prepare an EIS was also arbitrary. Here, Plaintiffs will focus on the Corps' failure to take a hard look at the direct and indirect impacts to (1) wetlands, flooding, and wildlife; (2) air and water pollution; (3) environmental justice; (4) historic resources; (5) connected actions; and (6) cumulative impacts.

##### 1.     The Corps' cursory analysis of impacts to wetlands and flooding falls far short of the "hard look" NEPA requires

The Plastics Facility will permanently damage 116.2 acres of wetlands and other waters (about 88 football fields) and cover 1,500 acres (nearly 2.5 square miles), yet the Corps never took a "hard look" at resulting impacts to hydrology, drainage, flooding, adjacent wetlands, wetlands, or wildlife. The Corps' EA fails to consider the risk of flooding and related impacts

---

[4] For purposes of preliminary relief, Plaintiffs focus here on a subset of their claims concerning the Corps' violations of law.

even though the Plastics Facility will be built on coastal wetlands in low-lying areas along the Mississippi River—where half the property is barely above sea level and will soon be underwater. AR002231, AR002330, AR005893–909.

The Corps' EA was simply too flawed to assist in determining whether the action may significantly impact the environment and require preparation of a full EIS. *Am. Rivers v. Fed. Energy Reg. Comm'n*, 895 F.3d 32, 49-55 (D.C. Cir. 2018) [hereinafter, *Am. Rivers v. FERC*]; 40 C.F.R. § 1501.4; 1508.9(a).  As in *American Rivers v. FERC,* the Army Corps relied on Formosa's—the applicants'—statements without independently verifying or collecting information to conclude there would be no significant impacts. *Am. Rivers v. FERC*, 895 F.3d at 50. In that case, the D.C. Circuit found the EA "rife with flaws" for failing to explain the effects of or take hard look at impacts to  fish, finding it "woefully light on reliable data and reasoned analysis [while] heavy on unsubstantiated inferences and *non sequiturs*." *Id*. at 50–51. The Corps' EA here is a close analogy: it sparingly notes the Plastics Facility's impacts, contains a "breezy dismissal" of serious impacts, and accepts Formosa Plastics' self-serving positions as "adequate" evidence of no significant impacts. *Id.*

To start, the Corps failed to consider that construction of the Plastics Facility will severely alter the hydrology and drainage of the site, increasing the likelihood that flooding will harm contiguous wetlands and other property. The permit allows 554,671 cubic yards of material, enough to fill over 45,000 dump trucks, to be dumped as fill in wetlands and low-lying areas. AR000535. This will dramatically alter the hydrology of the site, which increases "flashiness"—meaning that water volume from the site will rapidly increase during storms, damaging contiguous wetlands and valuable, storm-protecting habitat types. AR003031, Teel Decl. Ex. B, at 149–69. The EA failed to *mention* the effects of this fill on hydrology, flooding, runoff, or contiguous wetlands. This violates NEPA's "hard look" mandate. *See Friends of the Earth, Inc. v. U.S. Army Corps of Eng'rs,* 109 F. Supp. 3d 30, 37-38 (D.D.C. 2000) (Corps' EA

on a Section 404 permit for construction of floating casinos on the Mississippi River was insufficient because it failed to evaluate impacts to hydrology and wetlands from "runoff, sedimentation and placement of impervious surfaces").

The EA's discussion of flooding comes only in response to public comments, and its finding of no flood risk relies on a "no-risk analysis" that *has not yet been completed* but that Formosa Plastics claims "will demonstrate that the fill placed within the floodplain will cause no rise in the base flood water surface elevation." AR000127. The Corps must analyze all impacts from its decision; it cannot abdicate its analytic responsibility to Formosa Plastics for some future, unknown date. To do so is arbitrary and capricious. *Am. Rivers v. FERC,* 895 F.3d at 54 (an agency cannot rely on "sight-unseen acceptance" of an applicant's "anticipated-but-unidentified mitigation measures" which the agency was content "to leave as 'TBD'"); *Gerber v. Norton*, 294 F.3d 173, 185-186 (D.C. Cir. 2002) (an agency may not "delegate its responsibility to the regulated party" (citations omitted)); *see also Idaho v. Interstate Commerce Comm'n.,* 35 F.3d 585, 596 (D.C. Cir. 1994) (similar).

Next, the EA fails to adequately analyze the risk of flooding. Major storms with the capacity to flood the site—such as Category 3 or higher hurricanes and intense rainfall events—are increasingly likely and common due to climate change. AR002984, AR003027–32; AR003030; Teel Decl. Ex. B, at 94–129. The Plastics Facility will be between the Mississippi River and Lac Des Allemands, swamp an area endangered by the "killer storm surges" from the Gulf of Mexico. AR0006336; AR003030; Teel Decl. Ex. B, at 124–134. Yet the Corps did not consider the risk of flooding due to hurricanes or storm surges, relying instead on Formosa's hydrology report, which assumes unrealistic low water levels in the St. James Canal but fails to model a range of other, likely scenarios—like hurricane and storm surge events. AR003058, AR003060. Similarly, the Corps failed to model a 500-year rain event and only evaluated flooding impacts within the 100-year floodplain, AR000126–127, even though floodplain maps

are outdated and do not represent the true risk of flooding in Louisiana, AR003031–032, Teel

Decl. Ex. B, at 170–203. In other words, the Corps' EA dismisses flooding concerns solely based

on Formosa Plastics' studies of drainage and hydrology issues, then summarily states the facility

will have "no impact on the effort to flood proof the area." AR000114–15. This conclusory

assertion, based solely on the applicant's statements, mirrors the "hurried analysis" in *S. Utah*

*Wilderness Alliance v. Norton,* 237 F. Supp.2d 48, 52-55 (D.D.C. 2002), where an agency's EA

did not reflect the "hard look" NEPA requires.

Finally, the Corps failed to take a "hard look" at direct and indirect impacts of destroying

116.2 acres of wetlands and other waters on wetlands and wildlife. This includes damage to 6.7

acres of sensitive batture wetlands that are habitat for bald eagles and other wildlife. AR000105,

AR006432. Eight and a half acres of forested wetlands will be destroyed on site that are habitat

for 25 species of migratory birds of concern. AR000104, AR005505. The EA fails to mention

any adverse impacts to thousands of additional acres of forested wetland that will be affected—

including the contiguous Lac des Allemands swamp, which includes baldcypress-water tupelo

forested wetlands that play an invaluable role protecting communities against storms.

AR003030, Teel Decl. Ex. B, at 135–47. Formosa Plastics purchased mitigation credits for *direct*

wetlands impacts, AR000106–107, but this does not substitute for a NEPA analysis of the

project's concomitant impacts. *Manitoba*, 398 F. Supp. 2d 41, 65 n.24 (even with mitigation, an

EA must completely account for any possible adverse impacts).

The EA also fails to take a hard look, or even adequately describe, the Plastics Facility's

impacts on migratory birds that use the Mississippi flyway migration corridor. Coupled with

deforestation of 8.5 acres; construction, noise, traffic, and lighting from the Plastics Facility will

displace birds from preferred habitat and inhibit their feeding and nesting. *See* AR005507.

However, rather than quantifying or qualitatively describing impacts to migratory birds, the EA

focuses on the absence of bald eagle nests in 2017 to conclude that all bird impacts have been

minimized or eliminated. AR000125. Additionally, manatees that are threatened by vessel traffic and endangered pallid sturgeon that are threatened by industrial pollutants live in this part of the Mississippi River. AR006446; 82 Fed. Reg. 16,668, 16,701 (Apr. 5, 2017); 55 Fed. Reg. 36,641 (Sept. 6, 1990). Construction will expose these animals to habitat destruction, traffic, and noise, light, and water pollution, but the Corps considered none of these impacts in the EA, in violation of NEPA. *See Found. for N. Am. Wild Sheep v. U.S. Dep't of Agric.*, 681 F.2d 1172, 1178 (9th Cir. 1982) (holding invalid an EA's "omission of any meaningful consideration" of a road's traffic impacts on wildlife).

### 2.      The EA never gave a hard look at impacts to air or water quality

The Corps acknowledges the Plastics Facility will cause harmful air and water pollution, AR000154, but never analyzed these impacts either quantitatively or qualitatively. The Corps' failure to even consider impacts on air quality, water quality, or climate change—much less take a "hard look" at the direct, indirect, and cumulative impacts—violates NEPA and is arbitrary and capricious.

As an initial matter, the Corps failed to quantify air and water pollution from construction anywhere in the record. The EA also does not evaluate the impacts of the facility's release of vast quantities of (1) common air pollutants that harm public health like soot and those that cause smog, AR003024–025; Teel Decl. Ex. A, at 24–57; (2) toxic and carcinogenic pollutants, AR003025–026, Teel Decl. Ex. A, at 58–159; (3) 13.6 million tons of greenhouse gases each year, AR000126, AR003028, AR003037; or (4) wastewater and stormwater discharges, AR000156, AR00166 (merely noting that the state Department of Environmental Quality ("LADEQ") issued a water quality certification for the project's placement of fill material). Instead of taking a "hard look," the Corps summarily concludes that "the plant will not impact water quality or air quality in a manner that is not accepted by the [LADEQ]," AR000171–172, and that air quality issues are "subject to local and state regulatory authorities and are thus are

[sic] anticipated to be local in extent, minor in intensity, and/or short-term in duration."
AR000152, *see also* AR000154 (Formosa "is properly permitted with the LADEQ air and water
permits."), AR000128, AR000130. Further, the EA fails to discuss the wastewater and
stormwater pollution that Formosa Plastics will discharge into the Mississippi River, St. James
Canal, and other water on and adjacent to the site. As just one example, plastic pellets and
powders the facility will produce are a major source of water pollution from facilities just like
this. These tiny plastic beads escape during storage, loading, and transportation by rail, truck, or
vessel. *See, e.g.*, AR003033; Teel Decl. Ex. B, at 204–09. One dock that will be built will be
large enough to hold material to load four container barges, on which plastic pellets will be
loaded and shipped on the Mississippi River. AR005151. Despite the Corps' contention
otherwise, AR000154, Formosa Plastics has not yet received its stormwater or wastewater
discharge permits.

NEPA requires more than passive acceptance of an applicant's promise not to violate
state or local pollution standards, as the Court of Appeals held in *Am. Rivers v. FERC*, 895 F. 3d
at 54. In that case, the agency relied on a state water quality certification to find no significant
water quality impacts of a river project. However, the court found this an unacceptable stand-in
for the required NEPA analysis, especially given the applicant's record of water quality
violations. *Id.* at 54. The EA here suffers from the same flaw.

The Corps' wholesale reliance on state permits therefore renders the EA inadequate under
binding Circuit precedent, which establishes that a state agency's  regulation of  Formosa does
not relieve the Corps of its own duties under NEPA to analyze and disclose to the public all of
the direct, indirect, and cumulative impacts of pollution. It is well-settled that "the existence of
permit requirements overseen by another federal agency or state permitting authority cannot
substitute for a proper NEPA analysis." *Sierra Club v. Fed. Energy Reg. Comm'n*, 867 F.3d
1357, 1375 (D.C. Cir. 2017) (citing *Calvert Cliffs' Coordinating Comm. v. Atomic Energy*

*Comm'n,* 449 F.2d 1109, 1122-23 (D.C. Cir. 1971). The Corps cannot rely on "[c]ertification by

another agency that its own environmental standards are satisfied" in lieu of performing its own

NEPA analysis. *Idaho,* 35 F.3d at 596 (quoting *Calvert Cliffs',* 449 F.2d at 1123 (additional

citation omitted); *see also S. Fork Band of W. Shoshone v. U.S. Dep't of Interior*, 588 F.3d 718,

726 (9th Cir. 2009) (rejecting agency's failure to analyze air impacts based on the fact the

facility operates under a state permit because "[a] non-NEPA document—let alone one prepared

and adopted by a state government—cannot satisfy a federal agency's obligations under NEPA"

(citation omitted)). Disclosure of these impacts is even more important when an applicant has a

history of related violations at its other facilities. *See infra* at 34.

NEPA required the Corps to analyze the impacts of the facility's air and water pollution.

The Plastics Facility and its infrastructure are a cohesive whole that cannot proceed "independent

of the wetlands project." *White Tanks Concerned Citizens, Inc. v. Strock,* 563 F .3d 1033, 1036

(9th Cir. 2009) (Corps had to analyze environmental impacts of the entirety of a housing project

even though impacted wetlands represented only one percent of the development's footprint).

Just like in *White Tanks,* "this project's viability is founded on the Corps' issuance of a Section

404 permit, [thus] the entire project is within the Corps' purview." *Id.* at 1042. Indeed, the

Corps' admitted the "entire project lies within Corps jurisdiction," asserting the broad scope of

its EA analysis:

> The scope of analysis extends beyond the project footprint/regulated activity to examine
> area wetlands and drainage to ensure that excavation and fill activities do not cause
> further adverse effects or local water quality issues *and that plant operations do not
> cause further adverse effects to the surrounding communities.*

AR000108 (emphasis added). The Corps was obligated to consider effects beyond the discharge

of fill, but never did so. *See, e.g. Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846,

867-68 (9th Cir. 2004) (requiring the Corps to consider effects of a Section 404 permit for an oil

refinery dock on increased oil tanker traffic and oil spills risks).

### 3.   The EA failed to take a hard look at environmental justice

Formosa Plastics' petrochemical complex will burden a low-income, African American community with toxic air pollution. However, the EA arbitrarily concluded there are no adverse effects on environmental justice. AR000173–174. The Corps failed to properly address the project's disproportionately high adverse health and environmental effects on minority and low-income populations. Exec. Order No. 12,898. Instead, the Corps rubber-stamped Formosa Plastics' flawed rationale, violating NEPA in several respects.

First, the Corps concludes that the project will have of "no adverse effect" because the "facility will meet all NAAQS for criteria pollutants and ambient air standards for toxic air pollutants." AR00173–174. The Fourth Circuit has rejected the same kind of "flawed" environmental justice analysis. *Friends of Buckingham v. State Air Pollution Control Bd.*, 947 F.3d 68, 90–92 (4th Cir. 2020).  It concluded that "even if all pollutants within the county remain below state and national air quality standards, the Board failed to grapple with the likelihood that those living closest to the [project]—an overwhelmingly minority population . . . —will be affected more than those living in other parts of the same county." *Id.* at 91–92. Here, as in *Friends of Buckingham*, the Corps' analysis fails because it did not assess the disproportionate harm of air pollution on St. James' African American population.

Second, the EA parroted Formosa Plastics' irrelevant excuse that the site is "remote." AR000174.  Regardless of the area's population density,[5] however, the Corps has a duty to determine "whether there may be a disproportionately high and adverse human health or environmental effects on minority populations." Teel Decl. Ex. B, at 224, at 9; *see, e.g., Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 255 F. Supp. 3d 101, 137-40 (D.D.C. 2017)

---

[5] The EA biased the population density by cherry-picking the center of the 3.75 square mile property, which unsurprisingly has zero inhabitants within a mile. The record shows the true one-mile radius from the property boundary has 122 residents. AR002236. Finally, the density analysis ignores hundreds of children attending school one mile away. AR006905.

(rejecting the Corps' environmental justice analysis in an EA). The Plastics Facility will be just a half-mile from the residential community of Union, one mile upriver from St. Louis Academy (previously called Fifth Ward Elementary School), and near the residential community of St. James. AR006336, AR006905. These communities are predominantly low income and African American, and it is critical that the Corps evaluate the impacts of the project on these communities' air quality, water quality, and public health.

Finally, the Corps ignored the legacy of petrochemical plants along this stretch of the Mississippi River, which is called "Cancer Alley" due to its disproportionate pollution burden and health problems. AR000116, AR002047. Community members have watched family and friends die early deaths due to cancer or they themselves have fought cancer and other illnesses. AR002020, AR002022–2023, AR002025, AR002083, AR002103–104, AR002111, AR002233. NEPA mandates that agencies consider "the potential for multiple or cumulative exposure to human health or environmental hazards in the affected population and historical patterns of exposure to environmental hazards." Teel Decl. Ex. B, at 224; *Standing Rock Sioux Tribe*, 255 F. Supp. 3d at 137–40. Yet the Corps failed to do so, rendering its EA unlawful.

### 4.      The EA failed to take a hard look at historic resources

An EA must consider whether the action "may cause loss or destruction of significant scientific, cultural, or historical resources." 40 C.F.R. § 1508.27(b)(8). As discussed below regarding the Corps' compliance with the NHPA, *see infra* at 24–30, the Corps failed to meaningfully address the project's impacts on various historic burial sets, let alone provide the requisite convincing case of no significant impacts.

### 5.      The Corps unlawfully failed to consider several connected actions

The Corps' EA failed to evaluate connected actions of new pipelines and transmission lines for the Plastics Facility that will have significant environmental impacts—including up to 567 acres of additional wetlands harm. Under NEPA, an agency acts unlawfully when it "divides

connected, cumulative, or similar federal actions into separate projects and thereby fails to address the true scope and impact of the activities that should be under consideration." *Del. Riverkeeper Network v. Fed. Energy Reg. Comm'n*, 753 F.3d 1304, 1314 (D.C. Cir. 2014) (the agency impermissibly analyzed one segment of a four-part pipeline upgrade project instead of the entire project); *see also* 40 C.F.R. §§ 1508.7, 1508.25(a)(1)–(2).

Actions are connected if they, *inter alia*, "[c]annot or will not proceed unless other actions are taken previously or simultaneously," or are "interdependent parts of a larger action and depend on the larger action for their justification." *id*. at § 1508.25(a)(1). Courts also consider the whether the project has "logical termini" and the "substantial independent utility" of a project. *Del. Riverkeeper*, 753 F.3d at 1315–16; *Hammond v. Norton*, 370 F. Supp. 2d 226, 247 (D.D.C. 2005).

Here, the Corps impermissibly failed to analyze in its EA the impacts to environmental and cultural resources from connected federal actions: the approval of Section 404 permits for transmission lines and pipelines built solely to serve the Plastics Facility. AR004171–172. The Plastics Facility will require two segments of an electrical transmission line, three natural gas pipelines, and five liquid feedstock pipelines. AR006334–344. Only one of these requisite pieces of infrastructure—a propane pipeline—exists currently; the remaining nine projects will be entirely new construction. AR006334. These new infrastructure projects have no independent significance and utility outside of serving the Plastics Facility. AR002248. The project "will require the use of several [new] pipelines" as well as "two new transmission lines," AR002249, and the pipelines will be "servicing only this facility," AR004675; *see also* AR006334.

Because these directly connected infrastructure projects will fill wetlands and will therefore have adverse impacts as a result of the Plastics Facility, these impacts were required to be analyzed in the EA to provide a full picture of the harms associated with the Facility. Yet they were never mentioned as a cumulative impact. Worse, the Corps knew early in the process that

the project would necessitate these wetlands-destroying infrastructure projects. AR006330–335; *see also* AR006357 ("The final plans for new transmission lines will be provided as an application update . . . when they become available."). A new utility switchyard is included in the impacts analysis, but inexplicably, new transmission lines that connect to it are not. AR006334. Similarly, none of the impacts from the pipelines that will transport gas and natural gas liquids directly to the Plastics Facility are mentioned (let alone analyzed) in the EA, even though the Corps was aware of these projects, which, in total, could fill and otherwise harm more than 535 acres of wetlands and nearly 32 acres of open waters. *Id.* These omissions were neither explained nor substantiated; and the Corps' EA is therefore arbitrary and capricious.

### 6.    The Corps omitted the required cumulative impacts analysis

The Corps neglected to conduct any cumulative impacts analysis on the impacts to wildlife, wetlands, flooding, drainage, hydrology, air quality, water quality, public health, historic resources, or environmental justice, which violates NEPA. "As the D.C. Circuit has emphasized, 'a meaningful cumulative impact analysis must identify (1) the area in which the effects of the proposed project will be felt; (2) the impacts that are expected in that area from the proposed project; (3) other actions—past, present, and proposed, and reasonably foreseeable— that have had or are expected to have impacts in the same area; (4) the impacts or expected impacts from these other actions; and (5) the overall impact that can be expected if the individual impacts are allowed to accumulate.'" *Great Old Broads for Wilderness v. Kempthorne*, 452 F. Supp. 2d 71, 84 (D.D.C. 2006) (quoting *Grand Canyon Trust v. Fed. Aviation Admin.*, 290 F.3d 339, 342 (D.C. Cir. 2002) (striking down EAs for failing to meet NEPA's mandates).

The Corps' EA does not satisfy these requirements. While it contains a definition of "cumulative impacts," AR000161–162, and explains the geographic scope for an analysis, AR000162; it then omits any such analysis for wildlife, wetlands, flooding, drainage, hydrology, air quality, water quality, public health, historic resources, or environmental justice. The EA fails

to mention any other past, present, or reasonably foreseeable projects in the area, including other industrial developments mentioned in public comments. AR003043 (noting permits issued to Yuhuang Chemical, Inc., Americas Styrenics LLC, Mosaic Phosphate Company, Nustar Logistics, and Marathon Pipeline among others in St. James). Instead, the EA's unsupported conclusion is that "the incremental contribution of the proposed activity to cumulative impacts . . . [is] not considered to be significant." AR000163; *see also* AR000151 (Table 7 deeming cumulative effects for aquatic ecosystem as "Minor Effect (Long Term)").

The EA further concludes, with no analysis, that "[o]ther secondary effects that may be realized include reduced air quality, increased traffic, and construction equipment noise," which "are subject to local and state regulatory authorities and are thus are [sic] anticipated to be local in extent, minor in intensity, and/or short-term in duration." AR000151–152. This is not even a sideways glance, let alone the requisite hard look required by NEPA. As in *Great Old Broads,* because the agency's "EA fails to include the requisite cumulative impacts analysis, it cannot be sustained." *Great Old Broads,* 425 F. Supp. 2d at 85; *see also Grand Canyon Trust*, 290 F.3d at 342 ("the agency's EA must give a realistic evaluation of the total impacts and cannot isolate a proposed project, viewing it in a vacuum"); *Friends of the Earth, Inc. v. U.S. Army Corps of Eng'rs,* 109 F. Supp. 2d 30, 42 (D.D.C. 2000) (rejecting EAs prepared by the Corps that contained "no actual analysis," just a "conclusory statement" that cumulative impacts were minimal).

**B.     Plaintiffs Are Likely to Prevail on Their Claims That the Corps Inadequately Evaluated the Project's Impacts Under the NHPA**

Formosa Plastics' complex will cover 1,500 acres, and in its path of destruction there are historic sites—including cemeteries of enslaved people—which were not properly identified, disclosed, or safeguarded. Like NEPA, the NHPA is a "stop, look and listen" statute. While procedural, each is a "powerful legal mechanism" that "cannot casually be set aside." *Slockish v. U.S. Fed. Highway Admin.*, 664 F. Supp. 2d 1192, 1208 (D. Or. 2009).  Here, the Corps did not

faithfully execute its NHPA mandates and prematurely issued a permit to Formosa Plastics before conducting reasonable identification efforts for historic properties on site. Plaintiffs are likely to succeed in showing the Corps violated the NHPA.

### 1.     The Corps did not properly define the area of potential effects

As an initial matter, the Corps did not properly define the "area of potential effects"—the locations where direct or indirect impacts to historic resources may occur—for the project, as the NHPA requires. 36 C.F.R. § 800.4; *see also id.* § 800.16(d) ("[a]rea of potential effects means the . . . areas within which an undertaking may directly or indirectly cause alterations in the character or use of historic properties."). As discussed *supra* at Section A.1.b.iv., at 21–23, the Corps omitted several portions of this project from its analysis, namely the construction of transmission lines and pipelines built solely to service the Plastics Facility that will impact 535.2 acres of wetlands and 31.8 acres of open waters. AR004171–72, AR006330, AR006334. The Corps failed to include these areas within the area of potential effects of the Plastics Facility or to engage in the NHPA identification process for these areas. The record contains no discussion of the potential adverse effects of these infrastructure routes on historic resources.

Furthermore, the Corps erroneously determined the "Buena Vista Cemetery area is outside of the project [area of potential effects] and no project impacts would occur within 300ft." AR000999. The agency also asserted "the cemetery will be fenced outside of the facility because it is near the project boundary line and the public will have access to it." AR000110. To begin with, Formosa Plastics initially fenced off an inaccurate location for the cemetery, which the Corps did not acknowledge, question, or explain in its NHPA determination. AR000999. Similarly, in its Memorandum of Record, the Corps does not explain how this now-relocated fencing protects the cemetery from all direct or indirect adverse effects of the Plastics Facility. AR000165; *see* 36 C.F.R. § 800.5(a)(2) (defining adverse effects to include, for example, "[r]emoval of the property from its historic location," which Formosa Plastics has said it is

considering (AR001120), and "introduction of visual, atmospheric or audible elements that diminish the integrity of the property's significant historic features."); *see also Pye v. United States*, 269 F.3d 459, 469 (4th Cir. 2001) (in discussing impacts to an African American cemetery, the court noted, "[e]ven if no backhoes will touch either historic area, damage to historic areas can occur in less direct ways. . . . [T]he smallest of endeavors can have enormous consequences if taken improvidently").

Further, contrary to the Corps' assertion, Formosa Plastics has never committed to protecting the Buena Vista Cemetery (or providing public access to it).[6] On the contrary, Formosa Plastics appears to tacitly acknowledge the facility will likely impact the cemetery, because  there are potential plans to relocate the human remains. AR001120 (Formosa's Supplemental Environmental Assessment Statement referencing the Buena Vista Cemetery's "relocation, if necessary."); Spees Decl. Ex. H, ECF No. 27-2 (June 15, 2020 letter from Formosa to Pam Spees) (Formosa Plastics plans "to have the remains re-interred"). The Buena Vista Cemetery and the ancillary transmission lines and pipelines should have been included in the area of potential effects for the NHPA analysis for this project but were not. As a result, the Corp failed to comply with its duties under NHPA.

### 2. The Corps' lack of "identification efforts" violates the NHPA and puts historic cemeteries at risk

The Corps failed to make a reasonable and good faith effort to identify and delineate historically important cemeteries the Plastics Facility will endanger, even after presented with evidence of their existence and locations. Instead, the record and its own Memorandum shows the Corps rubber-stamped Formosa Plastics' conclusions that historic sites will not be impacted with almost no involvement in the process. AR000165.

---

[6] Formosa has repeatedly denied public access to the cemetery (including for a one-hour Juneteenth commemoration this year, *see infra* at 43).

Under the NHPA, the agency must make "a reasonable and good faith effort to carry out appropriate identification efforts, which may include background research, consultation, oral history interviews, sample field investigation, and field survey." 36 C.F.R. § 800.4(b)(1). As a starting point, the Corps is required to review "existing information on historic properties within the area of potential effects, including any data concerning possible historic properties not yet identified," *id.* § 800.4(a)(2), and to "[s]eek information, as appropriate, from . . . other individuals and organizations likely to have knowledge of, or concerns with, historic properties in the area." *Id.* § 800.4(a)(3).

There is no evidence in the record the Corps conducted any "oral history interviews, sample field investigations, . . . field survey," or anything remotely resembling adequate identification efforts, *id.* § 800.4(b)(1), and this remained true even after the Corps was presented with evidence of historic cemeteries on site. The NHPA does not tolerate this level of passivity. *See, e.g., Comanche Nation v. United States,* No. CIV-08-849-D, 2008 WL 4426621 (W.D. Okla. Sept. 23, 2008) (Defendants failed to "stop, look and listen" and instead "merely paused, glanced, and turned a deaf ear to warnings of adverse impact." (citation omitted)).

Before the Corps issued its NHPA determination, Formosa's consultants twice overlooked or ignored two known historic cemeteries on site believed to contain the remains of enslaved people. AR000864–915, AR005970–995. Even after a "source," later identified as an archeologist with the Louisiana firm Coastal Environments, Inc. ("CEI"), notified the State Historic Preservation Office ("SHPO") of Formosa's oversight, the Corps never got involved. AR000165.

CEI later alerted the reviewing agencies again, this time explaining that the cemeteries are, in the Corps' understated words, "in slightly different locations" than surveyed. AR000165. CEI said it remained "greatly concerned that the contracting firm . . . did not examine the correct area" and "plotted the southeastern limits of the cemetery approximately 86 meters northeast of

the northern limits of the graveyard location indicated by the map overlays," concluding, "I only hope that this effort will prevent the indiscriminant [sic] destruction of the cemetery." Spees Decl. Ex. B, ECF No. 27-2. Even after the revelations of the cemeteries' existence and Formosa's mistaken survey locations, there is no evidence the Corps ever contacted CEI for additional information, although CEI certainly qualifies as an organization "likely to have knowledge of, or concerns with, historic properties in the area." 36 C.F.R. § 800.4(a)(3).

While the Corps' NHPA determination includes a section titled "Identification and Evaluation," it is void of any evidence of identification and evaluation efforts. In fact, the only indication of Corps activity regarding the burial sites is in its three-page NHPA determination, which mentions "[b]ackground research and literature review . . . conducted by Corps staff in November and December of 2018," AR000997, but there is no evidence of this "review" in the record. Rather, the record demonstrates the only basis for the Corps' conclusions was information Formosa provided, with sign-off from the SHPO, even though CEI repeatedly pointed out to the agencies that this information was incorrect and incomplete. AR005353; AR000165; Spees Decl. Ex. B, ECF No. 27-2. The Corps' adoption of Formosa Plastics' findings and reports without any further inquiry violates the NHPA. While the Corps may use contractors, including those of applicants, to prepare "information, analyses, and recommendations;" the agency "remains legally responsible for all required findings and determinations . . . [and] is responsible for ensuring that its content meets applicable standards and guidelines." 36 C.F.R. § 800.2(a)(3). Similarly, consultation with and concurrence from the SHPO does not absolve the Corps of its NHPA duties. *See So. Utah Wilderness All. v. Burke*, 981 F. Supp. 2d 1099, 1109 (D. Utah 2013) (noting that consultation with the SHPO is but one requirement, and "[t]here is nothing in the NHPA or Section 106 that excuses the [agency's] failure to comply with the other procedures based on a concurrence from the SHPO.").

Courts have found an agency's identification efforts unreasonable where there is evidence of historical properties in the area of potential impacts that have not been fully surveyed. For example, the Tenth Circuit held an agency did not "reasonably pursue the information necessary to evaluat[e]" whether a canyon contained cultural resources when information indicated "a sufficient likelihood" of historic properties to "warrant further investigation." *Pueblo of Sandia v. United States*, 50 F.3d 856, 860-62 (10th Cir. 1995). The same is true here. The Corps was presented with evidence showing historic properties might be present but did nothing with it. Such failure is the essence of arbitrary decisionmaking.

A post-hoc archaeological report—which Formosa's consultants submitted in June 2019, five months *after* the Corps' NHPA determination—does nothing to remedy the Corps' failures. That report indicates that Formosa's consultants (1) subsequently discovered additional human remains at the Buena Vista Cemetery site, requiring the boundaries and fencing plan to be changed, and (2) again failed to find the Acadia Cemetery. AR000324–387. There is no evidence the Corps had any involvement in determining how or where Formosa's consultants undertook this additional site work or evaluated the consultants' conjecture that the Acadia Cemetery had previously been destroyed. The Corps instead summarily accepted that Formosa's contractors did not find any remains in the area where it plans to build the facility's utility plant. AR000165. A February 2020 report provided to the Corps (and disregarded) illuminates its lack of reasonable efforts, explaining in detail the errors and oversights that still have not been addressed with respect to the Acadia and Buena Vista cemeteries. Importantly, the report also concludes four additional cemeteries may exist on the project site that have yet to be investigated. Spees Decl. Ex. E, ECF No. 27-2.[7] The Corps' treatment of these cemeteries and other possible burial sites

---

[7] The Corps' Memorandum of Record contains other omissions, errors, and procedural irregularities that further undermine the credibility of its conclusions. For example, it shows the SHPO's concurrence came *before* the Corps' requested it. AR000165. It also shows the Buena

does not meet the "take into account" standard of the NHPA. Its lack of process, independent inquiry, and transparency reflects a fundamental flaw in the Corps' permit analyses with respect to historic and cultural resources, and Plaintiffs are likely to succeed on their claim the Corp violated the NHPA.

### C.    Plaintiffs Are Likely to Prevail on Their Clean Water Act and Rivers and Harbors Act Claims.

Plaintiffs are likely to succeed on their claims that the Corps violated the Clean Water Act and Rivers and Harbors Act. The Corps (1) failed to "adequately explain why there is no less-damaging practicable alternative" and (2) arbitrarily found the project in the public interest. *All. to Save the Mattaponi v. U.S. Army Corps of Eng'rs*, 606 F. Supp. 2d 121, 130, 136 (D.D.C. 2009) [hereinafter "*Mattaponi*"].

### 1.    The Corps failed to demonstrate that the proposed project will have the least damaging environmental impact

The Corps failed to ensure it selected the least environmentally damaging practicable alternative. The Clean Water Act prohibits the Corps from issuing a permit "if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem." 40 C.F.R. § 230.10(a). Here, it is undisputed that the project is *not* "water dependent" (AR000111; Defs' Answer ¶ 118, ECF No. 19), and therefore it must be *presumed* less environmentally damaging alternatives are available "unless clearly demonstrated otherwise." 40 C.F.R. § 230.10(a)(3); *see Utahns v. Dep't of Transp.*, 305 F.3d 1152, 1186-87 (10th Cir. 2002) ("The test is whether the alternative with less wetlands impact is

---

Vista Cemetery "contains the individuals who were part of the family associated with the plantation," (AR000107; error repeated at AR000165), which has no support in the record and is in fact contradicted by Formosa Plastics' own consultants. AR000349 ("According to a search on Find-A-Grave, none of the previous owners are buried at the plantation. They are buried in various locations in St. James, Assumption, and Orleans Parishes. It is possible that slaves who once lived on the property might be buried at this location.").

'impracticable,' and the burden is on the Applicant . . ., with independent verification by the [Corps], to provide detailed, clear and convincing information *proving* impracticability.").

Plaintiffs are likely to prevail because the Corps failed to demonstrate the lack of less environmentally damaging alternatives. Its selected alternative had the most wetlands (40 percent of the property) and most significant damage to wetlands (61.7 acres) of all alternatives, AR000106, AR000278 (alternatives 1 & 2 combined are the preferred alternative), yet the Corps eliminated all others as impracticable *before* ever comparing the potential harm to wetlands. Instead of providing clear and convincing information proving impracticability, and without any independent analysis, the Corps parroted Formosa Plastics' analysis and criteria that precluded otherwise practicable alternatives. This is insufficient. *Sierra Club v. Van Antwerp*, 709 F. Supp. 2d 1254, 1264–68 (S.D. Fla. 2009) (the Corps violated the Clean Water Act with an uncritical acceptance of applicant's alternatives report), *aff'd*, 362 Fed. Appx. 100 (11th Cir. 2010).

As one example, the Corps never considered permitting a smaller facility. Had the Corps done so, it could have considered other properties—with fewer wetlands and lesser environmental harm—that were eliminated primarily because of their size. AR 000139. Notably, the facility's construction is planned in two phases. Construction of Phase I alone would yield 74 percent of the total product Formosa plans to produce, thus generally meeting project objectives of producing plastic for the global market. Yet the Corps failed to consider an alternative that would reduce the facility footprint by not building the Phase II expansion, which consists of a second ethane cracker and utility plant. AR004162, AR006052 (Figure 1). Here, neither the Corps nor Formosa Plastics ever explained why it must build one of the world's largest plastic plants for the project to be practicable, let alone provide clear and convincing information *proving* the impracticability of a smaller facility. The Corps is under no obligation to accommodate all components of a proposed project. *Shoreline Assocs. v. Marsh*, 555 F. Supp.

169, 179 (D. Md. 1983), *aff'd*, 725 F.2d 677 (4th Cir. 1984) (upholding the Corps alternative that avoided wetlands by not accommodating boat storage and launch desired by developer).

The Corps' failure to evaluate a smaller facility option is like the evaluation that the Tenth Circuit found deficient in *Utahns*, 305 F.3d at 1189. The Tenth Circuit held that the Corps violated the law when it eliminated practicable alternatives for a proposed freeway, such as a narrower median or right-of-way, because both met the basic project purpose even if they did not allow for all of the amenities or utilities desired by the applicant. *Id*. Here, the Corps never assessed a smaller option, silently acquiescing to Formosa Plastics' unsupported rejection of "smaller plant options . . . [because] the social and economic benefits created by a [f]acility of this size would not be realized." AR005418. The Corps and Formosa Plastics needed to prove—and they failed to prove—that a smaller, less damaging facility is impracticable because of costs, technology and logistics. *Utahns*, 305 F.3d at 1166 (alternatives analysis inadequate with "no cost methodology contained in the record").

The Corps also failed to consider alternatives to building a marine facility, including three docks and a heavy haul road, which would permanently destroy precious batture wetlands. The Corps itself found that the basic purpose of the project is not water dependent, AR000111, but it never demonstrated that it is impracticable for the facility to use the site's existing roads and rail for transportation of equipment, supplies, and products. The Corps irrationally eliminated alternatives that lacked an option to build docks. AR000137–144. The fact that an applicant would like to build a dock does not compel the Corps to include it in considering alternatives if the basic purpose is not water dependent. *See, e.g.*, *City Club of N.Y. v. U.S. Army Corps of Eng'rs*, 246 F. Supp. 3d 860, 872 (S.D.N.Y. 2017) (holding that the Corps' alternatives analysis was faulty because the basic purpose could be met without building a pier).

The Corps' also arbitrarily and capriciously rubber-stamped Formosa Plastics' elimination of sites in Ascension Parish, an area that is *not* predominately African American. The

conclusory statement that "by this time, six sites located in Ascension Parish had been eliminated," AR000139, fails to demonstrate that alternatives were not practicable. Formosa eliminated promising sites in Ascension Parish, claiming that the region would not attain air pollution standards in the future, but Ascension Parish in fact kept its attainment status on April 30, 2018, long before the Corps' final decision. 83 Fed Reg. 25,776 (June 4, 2018). Practicable alternatives must be analyzed, even if they only become available during the approval process. *Mattaponi*, 606 F. Supp. 2d, at 129-30. In *Mattaponi*, water needs changed and previously rejected alternatives became practicable during the pendency of the permit application. The court held the Corps failed to "explain fully, based on an analysis adequate to the task, why other alternatives are either impracticable or more damaging." *Id* at 130. Here, as in *Mattaponi*, the Corps had to provide more analysis on the Ascension Parish alternatives to demonstrate their unavailability.

 For these reasons, Plaintiffs are likely to succeed in establishing that the Corps violated the Clean Water Act by failing to prove that it selected the least environmentally damaging alternative.

  **2. The Corps' finding that the proposed project is in the public interest is arbitrary and capricious**

 Plaintiffs are also likely to prevail because the Corps' public interest review—which requires it to consider the cumulative effects on aesthetic, historic, environmental, wildlife, floodplain, water, and community welfare values, *see* 33 C.F.R. § 320.4(a)(1)—fails to comply with the Clean Water Act and Rivers and Harbors Act. The Corps' public interest review was a table with checkboxes indicating if the effects are "detrimental," "neutral," "negligible," or "beneficial." AR000152–158.  This cursory review assigned a "neutral" or "negligible" value to nearly every public interest factor, falling well short of the careful, reasoned analysis the law requires. 33 C.F.R. § 320.4(a)(1). The Corps must balance the detriments against the benefits and deny the permit if it would be against "the public interest." *Id*. § 320.4. Here, the Corps

improperly tipped the scale by disregarding the detriments. Plaintiffs are likely to show that the Corps' decision for at least one of many public interest factors was arbitrary.

First, the Corps' failure to properly weigh Formosa Plastics' long history of environmental violations was arbitrary. *Cf. Animal Legal Def. Fund v. Purdue*, 872 F.3d 602, 619-20 (D.C. Cir. 2017) (holding that an agency's licensing decision was arbitrary and capricious where the agency relied on a certification of compliance while ignoring the facility's history of non-compliance with regulatory requirements). The Corps' erroneously relied on Formosa Plastics' environmental compliance, dismissing concerns because the project will be "properly permitted with the LADEQ air and water permits." AR000154. The Corps' acceding to Formosa Plastics' rationale that its history of violations did not show a bad track record—but rather that it has cooperated with regulators, self-reported violations, and agreed to ensure compliance—is belied by the evidence. AR000119.

The Corps never even acknowledged Formosa Plastics was deemed a "serial offender" with "enormous" violations of environmental laws. *See San Antonio Bay Estuarine Waterkeeper*, 2019 WL 2716544, at *8-9. Before the Corps granted this permit, a federal court held Formosa Plastics liable for violating the Clean Water Act for discharging billions of plastic pellets into a bay from its facility in Point Comfort, Texas. *Id.* The court detailed the severity of the violations stating, "[t]he evidence demonstrates that Formosa Plastics has been in violation of its Permit concerning the discharge of floating solids . . . since January 31, 2016 and that the violations are enormous. . . . Formosa has also failed to report violations of the Clean Water Act to State and/or federal authorities." *Id.* at 25–26. EPA records also show that Formosa Plastics' other plastics plant in Baton Rouge, Louisiana, has been in violation of the Clean Air Act every quarter since 2009 and in violation of the Resource Conservation and Recovery Act every quarter since 2004. AR003021; Teel Decl. Ex. A, at 8–23. The Corps' failure to properly consider Formosa Plastics' long track record of violating permit requirements and failing to report violations is arbitrary,

and undermines its findings on environmental concerns, fish and wildlife values, and water quality factors.

Second, the Corps' impermissibly discounted all adverse effects and only looked at beneficial economic effects. The law does not allow an "unjustifiably greater weight" to be assigned to the benefits of a project. *Hough v. Marsh*, 557 F. Supp. 74, 86 (D. Mass. 1982) (striking down public interest review that looked one-sidedly at economic benefits but ignored adverse impacts). The Corps unlawfully glossed over the environmental and health concerns of the Formosa Plastics' project. Public testimony, media, and comments about the project show that the Corps' failed to consider important aspects of the problem and overly weighted the claimed benefits.

For example, the Corps has not squared its negligible impact findings on aesthetic and historic values with the serious concerns that the project deepens environmental racism, desecrates graves of enslaved persons, and mars the landscape—as described in the NEPA and NHPA sections above. The Corps' tries to paint a rosy picture by claiming that landscaping, with a "tree screen," will make the aesthetic impacts negligible, AR000153, but this ignores that the agricultural character of the land will change into a gargantuan industrial facility belching air and noise pollution into an African American neighborhood. When paying respects or engaging in quiet contemplation at the graves on the property, if ever allowed access, future visitors will experience a backdrop of one of the world's largest petrochemical complexes—with smokestacks, chemical tanks, utility plants, foul smells, and pipelines. This entails nearly complete loss of aesthetic values, which will certainly "mar the beauty," "deny access to or visibility of the resource, or result in changes in odor, air quality or noise levels." 40 C.F.R. § 230.53. Additionally, the adverse impact on historic values is *not* "neutral because it has been mitigated," AR000155, because the Corps failed to ensure access to and adequate protection of the Acadia and Buena Vista cemeteries, and failed to conduct any analysis of four additional

potential burial sites on the property. *See supra* at 24-30. There is no support for the Corps'

conclusions that community welfare, historic, and aesthetic values tip the scales in favor of the

public interest. *See, e.g., Wyo. Outdoor Council v. U.S. Army Corps of Eng'rs*, 351 F. Supp. 2d

1232, 1256 (D. Wyo. 2005) (public interest review ignored cumulative impacts).

 The Corps also downplayed the pollution from the Plastic Facility. The Corps' scant

description noted the facility's impacts on plastic, air, and water pollution, including:

> the addition of more disposable plastics to the environment, output of chemicals through
> the smoke stack, possible contaminants entering the Mississippi River, potential
> contaminants in the area drainage entering the river and lake systems nearby, potential
> impacts to fish and wildlife, evacuation hazards, impacts to wetlands, and chemical spill
> concerns.

AR000154. However, it determined that these concerns are "neutral because the issues have been

mitigated," *id.*, even though the record reveals nothing that "mitigated" plastic, air, or water

pollution—or related impacts on wildlife and public health. The Corps only required Formosa

Plastics to provide compensatory mitigation for some wetland loss by purchasing wetlands

credits, AR000107; but this will not mitigate the pollution. For example, though not analyzed by

the Corps, the facility will double the air pollution in St. James Parish, including carcinogenic

pollutants. Teel Decl. Ex. A, at 81. There is no mention of how Formosa Plastics' chronic air

pollution will be mitigated. *Mattaponi*, 606 F. Supp. 2d at 136 (the Corps unlawfully failed to

consider the impacts of chronic exposure to water pollution). Plastic pollution is likewise

unmitigated—both the direct effects of plastic pellet discharges and indirect plastic pollution

from the annual production of 2.4 million tons of ethylene (an amount that could make about a

trillion plastic water bottles)—much of which will inevitably end up in landfills and oceans.[8]

---

[8] The Corps' token statement that "[r]ecycling programs in many areas help to mitigate the
disposable plastic issues," AR000154, runs contrary to the fact that plastic continues to
overwhelm municipal waste management systems—and only 9 percent of plastic is recycled
nationally. AR003033; Teel Decl. Ex. B, at 204-09

Finally, the Corps' neutral finding on the project's harm to wildlife was arbitrary. For example, the Corps' found that fish and wildlife values are neutral because they "will relocate," AR000155, and claimed the project would have "no effect" on endangered pallid sturgeon or threatened manatee, AR000146, AR006012; but this runs counter to evidence in the record. The record does not support a "no effect" determination for pallid sturgeon. Rather, it reflects a "concern for the endangered Pallid Sturgeon," AR000108; in particular, the Louisiana Department of Fish and Wildlife expressed concerns about sturgeon becoming entrained or impinged in the facility's intake structure. AR000108–109. Formosa Plastics' own consultant also noted that pallid sturgeon are likely to occur in the affected area and advised against construction during the breeding season, AR006432; however, no such mitigation was adopted. Further, in its "Species Effects Determination Key" the Corps wrongly indicated project is not in St. James Parish, which lead to an incorrect "no effect" determination for manatees. AR006012. The numerous vessels serving the facility will worsen a predominant threat to manatee survival—vessel collisions. *See* 82 Fed. Reg. at 16,701; *see also* AR006446, AR004166 (discussing increased traffic servicing the facility). In addition, the property is important migratory bird and bald eagle habitat. The forested area and borrow pits that will be filled serve as a migratory bird flyway and feeding grounds, and bald eagles have been sighted and may nest in the forested wetlands.[9] AR006432–433. The Corps' brief statement that impacts to wildlife will be mitigated is insufficient to support the Corps' public interest finding. AR000155.

Plaintiffs are likely to succeed in showing that the Corps' analysis was arbitrary in one or more of these many aspects to warrant the preliminary relief sought.

---

[9] The Corps cannot rely on a single survey Formosa Plastics conducted in 2017 outside the nesting season to justify that no nests were found, and nests on adjacent properties could also be disturbed. AR006433.

## II.      Plaintiffs Will Suffer Irreparable Harm Absent Injunctive Relief

Unless the Court grants this motion, Plaintiffs will suffer irreparable harm from Formosa Plastics' imminent and permanent destruction of critical environmental and historic resources—the very resources this lawsuit seeks to protect. This injunction is necessary to temporarily maintain the status quo and prevent irreparable harm until the Court can rule on the merits.[10]

Some members of the plaintiff groups have lived in St. James their whole lives. Lavigne Decl. ¶ 2. A lifelong resident, Ms. Lavigne lives on the same road and the same stretch of the Mississippi River where the Plastics Facility will be built. Lavigne Decl. ¶ 3. Mr. Cayette lives on land his great-grandfather acquired in the 1800s after the abolition of slavery. Cayette Decl. ¶ 2. For these plaintiffs, Formosa Plastics is not only an unwanted neighbor; but construction will also destroy the precious remaining fields, forest, swamps and drive away the birds, frogs, grasshoppers, butterflies, and dragonflies they grew up with and adore. Lavigne Decl. ¶ 22, Cayette Decl. ¶ 11.  Construction of the Plastics Facility will pollute the air they breathe, it will increase traffic, cause odors and noise. Lavigne Decl. ¶ 18, Cayette Decl. ¶¶ 8–10. Heartbreakingly, the project limits their ability to visit the cemeteries of the enslaved people who worked on the plantations so that they may "pray, sing, bring flowers" to honor their ancestors. Lavigne Decl. ¶ 30, Cayette Decl. ¶ 6. In Mr. Cayette's own words, "It would be a painful loss of my culture and heritage if those sacred sites are disturbed, and I would be emotionally and spiritually devastated if it happens." Cayette Decl. ¶7.

Formosa Plastics has already begun and plans to ramp up construction over the next six months. Teel Decl. Ex. E. If it proceeds as planned, Formosa Plastics will damage 6.7 acres of critical batture wetlands; build a dock, heavy haul road, and bridge from the levee over Highway 18; relocate utilities; widen Highway 3127 from two to four lanes; and initiate a pile-driving

---

[10] Courts need not defer "to federal agencies' positions concerning irreparable harm." *San Luis & Delta-Mendota Water Auth. v. Jewell*, 969 F. Supp. 2d 1211, 1215 (E.D. Cal. 2013).

program and pipeline projects. *Id.* An injunction is necessary to prevent these activities that will cause irreparable harm. *See, e.g., Se. Alaska Conserv. Council v. U.S. Forest Serv.*, 413 F. Supp. 3d 973, 980-81 (D. Alaska 2019) (finding initial steps of ground-disturbing activities, including building a road, would cause irreparable harm).

The harms from these activities both independently and collectively warrant injunctive relief. "Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable." *Humane Soc'y of the United States v. Kempthorne*, 481 F. Supp. 2d 53, 69 (D.D.C. 2006) (citation omitted); *see also Nat'l Wildlife Fed'n v. Burford*, 835 F.2d 305, 323–26 (D.C. Cir. 1987) (affirming preliminary injunction based on environmental injury). "When a procedural violation of NEPA is combined with a showing of environmental or aesthetic injury, courts have not hesitated to find a likelihood of irreparable injury." *Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d 1, 24 (D.D.C. 2009) (citations omitted). Irreparable harm from the imminent construction activities fall into three categories: (1) environmental and aesthetic injuries; (2) levee instability; and (3) injuries to historic and cultural resources.

First, the injunction is necessary to prevent irreparable harm to Plaintiffs' concrete environmental interests in wetlands, wildlife, aesthetics, and clean air. Formosa Plastics' initial construction activities include imminent tree clearing and filling of forested batture wetlands on the Mississippi River to build a dock, road, and bridge; and that harm alone is sufficient to warrant an injunction. *See, e.g.*, *Sierra Club v. U.S. Army Corps of Eng'rs*, 645 F.3d 978, 995 (8th Cir. 2011) (finding irreparable harm from filling wetlands); *Nat'l Wildlife Fed'n v. Marsh*, 721 F.2d 767, 786 (11th Cir. 1983) (same); *Idaho Rivers United v. Probert*, No. 3:16-cv-00102-CWD, 2016 WL 2757690, at *17 (D. Idaho May 12, 2016) (finding irreparable harm from cutting trees). Destroying wetlands or clearing trees is the definition of irreparable. *See League of Wilderness Defs./Blue Mts. Biodiversity Project v. Connaughton*, 752 F.3d 755, 764–65 (9th Cir.

2014) (clearing trees cannot be remedied with money or by planting seedlings, irrespective of whether the trees are small and were previously logged). Building on the batture will damage up to 6.7 acres of wetlands—including clearing trees—and require 27,611 cubic yards of fill. AR000105, AR002243. As construction proceeds, even more wetlands throughout the property will be permanently destroyed, and contiguous wetlands will be harmed as well. Shaffer Decl. ¶¶ 12-13, van Heerden Decl. ¶ 17.

Destruction of these wetlands will directly harm Plaintiffs' aesthetic interests. For example, this will impair Mr. Eustis' ability to observe and photograph wildlife and wetlands surrounding the property. Eustis Decl. ¶¶ 8, 11. It will also harm Plaintiffs' interests in migratory birds and other wetland wildlife. AR003023–024, AR004313–315, AR006434; Eustis Decl. ¶¶ 10, 13; Alexander Decl. ¶¶ 6-7 ("I am an avid birdwatcher . . . [and t]he destruction of wetlands will further threaten these birds, affecting my ability to continue seeing and enjoying them"); Shaffer Decl. ¶ 13 (construction will displace migratory birds).

Plaintiffs will also be irreparably harmed by Formosa Plastics' transformation of the agricultural landscape to a massive construction site for the petrochemical complex, forever damaging the look, feel, and value of this serene spot on the river. *See Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (finding activity that harms a plaintiff's "ability to 'view, experience, and utilize'" an area in an "undisturbed state" is "actual and irreparable injury" that "satisfies the 'likelihood of irreparable injury' requirement articulated in *Winter*"). Plaintiffs' members value and have benefitted from this area for many years, and Formosa Plastics' construction will harm them in immediate and concrete ways. *See, e.g.*, Lavigne Decl. ¶ 21 (describing how she values "green and beautiful agricultural land and rich wetlands" and filling those wetlands and bulldozing the trees will cause her "great sorrow and anger" every time she goes by); Cayette Decl. ¶ 8 (describing how the open space and wildlife improve his quality of life and how construction will destroy "the natural beauty of the site").

The irreparable harm also includes an immediate increase in air pollution from construction, road traffic, and vessel traffic, Lavigne Decl. ¶ 19, Cayette Decl. ¶ 10; and in due course the petrochemical complex will *double* the air pollution in the Parish. Air pollution not only increases the risk of dying from COVID-19; but the plant's emissions also include harmful pollutants that endanger human health and the environment. Cayette Dec. ¶¶ 8-9; Lavigne Decl. ¶ 16. "[S]everal courts, including the Supreme Court, have found that increased air pollution can constitute irreparable harm." *California v. U.S. Bureau of Land Mgmt.*, 286 F. Supp. 3d 1054, 1073-74 (N.D. Cal. 2018) (citing *Beame v. Friends of the Earth*, 434 U.S. 1310, 1314 (1977) (recognizing "irreparable injury that air pollution may cause during [a two month] period, particularly for those with respiratory ailments"); *Sierra Club v. U.S. Dep't of Agric.*, 841 F. Supp. 2d 349, 358 (D.C. Cir. 2012) (irreparable harm from air pollution due to coal plant expansion). Absent an injunction, Plaintiffs' members will be forced to breathe air polluted with soot, smog, carcinogens and other pollutants. Cayette Decl. ¶ 9; Lavigne Decl. ¶¶ 16, 27; Cooper Decl. ¶ 7. This puts them at risk of developing asthma, respiratory problems, cancer, and other health problems. AR003024–026. This harm is especially pronounced because some of Plaintiffs' members already suffer from ailments that make them more vulnerable to air pollution. Cayette Decl. ¶ 9, Lavigne Decl. ¶ 18, Cooper Decl. ¶¶ 5-7.

Further, the imminent construction on the levee for the heavy haul road and bridge, and the trucks carrying heavy loads, will immediately and irreparably risk levee instability and flooding. Van Heerden Decl. ¶¶ 24, 27, 29-30; *see also Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1038 (8th Cir. 2016) (affirming irreparable harm for levee work, an initial step in a larger project with flooding harm). As detailed in Dr. van Heerden's declaration, construction and trucks on the west bank of the Mississippi River threaten to destabilize the levee. Van Heerden Decl. ¶¶ 24, 27, 29-30. The Mississippi River Flood Protection Levee protects St. James residents, homes, farms, transportation routes, and other

41

resources from inevitable hurricanes and floods. AR000548; van Heerden Decl. ¶ 30; Lavigne Decl. ¶ 24. In addition to levee instability, Plaintiffs' members face harm from flooding because construction and landfill will increase flood risk even as soon as this hurricane season—between June and November. *See* Shaffer Decl. ¶¶ 8-11; van Heerden Decl. ¶¶ 10, 16, 21, 23, 25 (noting there is a high probability that the property will flood during major storms or intense rainfall). This increased flooding hazard puts locals at risk. Lavigne Decl. ¶ 28.

Finally, the imminent plans for boring and pile driving (as well as ensuing landfill and construction) on the site will irreparably harm historic properties, some of which have never been surveyed. Spees Decl. Ex. E, ECF No. 27-2. The CEI Report concluded, (1) Formosa Plastics' consultants overlooked the Acadia and Buena Vista cemeteries in its archeological reports, and other omissions made it "impossible to evaluate the conclusions presented" (*id.* at 11); (2) when sent back to do further investigation after CEI reported their error to the SHPO, Formosa Plastics' consultants searched in the wrong location for the Acadia Cemetery (*id.* at 20); (3) four unmarked cemeteries (sites B, D, H, and L) may exist on the project site in addition to the two previously identified (*id.* at 120-21); (4) further investigations are required to avoid construction impacts to the Acadia Cemetery and the four additional potential burial sites (*id.* at 34, 121-122). Because of the Corps' inadequate identification of historic resources, Formosa Plastics' activities risk irreversibly damaging historic grave sites of enslaved people. Construction will also harm the aesthetics of the historic cemeteries and impede access for those paying their respects to the deceased. Plaintiffs will suffer irreparable injury to their interests in these historic grave sites. *See, e.g.*, Lavigne Decl. ¶¶ 30-33; Cooper Decl. ¶ 13; Cayette Decl. ¶¶ 6-7; London Decl. ¶ 8.

This harm is significant and imminent, as Formosa Plastics has already sought to block Plaintiffs' access to access the Buena Vista Cemetery. In denying Ms. Lavigne of RISE St. James' most recent request for access (Spees Decl. Ex. G & H, ECF No. 27-2), Formosa Plastics

argued the "property is an active construction site," rendering it unsafe for her to visit the cemetery. *Id.* Ex. H. On Juneteenth this year (June 19, 2020), Ms. Lavigne visited the Buena Vista Cemetery to pay respects to her community's ancestors and honor the resting place of enslaved people who had no say in where they worked or died. Lavigne ¶ 30. To do so, she had to obtain a Temporary Restraining Order in state court. *RISE St. James and Sharon Lavigne v. FG LA LLC, a/k/a Formosa Plastics*, Civ. Action 39963, 23rd Judicial District Court (June 18, 2020). This affirms the immediacy of the harm and need for injunctive relief.

An injunction is necessary given Formosa Plastics' refusal to delay construction; imminent, significant, and irreparable injuries; and the provisions of NEPA, the NHPA, and Clean Water Act that require analysis *before* any project construction occurs.

## III.   The Balance of Equities and the Public Interest Favor an Injunction

Granting Plaintiffs' requested relief—which would maintain the status quo pending a decision of these issues on the merits—serves the public's interest in preventing harm that our environmental laws were meant to protect. The preliminary injunction factors of balancing the equities and finding an injunction in the public interest "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Additionally, "there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *League of Women Voters of the United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (citation and internal quotations omitted).

The Court "looks to the statutes enacted by Congress" for the public interest test. *Quechan Tribe of the Fort Yuma Indian Rsrv. v. U.S. Dep't of Interior,* 755 F. Supp. 2d 1104, 1122 (S.D. Cal. 2010) (citation omitted). In enacting NEPA, the NHPA, and the Clean Water Act, Congress established that protecting environmental and historic resources is in the public interest. *Brady Campaign*, 612 F. Supp. 2d at 26 ("the public has an interest in having Congress' mandates in NEPA carried out accurately and completely" (citation omitted)); *Sierra Club v.*

*Marsh*, 714 F. Supp. 539, 592-93 (D. Me. 1989) (similar); *Quechan Tribe,* 755 F. Supp. 2d at 1122 (public interest served, because with the NHPA, Congress "determin[ed] that preservation of historical properties takes priority"); *Friends of the Wild Swan, Inc. v. U.S. EPA,* 130 F. Supp. 2d 1207, 1213 (D. Mont. 2000) ("The public interest is best served by prompt action" by the government "to comply with the [Clean Water Act's] charge"). The public has an overriding interest in ensuring the Corps complies with these statutes *before* taking actions that irreversibly impact the environment.

As discussed above, if an injunction is not granted Plaintiffs will be irreparably harmed by the destruction of wetlands, environmental damage, and the desecration of grave sites of enslaved persons, which bear witness to both our country's shameful past and the faith, resilience, and perseverance of the present-day St. James community. If irreparable injury is probable, "the balance of harms will usually favor the issuance of an injunction to protect the environment." *Idaho Conserv. League v. Atlanta Gold Corp*., 879 F. Supp. 2d 1148, 1158 (D. Idaho 2012) (citation omitted) (granting a preliminary injunction after weighing environmental harm of water pollution over the economic injury).

Conversely, there is no harm at all to the Corps from temporarily suspending its permit. *Sierra Club v. Norton*, 207 F. Supp. 2d 1310, 1341 (S.D. Ala. 2002) ("proposed injunction threatens little tangible harm to the governmental entities"). And the harm to Formosa Plastics, if any, is likely minimal. Formosa is at the front end of a multi-year project, and a few months delay for a project that will not be completed for 10 years is unlikely to make or break the proposal. *See, e.g., Sierra Club v. Army Corps*, 645 F.3d at 97–98 (environmental harms outweighed temporary loss of jobs and delays in opening the plant). Delaying the project should not tip the balance of equities; Formosa Plastics made the risky decision to begin construction while the Corps' permitting decisions were in litigation, and after it became aware that its historic resources surveys were deficient. *See League of Wilderness Defs. v. Connaughton*, 752

F.3d 755, 766 (9th Cir. 2014) ("irreparable environmental injuries outweigh the temporary delay

intervenors face in receiving a part of the economic benefits of the project"). It is better to pause

construction now to preserve the status quo rather than risk having to reverse course as the court

ordered in *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs,* No. 16-1534-JEB, 2020 WL

3634426, at *8-9 (D.D.C. July 6, 2020).

**IV.     The Court Should Issue No Bond or Only a Minimal One**

If the Court issues an injunction, Plaintiffs—all nonprofit organizations—respectfully

request that the Court require no bond or, at most, a nominal bond. *See, e.g.,* Suckling Decl. ¶ 8-

9. Courts routinely require no bond or only a minimal bond (i.e., $500 or less) in public interest

environmental cases of this kind.[11]

**CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request the Court grant their Motion for

Preliminary Injunction.


Dated: July 14, 2020                                        Respectfully submitted,

                                                           s/ *Julie Teel Simmonds*
                                                           Julie Teel Simmonds, CA Bar No. 208282*
                                                           Emily Jeffers, CA Bar No. 274222*
                                                           Lauren Packard, CA Bar No. 317774*
                                                           CENTER FOR BIOLOGICAL DIVERSITY
                                                           1212 Broadway, Suite 800
                                                           Oakland, CA 94612
                                                           Ph: (510) 844-7100
                                                           jteelsimmonds@biologicaldiversity.org
                                                           ejeffers@biologicaldiversity.org
                                                           lpackard@biologicaldiversity.org

---

[11] *See, e.g.*, *W. Watersheds Proj. v. Schneider*, 417 F. Supp. 3d 1319, 1335 (D. Idaho 2019)
(ordering no bond); *Red Wolf Coal. v. U.S. Fish & Wildlife Serv.*, 210 F. Supp. 3d 796, 807
(E.D.N.C. 2016) (ordering a $100 bond); *Landwatch v. Connaughton*, 905 F. Supp. 2d 1192,
1198 (D. Ore. 2012) (ordering no bond).

Catherine Kilduff, DC Bar # 1026160
CENTER FOR BIOLOGICAL DIVERSITY
801 Boush St., Ste. 200
Norfolk, VA 23510
Ph: (202) 780-8862
ckilduff@biologicaldiversity.org

*Admitted *Pro Hac Vice*

*Attorneys for Plaintiffs*