**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

CENTER FOR BIOLOGICAL DIVERSITY, *et al.*,

                *Plaintiffs*,

       v.

U.S. ARMY CORPS OF ENGINEERS, *et al.*,

              *Defendants,*

    and

FG LA LLC,

             *Defendant-Intervenor.*

No. 20-cv-103 (RDM)

---

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiffs Center for Biological Diversity, Healthy Gulf, Louisiana Bucket Brigade, and RISE St. James ("Plaintiffs") move to admit extra-record evidence in this Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq*., challenge to the U.S. Army Corps of Engineers' issuance of a federal permit relating to the construction of a large plastics facility by FG LA LLC ("FG") in St. James Parish, Louisiana. Dkt. 27. The Army Corps of Engineers and Lieutenant General Todd S. Semonite in his official capacity as Commanding General of the Corps ("Corps" or "Defendants") oppose that motion. Dkt. 44. FG, which has intervened as a defendant, both opposes Plaintiffs' motion, Dkt. 43, and conditionally cross-moves to supplement the administrative record with its own materials, *id.*; Dkt. 45.

For the reasons explained below, the Court will grant in part and deny in part Plaintiffs' motion and will deny FG's conditional cross-motion.

# I.  BACKGROUND

## A.      Statutory and Factual History

FG, which is "a member of the Taiwanese conglomerate Formosa Plastics Group," Dkt. 1 at 2 (Compl. ¶ 2), seeks to build a large plastics manufacturing facility on a roughly 2,300-acre site in St. James, Louisiana (the "Project"), Dkt. 43 at 7.  The site consists "of undeveloped fields and wetlands," Dkt. 27 at 9, where 19th-century sugar plantations once operated, Dkt 1 at 2 (Compl. ¶ 3).  To build the facility, FG had to obtain a permit from the Corps, pursuant to Section 404 of the Clean Water Act and Section 10 of the Rivers and Harbors Act ("Section 404 permit" or "permit").  Dkt. 44 at 5.

Before issuing a Section 404 permit, the Corps must conduct analyses that satisfy several different statutes.  For present purposes, however, the two relevant statutes are the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321, *et seq.*, and the National Historic Preservation Act ("NHPA"), 54 U.S.C. §§ 300101, *et seq.*  Under NEPA, the Corps must consider the environmental effects of issuing a permit, including impacts on "cultural . . . heritage."  42 U.S.C. §§ 4331, 4332(2)(C).  The NHPA, in turn, requires the Corps to consider effects on historic properties prior to issuing a permit.  54 U.S.C. § 306108.  Regulations governing issuance of permits allow the Corps to "develop joint procedures with states and other [f]ederal agencies."  33 C.F.R. § 325.2(e)(3).  Although none of the parties have fully explained the arrangement that governs in Louisiana, it appears from the record that the Louisiana Department of Natural Resources ("LDNR"), the Louisiana Department of Environmental Quality ("LDEQ"), and the Corps jointly oversee the permitting process.  Dkt. 1 at 24 (Compl. ¶ 76); Dkt. 43 at 9.  When historic sites are potentially implicated, the Louisiana Division of

Archaeology[1] reviews permit applications to determine if the proposed project might disturb sites eligible for listing on the National Register of Historic Places.  Dkt. 43 at 10; *see also* Dkt. 50-31 at 2–3 (Division of Archaeology letter commenting on consultants' report); Dkt. 50-19 (Division of Archaeology concurrence with the Project).

    1.   *The 2017 Survey*

In the spring of 2017, FG began to investigate whether the proposed Project site contained cultural resources.  Dkt. 43 at 9.  During March and May of that year, contractors hired by FG conducted background studies, shovel-test excavations, and targeted mechanical excavations on the site but found no "intact archaeological deposits" or areas with "archaeological research potential."  *Id.* at 9–10.  FG submitted the results of this survey to the state Division of Archaeology, which critiqued several aspects of the survey and recommended further investigation.  *Id.* at 10; Dkt. 50-31 at 2–3.  Pursuant to this recommendation, FG's contractors conducted further excavations and "again found no archaeological deposits or research potential at" the Project site.  Dkt. 43 at 10.  Around the same time, the LDNR received FG's application for the Project, deemed it complete, and transferred it to the LDEQ and the Corps for review.  *Id.* at 9; Dkt. 52-10 at 3–9.

---

[1] The Court refers to the Louisiana "Division of Archaeology" throughout this opinion to avoid confusion, but the parties also refer to officials and actions associated with this division as officials and actions associated with the State Historic Preservation Office, or "SHPO."  For the purposes of this opinion, the two terms are treated interchangeably under the term "Division of Archaeology."

2.  *The 2018 Excavation*

On July 31, 2018, an FG contractor emailed the Corps' Neil Gauthier to alert him to a significant development.  Dkt. 51-2 at 2–3.  A third-party researcher had shared an 1878[2] map with State Archaeologist Chip McGimsey, "indicat[ing] . . . two cemeteries . . . in [the FG] project area."  *See id.* at 2; Dkt. 50-27.  The cemeteries lay on two former plantation properties: the Acadia plantation and the Buena Vista plantation.[3]  Dkt. 51-2 at 2.  With respect to the Acadia plantation, the FG contractor wrote:

> You can see that the Arcadia [sic] [c]emetery is located within a large borrow area and the buffer is also largely located in the borrow area, with one side extending onto Brock Road.  The borrow pit area was excavated out years before the current owner had ownership of the property.  As this particular . . . map was not known to us until yesterday, the survey report does not take into account the impact of the borrow pit on the cemetery.

*Id.*  And, with respect to the Buena Vista plantation, she wrote:

> The Buena Vista [c]emetery area is at the edge of the project area and the cemetery and the 100-foot buffer are located within a 300-foot buffer that had been planned for no development surrounding the plant facilities.  Shovel test units were excavated in this area.  Shovel tests are generally not the best method for identifying unmarked cemeteries, so it is not surprising that the field survey did not find evidence of this cemetery.  However, this area could be left as green space, with fencing, and a plan would be developed to protect the area from future development.

*Id.*  The email concluded, "We would like to schedule a time to talk with you about this matter" and asked when Gauthier and the "reviewing archeologist[]" would be available.  *Id.*

Ten days later, on August 10, 2018, McGimsey emailed two other Corps officials, Jason Emery and Noah Fulmer, regarding the map.  Dkt. 50-27 at 2.  Describing FG and its

---

[2]  The email's reference to the map as an "1877 map" seems to be an error; both Plaintiffs and FG refer to the map as an "1878 map."  Dkt. 27 at 16; Dkt. 43 at 10.

[3]  Although the email refers to "Arcadia," it appears that the correct name is "Acadia."

contractor's "consternation" at the discovery, McGimsey explained that FG had requested that he

contact the Corps' "archaeologists and bring [them] up to speed on the situation." *Id.*

McGimsey indicated that he and Ryan Seidemann, a Louisiana Assistant Attorney General, were

"comfortable" with a plan to keep the area identified as "the Buena Vista plantation cemetery . . .

as green space." *Id.* "[N]o further work" would occur in the area, "except perhaps . . . put[ting]

a fence and marker up." *Id.* How to handle the Acadia Plantation cemetery, however, was less

clear. McGimsey wrote:

> The Arcadia [sic] Plantation cemetery was largely destroyed prior to the client
> [FG] purchasing the land when a large borrow bit was excavated at its location.
> Ryan [Seidemann] and I have argued, however, that it is important to determine
> if any burials remain along the margins of the borrow pit. The client [FG] has
> the option of setting this area aside as green space, but has noted that that would
> cause significant issues for the facility plan. If they cannot avoid this area, we
> are recommending testing (backhoe stripping) to determine if any burials are
> present. If none are found, there are no further issues and construction can
> proceed. If burials are found, then the client [FG] will have to decide whether
> to redesign to avoid the cemetery, or to remove the remains and rebury them
> elsewhere. At this time, I am not aware they have made a decision on how best
> to proceed.

*Id.*

While FG and state officials considered how to respond to the new information about the

burial sites, FG continued to press for the public comment process for the Project to begin. On

August 20 and 21, 2018, Mike Horvath—another FG contractor—emailed Gauthier to ask about

the status of the public notice for the Project, explaining that Horvath was "getting significant

pressure from the client (FG)" to get the notice issued. Dkt. 51-1 at 2–3. Then, on August 27,

2018, LDEQ and the Corps issued a Joint Public Notice that described the Project site, attached

maps of the site, and allowed 30 days for public comment. Dkt. 43 at 9. The notice announced

that "[t]he New Orleans District is unaware of properties listed on the National Register of

Historic Places near" the Project but cautioned that "[t]he possibility exists that the proposed

work [could] damage or destroy presently unknown archaeological . . . sites." Dkt. 50-20 at 4. The notice made no reference to the recently discovered map or to the Buena Vista or Acadia cemeteries. Plaintiffs did not submit written comments regarding cultural resources implicated by the Project. Dkt. 43 at 9. Two days after the notice issued, FG contractor Horvath again emailed Gauthier to "update [him] on a cemetery issue" at the Project. Dkt. 51-1 at 2.

In October 2018, FG's contractor investigated what it believed to be the Acadia site by digging "a series of long, narrow trenches to look for any evidence of a cemetery, such as human remains, grave shafts, or funerary objects." Dkt. 43 at 11. Those investigations uncovered no evidence of a cemetery. *Id.* That same month, FG sent these results to McGimsey, the State Archaeologist, who sent a response four days later concurring with the investigation's conclusion that "no evidence of the [Acadia] cemetery was found" and approving FG's plan to put a fence around the Buena Vista site. Dkt. 50-19 at 2; *accord* Dkt. 43 at 10.

On November 1, 2018, the Corps, the LDNR, and the LDEQ issued a supplemental public notice for a joint hearing to be held on December 6, 2018. Dkt. 57 at 2; Dkt. 50-18. "The notice included a link to the LDNR webpage that hosts links to FG's joint permit application, along with the supporting documentation" for its application. Dkt. 57 at 2–3. This page evidently included correspondence between the Division of Archaeology and FG related to efforts to investigate the Acadia cemetery. *Id.* at 3 n.2. Based on the record before the Court, the linked letter seems to be the first public notice of the existence of the cemeteries. In response, at least one interest group, the Louisiana Environmental Action Network ("LEAN"), referred to the burial sites in its comments on the Project. Dkt. 57-3 at 2, 7. LEAN noted that FG had been asked "to identify the demarcation area of each [cemetery] and [to describe] construction of a fence around the historic cemetery site(s)." *Id.* at 7. The group stressed that the record provided

no information about "how [community members'] access [to the cemeteries would] be guaranteed." *Id.* at 7–8.  At the public hearing on December 6, 2018, Plaintiffs did not raise issues related to the cemeteries, Dkt. 43 at 9, although at least two members of Plaintiff RISE St. James registered to receive notice of the LDNR final decision.  Dkt. 57 at 4; Dkt. 57-5 at 2, 10.

The next public reference to the cemeteries was in a Supplemental Environmental Assessment Statement ("SEAS") that FG submitted to the Corps and the LDEQ on January 7, 2019.  Dkt. 53 at 1; Dkt. 53-1.  The SEAS was also "filed publicly on the [L]DEQ docket." Dkt. 53 at 1.  It explained:

> The Acadia [c]emetery was located in what is now a borrow pit, which was dug before FG purchased the property.  Additional field work was done and no evidence of a cemetery (i.e., human remains or funerary objects) was found. . . . The Division of Archaeology has no objections to future development in the area. . . .
>
> The area identified as Buena Vista [c]emetery is located on FG's eastern property line, within the 300 foot internal buffer zone.  As a result, no construction will occur within this area. . . .  To protect the area from any activities initiated by FG, FG has fenced off the area over which it has control so that there will be no disturbance from FG or its contractors.  The Division of Archaeology agreed that this approach "will demarcate the cemetery location from future development." . . .  At a point in the future, FG plans to properly examine the area and will comply with all applicable rules and procedures for relocation, if necessary.

Dkt. 53-1 at 19.

Two days after receiving the SEAS, the Corps' archaeologists concluded that no historic properties, as defined by regulation, were in the Project area.  Dkt. 43 at 13.  Then, on January 31, 2019, the LDNR issued its final approval of FG's application.  Dkt. 57 at 4; Dkt. 57-6 at 2. Those who registered for notice of the final decision—including, presumably, the two RISE St. James members who had done so—received notification electronically the same day.  Dkt. 57 at 4.  Among other things, the LDNR decision noted that the Project site contained

7

> two historic cemeteries that were identified by the Louisiana Division of
> Archaeology during the application process.  The applicant performed research and
> testing of these areas and subsequently provided a plan for protection of one site.
> The other site was deemed to no longer be of concern during the review process.
> This plan was approved by the Louisiana Division of Archaeology.

Dkt. 57-6 at 5.

3.   *The 2019 Excavation*

In early 2019, the Project hit another snag.  A third-party researcher notified State

Archaeologist McGimsey that FG's contractor had likely misidentified the boundaries of the

Buena Vista site and the location of the Acadia site and had yet to investigate the correct areas.

Dkt. 43 at 11.  In response, FG's contractor "conducted additional research" and identified a new

location for the Acadia cemetery—"roughly 300 feet southwest of the original investigation

site"—by "comparing a series of newer maps in the area."  *Id.*  The contractor investigated the

new site in May 2019 by digging eight trenches but again "uncovered no burials, artifacts, or

other evidence that a burial place existed."  *Id.*  The contractor once again concluded that, if the

Acadia cemetery had ever existed, it had been destroyed by borrow pits under a previous owner.

*Id.* FG's contractor also further investigated the Buena Vista cemetery by digging eight trenches

and found "four burials containing human remains, eight potential grave shafts, 14 posts or post

holes, and various 'wooden fragments and coffin nails.'"  *Id.* at 12.  The contractor determined

that the burial site "could have been a" cemetery for enslaved people "associated with the Buena

Vista Plantation" *id.*, and recommended construction of a fence to protect "the newly defined

boundaries of the cemetery."  Dkt. 52-3 at 6; *accord.* Dkt. 43 at 12.  In June 2019, FG sent these

results and a fencing plan to the Division of Archaeology, Dkt. 52-2 at 2 (fencing plan); Dkt. 50-

4 at 2 (referencing receipt of the fencing plan and report on the cemetery excavation); Dkt. 43 at

12, which approved the plan in early July.  Dkt. 50-4 at 2.

Plaintiffs did not comment on the cemeteries following release of the SEAS.  But they did submit comments on other aspects of the Project, even after the formal comment period had closed.  Plaintiffs RISE St. James and the Louisiana Bucket Brigade submitted comments through Earthjustice on July 9, 2019, discussing concerns about pollution and greenhouse gas emissions from the Project, among other issues.  Dkt. 57-11 at 2–8.  And Earthjustice submitted further comments on behalf of Plaintiffs RISE St. James, the Louisiana Bucket Brigade, the Center for Biological Diversity, and Healthy Gulf on August 12, 2019.  Dkt. 57-12 at 2–3.  These letters both cited the January 7, 2019 SEAS; the second did so many times.  Dkt. 57 at 6.  Neither letter discussed the cemeteries mentioned in the SEAS.

On July 9, 2019, the LDEQ held a public hearing to receive comments on the SEAS. Dkt. 53 at 1.  Representatives from RISE St. James and the Center for Biological Diversity testified at the hearing but did not address the cemeteries.  *Id.* at 2.

4. *Final Decision and Aftermath*

The Corps issued FG its permit on September 5, 2019.  Dkt. 27 at 9.  The Corps' Memorandum for Record, which also constitutes its Environmental Assessment, *id.*, briefly discusses the investigations into the Buena Vista and Acadia cemeteries.  *See* Dkt. 50-2 at 5, 8, 27, 53, 63.  The Memorandum does not detail the methodology used to locate—or to attempt to locate—the Acadia cemetery, other than saying that (1) the burial site's location was "[b]ased on archival information;" (2) archaeologists went "to the area and looked for this cemetery on two separate digs and did not find any remains;" (3) "[a]fter this issue was settled[,] an anonymous source provided information to the [Division of Archaeology] that the cemeteries may be located in slightly different locations," prompting the archaeologists to go "back onsite to look for the Acadia [c]emetery again;" and (4) this final visit found nothing further at the Acadia [c]emetery

but "found that the Buena Vista [c]emetery had different margins." *Id.* at 63.  The Memorandum categorizes the Project's impact on historic properties as "neutral" because of the mitigating fence around the Buena Vista cemetery.  *Id.* at 27, 53.

Plaintiff "RISE St. James, working with the Center for Constitutional Rights, submitted a Public Records Act request to the state of Louisiana" in November 2019, Sept. 2, 2020 Hrg. Tr. at 17–18, seeking, among other things, "all correspondence, maps, surveys, and reports relating to" the Acadia and Buena Vista plantations and "cultural and archeological resources on those properties, including cemeteries or burial grounds," Dkt. 27-2 at 5 (Ex. A).  As part of the response to that request, Plaintiffs received materials that disclosed additional information about the cemetery investigations, and they "realized that there was this very significant issue that they had not been aware of prior."  Sept. 2, 2020 Hrg. Tr. at 18.  On December 18, 2019, Plaintiffs RISE St. James, the Louisiana Bucket Brigade, and the Center for Biological Diversity sent a letter to Gauthier requesting that the Corps reopen its NHPA process to evaluate the Project's effects on historic properties, including "two cemeteries that may contain the remains of enslaved people and Civil War soldiers."  Dkt. 54-1 at 10.  Plaintiffs explained that they had learned from state-released records "that there ha[d] been an extensive back and forth about possible human remains at the Acadia [c]emetery."  *Id.* at 13.  "[T]o ensure the accuracy of [the Corps'] conclusions," Plaintiffs urged the agency "to investigate this issue in more depth and consider additional [protective] measures."  *Id.*  Plaintiffs also noted that they had submitted a related FOIA request to the Corps on November 14, 2019 but had received no response.  *Id.* at 13–14.

On April 11, 2020, after filing suit, Plaintiffs followed up on their request to reopen and submitted a report on the cemetery investigation that Coastal Environments, Inc. ("CEI") had

prepared for Plaintiffs in February 2020.  Dkt. 54-1 at 4–6; Dkt. 27 at 2; Dkt. 43 at 6.  Gauthier

replied to this email on May 1, 2020, asserting that the Corps' archaeologists could not open

some of the files, and Plaintiffs provided a corrected version the same day.  Dkt. 54-1 at 1–2.

Since that time, Plaintiffs have received no communication from the Corps with respect to their

request to reopen the NHPA process for the Project.  Sept. 2, 2020 Hrg. Tr. at 20.

## B.   Procedural History and Request to Admit Extra-Record Evidence

Plaintiffs filed this action on January 15, 2020.  Dkt 1.  They challenge the Corps'

decision to issue the permit on several grounds.  First, they allege that the Corps' Environmental

Assessment for the Project was inadequate, *id*. at 28–29 (Compl. ¶¶ 95–97), that the Corps

irrationally found that no significant impact on the environment would result, *id.*, and that the

Corps improperly declined to complete an Environmental Impact Statement, *id*. at 27 (¶ Compl.

94), in violation of NEPA and the APA.  Second, Plaintiffs allege that the Corps conducted an

inadequate "public interest" review prior to issuing the permit in violation of the Rivers and

Harbors Act, the Clean Water Act, and the APA.  *Id*. at 32–33 (Compl. ¶¶ 110–14).  Third, they

allege that the Corps failed to consider practicable alternatives that would have less of an impact

on the aquatic environment, in violation of the Clean Water Act and the APA.  *Id*. at 33–34

(Compl. ¶¶ 116–122).  Finally, they allege that the Corps inadequately accounted for effects on

historic property before issuing the permit, in violation of the NHPA and the APA.  *Id*. at 34–35

(Compl. ¶¶ 124–26).

To advance their arguments with respect to the Corps' violation of NEPA and the NHPA,

Dkt. 27 at 12, Plaintiffs move to admit eight documents as extra-record evidence, falling into

three categories.

1.   *CEI Report*

The first and most significant piece of extra-record evidence is a February 2020 archaeological report by Coastal Environments, Inc. ("CEI report").  Dkt. 27 at 2.  This is the same report that Plaintiffs sent the Corps in April 2020 as an addendum to their request to reopen the NHPA process for the Project.  *See* Dkt. 54-1 at 4–6.  Noting that FG's archaeological assessments provide "no explanation of how the 'Acadia [c]emetery'" was located for either the first or second investigation, Dkt. 27-2 at 47, 52 (Ex. E), the CEI report conducts its own map analysis, *id.* at 52–69, and identifies a different location for the Acadia cemetery, concluding that "neither set of trenches previously excavated by [FG] fell within the limits of the cemetery location," *id.* at 56.  In other words, the report posits that FG has yet to investigate the correct location for the Acadia cemetery.

The CEI report concludes that (1) FG's contractors and the Division of Archaeology "twice overlooked the existence of historic Acadia and Buena Vista cemeteries on the [Project] site;" (2) FG "repeatedly searched in the wrong location, delineated the wrong boundaries, and reported inaccurate survey efforts" for the two burial sites; (3) "[three] additional burial sites may exist on the [P]roject site;"[4] and (4) "further investigation is needed to avoid construction impacts to graveyards," particularly the Acadia cemetery and the other potential sites identified by CEI.  Dkt. 27 at 14.

---

[4]  Although Plaintiffs' motion references four such sites, in their reply brief, Plaintiffs adjust this number to three in light of Defendants' representation that one site is not on the Project site. Dkt. 47 at 11.

2.   *Emails Sent Between McGimsey of the Louisiana Division of Archaeology and Others Prior to the Permit's Issuance*

The second category of extra-record evidence that Plaintiffs seek to offer includes emails sent between the state Division of Archaeology and other parties prior to the Corps' issuance of the permit in September 2019.  Dkt. 27 at 2–3.  According to Plaintiffs, these emails "[s]how [t]hat the Corps [k]new or [s]hould [h]ave [k]nown [t]hat [i]t [h]ad [f]ailed to [a]dequately" assess effects on cultural resources.  Dkt. 27 at 17.  Plaintiffs received these emails as part of a public records request made on their behalf through the Center for Constitutional Rights.  These emails are attached as exhibits A–D to a declaration by Pam Spees, the lawyer who made the request.  27-2 at 1.  Exhibit A is the Public Records Act Request the Center for Constitutional Rights submitted on behalf of RISE St. James to the Louisiana Division of Archaeology, included to authenticate the other exhibits, *id*. at 18, and the remaining exhibits are emails that RISE St. James received through its public records request, as follows.

Exhibit B consists of a series of emails from January and February 2019[5] between Donald Hunter of CEI, Inc. and Chip McGimsey of the Louisiana Division of Archaeology discussing the 2018 excavation.  Dkt. 27 at 18.  In the exchange, Hunter advises McGimsey that he is "greatly concerned that [FG] did not examine the correct area" for the Acadia cemetery, probably due to its misreading of latitude and longitude lines on the 1878 map.  Dkt. 27-2 at 12 (Ex. B).  Hunter and McGimsey exchange further emails about standard practices related to cartographic regression analysis used to locate sites.  *Id.* at 8–11.  Exhibit C is an email exchange between the Louisiana Attorney General's office and McGimsey from February 2019.  Dkt. 27 at

---

[5]  Although Plaintiffs identify this email exchange as occurring in 2020, it is clear from the exhibit that the exchange occurred in 2019.  *See* Dkt. 27-2 at 8–13 (Ex. B).

18.  In this exchange, the participants discuss the need for FG to adjust its fence around the

Buena Vista cemetery and to re-excavate Acadia in light of new doubts about the exact locations

of each.  Dkt. 27-2 at 15–16 (Ex. C).  The Louisiana Attorney General's office advises that,

because of recent reevaluations of the 2018 excavation, FG needs to excavate the newly

identified Acadia cemetery area.  *Id.* at 15.  Although the Attorney General's office surmises that

this development will displease FG, it notes that further investigation would be required "of

anyone else" and the State "need[s] to be consistent," especially because it was "not [the State's]

error that led to the misplacement of the possible location on the maps."  *Id.*  Finally, Exhibit D

is another email between the Louisiana Attorney General's office and McGimsey.  Dkt. 27 at 18.

This one, from August 2018, responds to the initial discovery of the cemeteries, and the Attorney

General's office recommends that McGimsey discuss the matter with the Corps.  Dkt. 27-2 at

19–21 (Ex. D).  A clarifying communication from FG as to next steps is included in the email

exchange.  *Id.*

      3.  *Post-Permit Communications Between FG, Corps, and Plaintiffs*

The third category consists of communications sent and received on behalf of Plaintiff

RISE St. James *after* the Corps issued the permit.  Dkt. 27 at 3.  Plaintiffs offer this evidence to

"[s]how [t]hat [c]ultural and [h]istoric [r]esources [a]re" affected by the permit.  Dkt. 27 at 19.

These exhibits are also attached to the Spees declaration and lettered Exhibits F–H.  Exhibit F is

a May 22, 2020 letter the Center for Constitutional Rights sent on behalf of Plaintiff RISE St.

James to counsel for FG, copying the Corps.  *Id.* at 20.  The letter represents that "[r]ecords

obtained from the Louisiana Division of Archaeology . . . indicate that [FG] plans heavy

construction on the site of the Acadia Plantation Cemetery," notes that "four new sites are [also]

of concern," and requests that FG "advise whether [it] plans to search under the field road for

14

burials at the Acadia Plantation Cemetery and investigate the four newly identified sites." Dkt. 27-2 at 170–72 (Ex. F). The letter further requests public access to the cemeteries. *Id.* at 170. Exhibit G is a June 15, 2020 letter sent from counsel for FG to the Center for Constitutional Rights declining public access to the cemetery and describing a plan to do further archaeological investigation at the Buena Vista site, including potential relocation of remains. Dkt. 27 at 20; Dkt. 27-2 at 174–76 (Ex. G). Exhibit H is a June 15, 2020 email sent by counsel for FG to the Center for Constitutional Rights to the same effect. Dkt. 27 at 20, Dkt. 27-2 at 178–80 (Ex. H).

The Corps and FG oppose Plaintiffs' motion to admit any of the extra-record evidence, Dkt. 43; Dkt. 44, and FG conditionally cross-moves to supplement the administrative record with its own extra-record evidence, Dkt. 43; Dkt. 45.

## II. ANALYSIS

### A. Standard for Consideration of Extra-Record Evidence

Plaintiffs ask that the Court consider extra-record evidence in this APA challenge to the Corps' issuance of a permit to FG. The question whether to admit extra-record evidence is often confused with the question whether the administrative record is complete, perhaps because the same phrase—"'supplementing' [the] administrative record"—is often used to refer to both. *Oceana, Inc. v. Locke*, 674 F. Supp. 2d 39, 44 (D.D.C. 2009); *see also The Cape Hatteras Access Preservation All. v. Dep't of Interior*, 667 F. Supp. 2d 111, 113 (D.D.C. 2009); *Pac. Shores Subdivision v. Army Corps of Engineers*, 448 F. Supp. 2d 1, 5–6 (D.D.C. 2006). Although both questions require the Court to evaluate whether and when it should go beyond the administrative record compiled by the agency, they implicate different considerations and require application of different tests. *See Oceana v. Pritzker*, 126 F. Supp. 3d 110, 112 n.2 (D.D.C. 2015); *Cape Hatteras*, 667 F. Supp. 2d at 114–115; *Pac. Shores*, 448 F. Supp. 2d at 5–6.

A request to "add[] to . . . the administrative record . . . documents the agency considered" when it made its decision, *Pac. Shores*, 448 F. Supp. 2d at 5, that is, to complete the administrative record, is consistent with the principle that judicial review of an administrative decision should turn on what was before the agency when it acted—nothing more and nothing less, *see Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 792 (D.C. Cir. 1984) (court "should have before it neither more nor less information than did the agency when it made its decision").  The APA itself directs courts to review administrative actions based on "the whole record or those parts of it cited by a party," 5 U.S.C. § 706, which means "the full administrative record that was before the [agency] at the time [of its] decision," *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971), abrogated on other grounds by *Califano v. Sanders*, 430 U.S. 99 (1977).  Because the administrative record must therefore include "all materials" that were "before the agency at the time the decision was made," *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1095 (D.C. Cir. 1996) (internal quotations and citations omitted); *see also Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1002 (D.C. Cir. 2008), a court should grant a motion to complete the administrative record if "the moving party . . . rebut[s] the presumption of administrative regularity and show[s] that the documents to be included were before the agency decisionmaker," *Pac. Shores*, 448 F. Supp. 2d at 6.

A motion to admit extra-record evidence, in contrast, seeks to expand the record beyond that which was before the agency when it rendered its decision.  *See Pritzker*, 126 F. Supp. 3d at 112 n.2; *Cape Hatteras*, 667 F. Supp. 2d at 114–15.  Such a motion thus runs counter to the principle that judicial review of an administrative action is just that—a *review* of the *administrative action* the agency took based on what was before it at the time it acted.  Materials generated after the fact or materials that were not before the agency typically have little bearing

on what the agency actually did.  For this reason, courts are leery of requests to consider extra-record evidence in APA cases.  On rare occasions, however, extra-record evidence can help elucidate what the agency decided or did not consider, and, in those unusual circumstances, a court may rely on extra-record evidence for those limited purposes.  *See Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 514 (D.C. Cir. 2010) ("[T]his is the exception, not the rule.").

To succeed on a motion to admit extra-record evidence, the moving party must "demonstrate unusual circumstances justifying a departure from [the] general rule." *Dania Beach v. FAA*, 628 F.3d 581, 590 (D.C. Cir. 2010) (quoting *Tex. Rural Legal Aid v. Legal Servs. Corp.*, 940 F.2d 685, 698 (D.C. Cir. 1991)).  Although no all-embracing rule governs every such circumstance, for purposes of present dispute, the parties agree that the test set forth in *Animal Legal Defense Fund v. Perdue*, 872 F.3d 602, 611 (D.C. Cir. 2017), is dispositive.  Dkt. 27 at 11–12; Dkt. 43 at 15; Dkt. 44 at 9, 9 n.2.  Under that test, there are "at least three" circumstances that justify the consideration of extra-record evidence: "(1) The agency deliberately or negligently excluded documents that may have been adverse to its decision; (2) the District Court need[s] to supplement the record with background information in order to determine whether the agency considered all of the relevant factors; or (3) the agency failed to explain administrative action so as to frustrate judicial review."[6]  872 F.3d at 611 (internal punctuation omitted); *see*

---

[6]  At least the first of these three prongs applies to completion of the administrative record as well.  *See Fund for Animals v. Williams*, 391 F. Supp. 2d 191, 198 (D.D.C. 2005).  Decisions in this circuit also sometimes use a separate four-part test for considering whether to admit extra-record evidence.  *See, e.g.*, *Pritzker*, 126 F. Supp. 3d at 113 (explaining that consideration of extra-record evidence is appropriate "when the agency (1) acted in bad faith in reaching its decision, (2) engaged in improper behavior in reaching its decision, (3) failed to examine all relevant factors, or (4) failed to adequately explain its grounds for decision").

*also Dania Beach*, 628 F.3d at 590 (listing the same three exceptions); *Am. Wildlands*, 530 F.3d at 1002 (same); *Madison*, 82 F.3d at 1095 (same).  These narrow exceptions must be applied sparingly to maintain incentives for interested parties to present their evidence and views fully before an agency renders a final decision and to ensure that courts limit their role to the review of what occurred before the agency.  *See Hill Dermaceuticals, Inc. v. FDA*, 709 F.3d 44, 47 (D.C. Cir. 2013) (reserving the invocation of extra-record evidence for "gross procedural deficiencies"); *Ctr. for Sci. in the Pub. Interest v. Dep't of Treasury*, 797 F.2d 995, 1000 n.3 (D.C. Cir. 1986) (barring extra-record evidence because it was "not . . . made part of the record although . . . available during the comment period").  "[J]ust as the opportunity to comment is meaningless unless the agency responds to significant points raised by the public, so too is the agency's opportunity to *respond to* those comments meaningless unless the interested party clearly states its position" during the comment period.  *CTS Corp. v. EPA*, 759 F.3d 52, 65 (D.C. Cir. 2014) (emphasis in original) (internal punctuation omitted).  Accordingly, when evaluating whether to admit extra-record evidence, courts must consider whether admission constitutes "an end run around the agency's substantive . . . judgments."  *Id.*

Because the CEI report and Exhibits F-H came into existence after the Corps issued FG's permit, they necessarily constitute extra-record evidence.  The emails exchanged between the state Division of Archaeology's McGimsey and other parties, however, predate the permit, and Plaintiffs' contention that the emails prove that the Corps "knew—or should have known— about flaws in the historic resource analysis" might be interpreted as an argument that the Corps' decisionmakers knew of the emails when deciding to issue the permit or that the state officials were acting as the Corps' agents for purposes of conducting the archaeological assessment.  Dkt. 27 at 18.  Such an argument would amount to a motion to complete the record, rather than to

admit extra-record evidence.  *See Cape Hatteras*, 667 F. Supp. 2d at 114 (defining the

"administrative record" as "those documents that were before the agency decisionmaker"); *see*

*also* Fed. R. App. P. 16(a) (defining the administrative record as "the order involved, any

findings or reports on which that order is based, and the pleadings, evidence, and other parts of

the proceedings before the agency").

That, however, is not the argument that Plaintiffs make.  They argue, instead, that the

emails satisfy the "extra-record exception," Dkt. 27 at 18, and they offer no basis to conclude

that the Corps knew about these specific emails.  To be sure, they do argue that the emails relate

to issues the Corps should have known about, like "flaws in the historic resources analysis and

the importance of ensuring it was conducted properly."  Dkt. 47 at 26.  But that contention has

no bearing on the question whether the emails at issue were before the agency when it issued the

permit.  The Court will, accordingly, apply the extra-record-evidence standard to all of the

evidence at issue.

**B.**  **CEI Report**

Plaintiffs first argue that the CEI report satisfies all three of the extra-record exceptions

identified in *Animal Legal Defense Fund*, 872 F.3d at 611.  The Court will address each

exception in turn.

1.  *Agency Deliberately or Negligently Excluded the CEI Report or Its Contents*

According to Plaintiffs, the CEI report "contains relevant information that should have

been part of the Corps' identification efforts[] but was negligently missed and overlooked," Dkt.

47 at 20, thus satisfying the first *Animal Legal Defense Fund* exception.  872 F.3d at 611; Dkt.

47 at 20.  Defendants and FG disagree.  According to Defendants, "[t]he CEI [r]eport cannot

have been 'excluded' from the record given that it significantly post-dates the permit." Dkt. 44 at

19

10.  FG contends that the CEI report is not "adverse" to the Corps' decision and that the exception therefore does not apply.  Dkt. 43 at 22.

Whether and how the first *Animal Legal Defense Fund* exception applies to extra-record material—as opposed to material that was before the agency but was erroneously excluded from the record—is far from clear.  The exception has its roots in *Kent County v. EPA*, 963 F.2d 391 (D.C. Cir. 1992).  In that case, the plaintiffs challenged how the EPA had calculated a landfill's "waste characteristics" score.  *Id.* at 392.  Plaintiffs discovered several documents prepared by the EPA's own experts concluding that the agency's methodology led to inaccurate results.  *Id.* at 396.  EPA decisionmakers had evidently not uncovered these regional office documents when making their decision.  *Id.*  Although the D.C. Circuit acknowledged that the EPA was not expected to find "*all* documents that address a particular issue before making its decision," the court concluded that it was arbitrary for the EPA to rely on documents that were less on point while ignoring more relevant "documents that discuss what appears to be a well-aired debate." *Id.*  These documents merited consideration because the agency "was . . . negligent in failing to discover them."  *Id.*  But the D.C. Circuit did not accept all of the extra-record documents at issue and, instead, excluded one of the extra-record documents because it was not created until "after the EPA [had] issued its decision in Kent County's case."  *Id.*  Although the court does not address the question in detail, the court's reasoning is evident: a document produced after the agency made its decision could not have been negligently or intentionally withheld by the agency when compiling the administrative record.

Whether admitting documents that an agency possesses but does not know about amounts to completing the administrative record or admitting extra-record evidence is a question that the Court need not decide for present purposes.  What matters is that neither *Kent County* nor any

other precedent that Plaintiffs have cited supports the notion that the exception for material that the agency deliberately or negligently excluded from the record extends to documents that did not exist at the time the agency acted.  A decisionmaker might deliberately exclude a report that is adverse to her decision or might overlook a report that is buried in the files of a regional office; she cannot, however, exclude or overlook a report that was created months after the agency acted.

Plaintiffs attempt to sidestep this difficulty by arguing that the CEI report includes *information* that was available and excluded at the time the Corps issued the permit.  Dkt. 47 at 20 (accusing the Corps of "negligently exclud[ing] relevant information," rather than excluding the report itself).  Defendants, for their part, maintain that "this mischaracterizes the exception." Dkt. 44 at 12.  Defendants have the better of the argument.  For one thing, the exception refers to "deliberately or negligently excluded *documents*," not "information."  *Animal Legal Def. Fund*, 872 F.3d at 611 (emphasis added).   That distinction, moreover, makes sense because an exception for deliberately or negligently excluded *information* would sweep too broadly and would undermine the principle that APA review is not *de novo* but, rather, is limited to what occurred before the agency.  It is the rare agency decision that is impervious to critique from a later expert report, and such reports can easily be cast by interested parties as containing *information* that the agency might have discovered had it thought harder or searched more extensively.  Opening the door to judicial consideration of information that an agency might have discovered upon further study—even if limited to cases of agency negligence—proves too much and would allow a "narrow" exception to consume the "black-letter" rule that "a reviewing court should have before it neither more nor less information than did the agency when it made its decision."  *CTS Corp. v. EPA*, 759 F.3d 52, 64 (D.C. Cir. 2014) (citations omitted).

Beyond that, even if a post-decision document that incorporates pre-decision information might fall within the exception, the movant must, at a minimum, identify with specificity the available information that the agency deliberately or negligently declined to consider.  In *City of Dania Beach*, the plaintiffs sought to admit "hundreds of pages of" extra-record documents from prior Environmental Impact Statements ("EISs") to challenge the FAA's approval of an airport expansion.  628 F.3d at 590.  The FAA had started the NEPA analysis afresh years after these prior EISs, and the expansion was based on the new batch of EISs, not the old ones.  *Id.*  Still, the plaintiffs claimed "that the administrative record nevertheless must include documents produced since the FAA first began considering the airport's expansion" and that the FAA "selectively excluded adverse documents from the earlier administrative process."  *Id.*  But the D.C. Circuit rejected this "vague proffer."  *Id.*  Criticizing the plaintiffs for "simply submit[ing] the entirety of the three draft EIS statements" rather than "identifying particular documents adverse to the FAA," the Court concluded that the plaintiffs' claim was "too generalized to support such a massive inflation of the record."  *Id.* at 590–91.

Here, as in *Dania Beach*, Plaintiffs attempt to justify the admission of a sizeable report (albeit smaller than the documents contemplated in *Dania*) based on bits of information that, according to Plaintiffs, the agency negligently excluded from the record.  Plaintiffs claim that unlike the *Dania Beach* petitioners, their motion does not lack specificity because it exposes "the Corps' negligent search for historic maps and other readily available resources."  Dkt. 47 at 22.  But this statement does not identify which maps or "other readily available resources" were excluded, nor does it explain why Plaintiffs must admit a report discussing these materials, rather than the materials themselves.  And, most importantly, Plaintiffs do not identify information (1) that is not otherwise in the administrative record, (2) that was readily available to the agency at

the time it acted, as the internal EPA documents were to the agency in *Kent County* or the former

EISs were to the agency in *Dania Beach*; and (3) that the agency disregarded.  Even if the Corps

might have discovered the information at issue had it, for example, requested that CEI conduct

an investigation before the Corps issued the permit or had the Corps conducted an archival

search for additional maps, the exception applies to material that the agency negligently or

intentionally ignored—not information that the agency might have discovered based on a more

searching investigation.

Given these difficulties, the Court concludes that the CEI report does not qualify under

the first exception for extra-record evidence.

      2.   *Background to Determine Whether Agency Considered Relevant Factors*

Plaintiffs also maintain that the CEI report "illuminates several new, relevant factors that

the Corps failed to consider," Dkt. 47 at 9, thereby satisfying the second *Animal Legal Defense

Fund* exception.  872 F.3d at 611.  Specifically, the report "reveals . . . errors and omissions . . .

in the Corps' identification of historic grave sites" and shows that "surveys for the Acadia

[c]emetery were consistently conducted in the wrong location."  Dkt. 47 at 9.  The report also

"indicates that one-third of the Acadia cemetery lies outside of the borrow pits dug by the

previous landowner . . . calling into serious question the Corps' . . . conclusion that a previous

landowner destroyed the cemetery."  *Id.* at 11.  Lastly, the report identifies "three anomalies . . .

that may constitute historic resources" on the Project site.  *Id.*

Defendants dismiss these contributions as "'nuanced points' about [] particular issue[s]"

that fail to "point out . . . '*entirely new*' general subject matter that the defendant agency failed to

consider."  Dkt. 44 at 12 (quoting *Oceana, Inc. v. Ross*, No. 17-cv-829 (CRC), 2020 WL

1905148, at *4 (D.D.C. April 17, 2020)).  Plaintiffs, Defendants continue, "do not provide any

information to suggest that the Corps entirely overlooked the Project's potential impacts on burial sites[;] . . . the Corps did consider this relevant factor." *Id.* at 14.  FG, for its part, downplays the differences between the CEI report and those by its contractors, noting that the reports share "several important points of agreement," including "the same basic method to ascertain the location of the sites."  Dkt. 43 at 18.  As to the Acadia cemetery location, FG asserts that the location identified by the CEI report "differ[s] by mere feet" from the location excavated by FG.  *Id.*

On several occasions, the D.C. Circuit has considered the admissibility of extra-record evidence purporting to show that an agency failed to consider relevant factors, either by ignoring a body of information altogether, *see e.g.*, *Animal Legal Def. Fund*, 872 F.3d at 618, 620  (D.C. Cir. 2017) (directing district court to reconsider its decision denying leave to supplement the administrative record with "records the agency had in its possession at the time of its decision," including agency investigations and first-hand accounts from members of the public of a zoo's license violations); *Hill Dermaceuticals*, 709 F.3d at 47 (holding that district court properly declined to consider "21 extra-record declarations that purportedly provide[d] detailed technical information" because the information was not before the agency when it acted); *Theodore*, 616 F.3d at 513–15 (holding that district court properly declined to consider a draft EIS from a separate project that implicated cumulative impacts of the challenged project because the challenger "had ample opportunity to seek to introduce the evidence before [the agency], but they did not"); *Madison*, 82 F.3d at 1095–96 (holding that district court properly declined to consider all bank files and underwriting materials reviewed by bank examiners, who prepared detailed memoranda summarizing their findings, because the files were not part of the record compiled by the agency when it declared banks insolvent), or by using flawed methodology, *see,*

*e.g.*, *CTS Corp.*, 759 F.3d at 63–64 (concluding that petitioner's reliance on post-decision expert report critiquing methodology used by EPA to evaluate groundwater contamination at a hazardous waste site was "procedurally foreclosed"); *Am. Wildlands*, 530 F.3d at 1002 (holding district court properly declined to consider two post-decision letters from scientists claiming agency misinterpreted their data in declining to list a type of trout as endangered); *Esch*, 876 F.2d at 990–92 (considering testimony by agency decisionmakers related to how claims were processed in dispute over ending plaintiffs' farm subsidies).

Of these decisions, *CTS Corporation v. EPA*, 759 F.3d 52, most closely parallels the present dispute—although it still differs from this case in important respects.  In that case, CTS Corporation petitioned to review the EPA's decision to add a site formerly owned by the company to the National Priorities List as a candidate for environmental cleanup.  *Id.* at 55.  CTS challenged the EPA's groundwater analysis by offering an extra-record expert report that critiqued the EPA's investigation and purportedly proved that contamination could not have traveled from the former CTS site as the EPA had posited.  *Id.* at 63–64.  The issues addressed in the expert report had not been raised during the comment period or prior to the agency's decision, CTS explained, because the necessary data were not made available until the final rulemaking.  *Id.* at 64.  The D.C. Circuit nonetheless held that the petitioners were not entitled to rely on the report.  Although the court noted that CTS's argument "fail[ed] in multiple respects," the most relevant reason for the case at hand was CTS's failure to seek the opportunity to weigh in on the agency's analysis prior to offering the report in litigation.  *Id.*  The court wrote: "if CTS felt that further comment on EPA's [groundwater] analysis was necessary after the EPA added the study to the final record, CTS could have petitioned the EPA for either reconsideration or a new rulemaking" or to "reopen the notice-and-comment period."  *Id.* at 65.  "Alternatively, CTS

could have pursued a procedural challenge arguing that EPA's failure to include the [groundwater] data in the record at the promulgation stage required that it be afforded an additional opportunity to comment on the data." *Id.* In other words, the D.C. Circuit acknowledged that interested parties might need further opportunity to respond to data revealed in the final agency decision. But to do so, an interested party must show that the agency's action was procedurally flawed, thereby opening a path for further administrative proceedings, or must pursue administrative remedies, such as seeking reconsideration or the reopening of the comment period.

Here, the CEI report provides background information on whether the Corps considered the relevant factor of the location of the Acadia cemetery. As is commonly the case, the parties debate "at what level of generality [the Court] should define the relevant factor which the agency must consider," *Ross*, 2020 WL 1905148, at *4 (quotation omitted), with Defendants framing the relevant factor as "impacts on burial sites" generally, Dkt. 44 at 14. But the case on which Defendants rely makes clear that "[i]n a complicated, scientific analysis . . . consideration of the intermediary evidentiary factors which lead to the ultimate conclusion are the very means by which the agency renders its decision and, generally speaking, any of them can be a relevant factor justifying" admission of extra-record evidence. *Ross*, 2020 WL 1905148, at *4 (internal quotation marks omitted). The process of locating a burial site constitutes an "intermediary evidentiary factor[]" in evaluating that site. Therefore, the process of locating a burial site and any potential errors in that effort constitute a relevant factor the agency must consider. FG's contention that the location "differ[s] by mere feet," Dkt. 43 at 18, is unavailing in the present context, where a difference of feet can mean the difference between investigating a potential historic burial site and excavating an inconsequential patch of dirt. Simply put, the Court is

26

persuaded that the correct location of the cemetery is a relevant factor bearing on the Corps'
decision to grant the permit.

But the Court's analysis does not end there.  Having concluded that the extra-record
document might show that the Corps failed to consider a relevant factor, the Court must consider
whether admitting the report would honor the mandate to "structure [parties'] participation so
that it . . . alerts the agency to the [parties'] position and contentions." *Theodore*, 616 F.3d at
514–15.  As in *CTS*, Plaintiffs explain their late submission of an expert study by citing the
agency's failure to disclose important information in the agency's notice—here, the Corps'
failure to acknowledge the expected location of burial sites (or any information about the sites)
in its notice of proposed action.  Dkt. 47 at 17–18.  This failure, according to Plaintiffs, violated
the Corps' regulations to disclose "current knowledge on historic properties" in its public notice.
*Id.* at 18 (emphasis omitted) (citing 33 C.F.R. § 325.3(10)).  Because the agency did not disclose
this information, Plaintiffs argue, they cannot be faulted for failing to raise the issue until now.
*Id.*

The Corps' failure to disclose the suspected existence of burial sites at the proposal stage
raises a legitimate concern.  Correspondence in the existing record between FG contractors,
McGimsey, and the Corps suggests that the Corps knew of the discovery and had reason to
appreciate its significance at the time of the August 2018 comment period.  *See* Dkt. 51-1; 51-2;
50-27.  But the problem with Plaintiffs' argument is that even though the initial public notice
contained no reference to the cemeteries, Defendants have identified several other forms of
notice that were provided prior to issuance of the permit—and while the Corps was apparently
still accepting comments—including a joint public notice issued in November 2018, Dkt. 57 at 2;

27

Dkt. 50-18, and the SEAS released in January 2019, Dkt. 53 at 1; Dkt. 53-1.[7]  The second

document was not released by the Corps, but Defendants have persuasively shown that Plaintiffs

were aware of the SEAS and that they cited it to critique other concerns raised by the Project.

Knowing of the existence of the cemeteries is distinct from knowing of the "extensive

back and forth about possible human remains at the Acadia [c]emetery," which Plaintiffs stress

they did not learn about until filing a public records request.  Dkt. 54-1 at 13.  Even so, according

to the D.C. Circuit in *CTS*, the unavailability of information prior to an agency's final decision

does not necessarily pave the way for interested parties' extra-record analyses, even those

responding to newly revealed data.  "[T]he remedy for an alleged procedural violation [such as

this] is not the outright judicial displacement of agency analysis . . . but rather the opportunity to

comment on the data before the agency in the first instance." *CTS*, 759 F.3d at 65.  The question,

therefore, is whether any of the circumstances in the case at hand justify treating the CEI report

differently from how the Court treated the extra-record report in *CTS*.

The cases differ in at least one meaningful way.  In *CTS*, the plaintiff offered the extra-

record scientific report to challenge the merits of the agency's decision, *see* 759 F.3d at 63

("CTS[] . . . seeks to bypass the administrative record and process altogether and have this court

consider new scientific evidence in the first instance."), and referenced an alleged procedural

deficiency only as an excuse for not filing the report prior to the agency's final decision, *id.* at

65.  Here, in contrast, Plaintiffs seek to rely on the CEI report for several reasons, some of which

go to the merits of the Corps' decision and some of which purport to show "gross procedural"

errors in the Corps' decision-making process, *Hill Dermaceuticals*, 709 F.3d at 47.  Of particular

---

[7]  Earthjustice submitted comments on behalf of Plaintiffs to LDEQ as late as August 12, 2019,
Dkt. 57-12 at 2, well after the existence of potential burial sites was publicly disclosed.

relevance here, Plaintiffs claim in their Complaint that "[t]he Corps did not adequately . . . disclose . . . the impacts of its proposed action on . . . at least two cemeteries containing the remains of enslaved people, in violation of the National Historic Preservation Act," Dkt. 1 at 35 (Compl. ¶ 125), and further argue that "the CEI [r]eport . . . bear[s] upon the adequacy of the Corps' compliance with the public notice and comment procedures under the NHPA," Dkt. 47 at 23.  Admitting the CEI report for the limited purpose of revealing a procedural violation differs from admitting the report as evidence that the Corps' permitting decision was flawed on the merits.  As the *CTS* court explained, extra-record evidence "'may be invoked to challenge gross procedural deficiencies'" and to "help the court to determine whether the administrative record is deficient in the first place."  759 F.3d at 64 (emphasis and citations omitted).  The Court concludes that Plaintiffs should be given the opportunity to show, if they can, that this is such a case.

Although the line between background information that might assist the Court in assessing whether the agency committed a procedural misstep resulting in the agency's failure to consider an important factor and information that goes to the merits of the agency's decision is a fine one, it is a line that the Court can police in its evaluation of the parties' cross-motions for summary judgment.  When it comes to those motions, Plaintiffs may, for example, cite to the CEI report as background to help the Court evaluate their contention that the Corps failed to provide the required public notice regarding the cemeteries and, as a result of that procedural deficiency, failed to consider the possibility that FG was looking in the wrong places.  Because the CEI report bears upon the possible mis-location of the Acadia cemetery, and the Court has determined that this possible mis-location is a relevant factor, Plaintiffs may cite the CEI report to illustrate the kind of "essential" information that the Corps forewent by allegedly failing to

"comply with notice and comment procedures." Dkt. 47 at 23 (citing 36 C.F.R. § 800.2(d)(1)). But Plaintiffs may not offer the report to demonstrate that "remains from the Acadia site may still be on the [Project] property," Dkt. 43 at 25, because that would call on the Court to "consider new scientific evidence in the first instance" and weigh the CEI report against the FG contractors' report. *CTS*, 759 F.3d at 65. In sum, Plaintiffs may offer the CEI report as context to reveal the Corps' procedural deficiencies, but not to "to critiqu[e the] analysis," *id.* at 63, contained in the Corps' Memorandum and Environmental Assessment,[8] Dkt. 50-2. With these provisos, the Court will grant Plaintiffs' motion to offer the CEI report as extra-record evidence for the purpose of demonstrating the Corps committed a "gross procedural" error, *Hill Dermaceuticals*, 709 F.3d at 47, resulting in the agency's failure to consider a relevant factor, *Animal Legal Def. Fund*, 872 F.3d at 611.

The Court emphasizes, however, that it is merely opening the door for Plaintiffs to make this type of narrow argument—an argument that focuses on process and not results. Nor has the Court formed a view on whether such an argument is meritorious or whether Plaintiffs have overstepped the narrow limits on the use of extra-record evidence. Consideration of those questions must await the parties' briefs on summary judgment.

3.    *Frustration of Judicial Review*

Plaintiffs also argue that the CEI report demonstrates that the Corps "failed to adequately explain its decision." Dkt. 47 at 22. The CEI report must be admitted, according to Plaintiffs, because it highlights procedural deficiencies on the part of FG and the Corps, *id.* at 22–23, the

---

[8] The Court does not find that the Corps' failure to identify the three "anomalies" mentioned in the CEI report rises to the level of a relevant factor that the Corps failed to consider. Moreover, Plaintiffs have not identified which information the Corps failed to disclose that would have made the identification of these anomalies possible sooner. Thus, the Court sees no reason that the three anomalies should be referenced going forward.

record does not show the Corps made "a good faith, reasonable effort" to assess harm to historic resources, *id.* at 24, and the record does not support the Corps' contention that the Project will have a neutral effect on historic resources, *id.* at 24–25.  Without the CEI report to show these failings, Plaintiffs assert that "[j]udicial review will be frustrated."  Dkt. 27 at 17.

Extra-record evidence is not admitted simply because the record fails to support a party's position; it is admitted under the third *Animal Legal Defense Fund* exception, 872 F.3d at 611, when the record does not permit the court to engage in meaningful judicial review.  The case Plaintiffs cite, Dkt. 27 at 17, *National Mining Association v. Jackson*, 856 F. Supp. 2d 150 (D.D.C. 2012), illustrates such a scenario.  In that case, the plaintiffs claimed that the EPA was applying final guidance as a binding administrative rule and offered extra-record documents to support that position.  *Id.* at 158.  The Court admitted the documents at issue because the record was "entirely bare as to how the EPA ha[d] applied the [f]inal [g]uidance."  *Id.*  Here, in contrast, the CEI report sheds little light on how the Corps decided to issue the permit, and the existing record provides Plaintiffs with the information necessary to seek review of what the Corps actually decided.

As to whether the CEI report "will bear upon the adequacy of the Corps' compliance with the public notice and comment procedures under the NHPA," Dkt. 47 at 23, the Court's limited grounds for admission above address this justification.  Broader admission is not merited under this third exception, because the mere existence of an adverse extra-record report does not prove the record is "entirely bare" to the point of frustrating judicial review.  And to the extent Plaintiffs refer to "procedural deficiencies" to describe inaccuracies with the agency's methodology for examining the burial sites, this contention is only a permutation of its "relevant factor" argument above.

Because the third prong of *Animal Legal Defense Fund*'s exceptions is either inapplicable or cumulative of the second, 872 F.3d at 611, the Court will deny Plaintiff's motion to admit the CEI report beyond the narrow purpose of background information for claims based on deficient notice and failure to consider a relevant factor.

**B.      Emails Between the Division of Archaeology and Other Parties**

Plaintiffs maintain that the emails sent prior to the Corps' permit decision, Exhibits A–D of the Spees declaration, constitute background information necessary to determine whether the Corps considered the factors relevant to its decision.  Dkt. 27 at 17–18.  These emails, according to Plaintiffs, highlight errors in FG's investigation leading up to the 2019 excavation and demonstrate that the Corps "should have given heightened scrutiny to the surveys and information regarding the Acadia [c]emetery."  Dkt. 47 at 27.

Defendants and FG both assert, among other responses, that the current record already reveals the "iterative review process lasting more than two years and involving multiple follow-up investigations and surveys."  Dkt. 43 at 27; *accord.* Dkt. 44 at 20.  FG further notes that the record includes "potential flaws in the maps used to locate" the burial sites.  Dkt. 43 at 27.  Both are correct, and the record also reveals that new insights repeatedly came from outside parties, not the contractors themselves, as demonstrated by the factual background laid out above.  Because the Court agrees with Defendants' contention that the current record is sufficient without these documents, the Court need not address Defendants' other objections to their admission.

The Court will therefore deny Plaintiffs' motion to admit the extra-record emails, exhibits A–D.

**C.      Post-Permit Communications About Burial Sites**

Finally, Plaintiffs maintain that Exhibits F–H of the Spees declaration, communications

between a representative for Plaintiff RISE St. James, FG, and the Corps, should be admitted to

show that the Corps failed to consider relevant factors.  Dkt. 27 at 19–20.  They argue that the

communications reveal that FG is "(1) prohibiting public access to the Buena Vista [c]emetery;

(2) impacting the look and feel of the Buena Vista [c]emetery with chain-link fencing and an

adjacent petrochemical complex; and (3) pursuing the cemetery's relocation." *Id.* at 21.  These

actions on the part of FG, according to Plaintiffs, prove that the Corps "should have . . . analyzed

. . . project impacts to cultural and historic resources under" the applicable statutes. *Id.*

The Court agrees with Defendants that post-decision materials that discuss post-decision

actions by permittees are "beyond the scope of the claims raised here, which only challenge

whether the decision complied with the law, not whether the permit is being correctly

implemented." Dkt. 44 at 23.  Despite Plaintiffs' suggestions to the contrary, Dkt. 47 at 29,

actions taken after an agency makes its decision cannot prove that the agency failed to consider

relevant factors.  The Court "should have before it neither more nor less information than did the

agency when it made its decision." *Walter O. Boswell Mem'l Hosp.*, 749 F.2d at 792.

The Court will, accordingly, deny Plaintiffs' motion to admit exhibits F–H.

**D.      FG's Cross-Motion to Admit Extra-Record Evidence**

Because the Court is admitting the CEI report, albeit in a limited fashion, the Court must

consider FG's conditional cross-motion to admit an extra-record "permit application previously

filed by a third party, which shows that the earlier owner excavated the borrow pits at the Acadia

site so that the contents could be used *offsite*." Dkt. 43 at 25 (emphasis in original); Dkt. 43-2 at

7; Dkt. 45.  "If Plaintiffs are allowed to use the CEI report to argue that remains from the Acadia

site may still be on the Sunshine property," FG argues, "the Court should also consider the proof

that the contents of that site were moved to a different property."  Dkt. 43 at 25.  The Court is not

admitting Plaintiffs' evidence to show that "remains from the Acadia site may still be on the

Sunshine property" but, rather, as background information relating to the adequacy of the Corps'

notice and whether it failed to consider an important factor.  As a result, there is no need to admit

FG's extra-record exhibit, and the Court will, accordingly, deny that motion.

## CONCLUSION

For these reasons, the Court hereby **DENIES** in part and **GRANTS** in part Plaintiffs'

motion to admit extra-record evidence, Dkt. 27.  The Court **ADMITS** the CEI report for the

limited purpose of providing background information to Plaintiffs' procedural claim as to

deficient notice from the Corps and whether the Corps, as a result, failed to consider an

important factor.  The Court declines to admit the remaining extra-record evidence offered by

Plaintiffs, Exhibits A–D and F–H.  Because the Court admits Plaintiffs' extra-record evidence in

a more limited fashion than contemplated by FG's cross-motion, the Court **DENIES** FG's

conditional cross-motion to add extra-record evidence, Dkt. 43; Dkt. 45.

**SO ORDERED**.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge


Date:  September 22, 2020